ALDON BOLANOS, ESQ., SBN. 233915
LAW OFFICES OF ALDON BOLANOS
925 G STREET
SACRAMENTO, CA 95814
PH.    916.446.2800
Fx.    916.446.2828
WWW.ALDONLAW.COM

Attorney for Edison Mayo

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EDISON MAYO,

    Plaintiff,

vs.

RECYCLE TO CONSERVE, INC,

    Defendants.

Case No.  2:10-cv-00629-WBS-EFB

**DECLARATION OF EDISON MAYO**

DATE:   April 11, 2011
TIME:   02:00 P.M.
DEPT:   05
JUDGE:  SCHUBB

I, Edison Mayo, declare as follows:

1. I am the plaintiff to this action and make this declaration on my own personal knowledge. If called I could and would testify competently to everything contained in this declaration.

2. Initially, I worked for Feed Commodities in about 1997 or 1998. Recycle to Conserve was initially called Dext. Then, in about 1999 or 2000 Dext bought Feed Commodities and the name changed to Recycle to Conserve. I am a truck driver with a Class A license in good standing and all endorsements. I have been a certified and licensed truck driver for approximately thirteen years. During my

1

entire career, I was never disciplined or written-up and every year I always received a raise. I also have received a bonus for good driving in 2006. During my entire career with the company, I was the only black driver.

3.  I had already been with the company Elwood the mechanic was hired. He started in about 2006 or 2007. From the very beginning we had problems. For example, he always referred to me by derogatory names, never calling me by name. He is from Louisiana, as am I. He would call me names like "coon-ass" and "coon-ass nigger." He did this very, very often. I can recall presently at least ten times he called me names of this nature. He also made derogatory slurs about and to other employees, for example calling another employee of Asian descent a "gook."

4.  As mechanic, Elwood was in charge of servicing my truck. However, he never repaired my truck in a timely fashion, and he often did poor work repairing my truck. In many instances, he simply refused to undertake needed repairs and I had to do the repairs myself or get the help of other employees. Things that went wrong with the truck included changing lights on the truck. As a driver, I was not supposed to do my own repairs. But Elwood refused to make these repairs on my truck. And on those occasions when he did actually perform the repairs, it took a very long time, days and weeks, for him to do the repairs.

5.  Another incident involved the truck overheating. I took the truck in for Elwood to repair. He never repaired it. I even went on vacation after giving Elwood the truck to repair, and let Sean O'Dahl know about the problem. Another driver also drove the truck, Kevin Christian, and it continued to have problems. When I got back, Elwood and Sean O'Dahl tried to blame me for allowing the truck to overheat and not bringing it in sooner. Kevin Christian is Caucasian, and he was not even blamed for causing the problem.

6.  O'Dahl refused to do his job as supervisor as far as Elwood and Elwood's actions toward me. If a white driver went to O'Dahl and asked for a repair or a

different truck, the white driver would get the work done. But whenever I brought my problems to O'Dahl about Elwood, he never did anything for me. I got the impression that he would only "go to bat" for the white drivers and employees, but not for me. I spoke with O'Dahl about Elwood on five or six occasions. O'Dahl never wrote up a statement, never asked me for a statement, and never took any action against Elwood. He would always only say "I will talk to him" or "I will take care of it" but he never did.

7. O'Dahl and I actually talked about how Elwood was racist against me. In fact, O'Dahl told me that Elwood was racist, and had some kind of mental problem, and that I should just "stay away" from him. We discussed this on at least three or four occasions when I would complain about Elwood. Again, nothing was ever done: no investigation, no statement taken, nothing. Just more of the same treatment from Elwood. I got the impression that if any white driver or employee had brought this to O'Dahl's attention, something would have been done. But nothing was ever done for me.

8. I got the feeling that O'Dahl was just playing all the sides to appear fair, when in reality he had no intention of helping me end the racial animus I was experiencing.

9. Elwood was the de facto supervisor. He always tried to tell everyone what to do. He always tried to tell me what to do. He acted like my supervisor. O'Dahl never countermanded any of Elwood's orders. Thus, to me it was like I had two supervisors: both Elwood and O'Dahl.

10. I got the feeling that Elwood and O'Dahl were close friends. O'Dahl never took any action against Elwood for anything he did to me. They often talked together privately and could be seen socializing at the yard.

11. I am familiar with the two accident rule. But in my opinion it was not applied fairly. I personally know of two other drivers who had two accidents and were not terminated under the two accident rule. They were white drivers. The

two other drivers are Ralph and Kevin Christian. Ralph had at least four accidents that I am personally aware of, and had failed a drug test after one of the accidents. But he was not terminated. Kevin Christian had four accidents as well. In fact, on one occasion he ran his truck into my vehicle. I had to take him to court for that. The company did nothing. No statements were taken. Kevin Christian is white. Elwood himself had several accidents driving company trucks. Nothing was ever done about it.

12.  On one occasion, Elwood backed into me with his truck into my company truck. The accident was on videotape in the company yard. But no report was ever made. No statements were ever taken. It seemed to me like whenever anyone else had an accident, no report was made. But whenever I had an accident, a report was made.

13.  On the date of the incident, I had been driving a very old trailer. Other drivers had complained about that trailer on multiple occasions. None of them wanted to drive it. O'Dahl forced me to use the trailer. Elwood said everything was fine on the truck. He had just worked on it a week or so before I had to use the truck. But the brakes just locked up on me. I was traveling below the speed limit and it was wet on the road. The brakes just locked up. Even when the truck was brought back to the yard, O'Dahl told me that it was likely the case that the truck just malfunctioned, and that the brakes locked. The brakes on the truck. Elwood's role. My information to O'Dahl.

14.  The trailer was only used for one route: the route to Cottage Bakery in Lodi, California. None of the other drivers wanted this route. So O'Dahl forced me to take it. Thus, I ended up with the older trailer that none of the other drivers wanted to use because it was the only trailer used for that route. Eventually the route was assigned to a sub-hauler because none of the other drivers wanted the route or to use the trailer. I was told by the driver that I trained (and who eventually took my job) that the sub-hauler would not use that trailer unless and

4

until the brakes on it were repaired, and he insisted they be repaired, and they were repaired.

15. Another example of what I believe was discrimination against me was that Kevin Christian, a white driver, had quit the company. When he quit, I had to assume his route and mine. No one was hired to replace him. No one was trained to take his place when he gave his notice. But then about a month later he decided to return. He got his old route back, the one he preferred, and I was forced to again take the route none of the other white drivers wanted. When he left, he received full severance and vacation and sick pay. Then he came back and picked right back up where he left off with all the accrued vacation and sick pay. He told me that himself.

16. Then, after my second accident, the company had me spend two weeks training someone else. I myself was still driving for three weeks. It seems to me that if they had really terminated me due to this policy, they would have done it immediately after the accident, not three weeks later. The fact that they did it three weeks later tells me the real reason they terminated me was due to my race, not due to the accident. When the training was complete, O'Dahl came to me and told me that I was fired for the accident that happened three weeks prior. I never received any severance package.

I declare on penalty of perjury under the laws of the United States that the foregoing is true and correct so help me God.

Dated: March 25, 2011     By: *Edison Mayo* (signature)
                          Edison Mayo