ALDON BOLANOS, ESQ., SBN. 233915
LAW OFFICES OF ALDON BOLANOS
925 G STREET
SACRAMENTO, CA 95814
PH.   916.446.2800
FX.   916.446.2828
WWW.ALDONLAW.COM

Attorney for Edison Mayo

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALFORNIA

EDISON MAYO,

    Plaintiff,

vs.

RECYCLE TO CONSERVE, INC,

    Defendants.

Case No. 2:10-cv-00629-WBS-EFB

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**

DATE:   April 11, 2011
TIME:   02:00 P.M.
DEPT:   05
JUDGE:  SCHUBB

## I.   INTRODUCTION

"This afternoon, following a series of threats and defiant statements, the presence of Alabama National Guardsmen was required on the University of Alabama to carry out the final and unequivocal order of the United States District Court of the Northern District of Alabama…This Nation was founded by men of many nations and backgrounds. It was founded on the principle that all men are created equal, and that the rights of every man are diminished when the rights of one man are threatened…It ought to be possible, in short, for every American to enjoy the privileges of being American without regard to his race or his color. In

1

short, every American ought to have the right to be treated as he would wish to be treated, as one would wish his children to be treated. But this is not the case."

--Speech of John F. Kennedy on July 11, 1963, announcing the submission of legislation to Congress that would become the Civil Rights Act of 1964.

## II.   STATEMENT OF FACTS

Plaintiff Edison Mayo, an African-American man, brings this case under Title VII of the Civil Rights Act of 1964, to remedy race discrimination he faced at the hands of his employer, Recycle to Conserve. The facts surrounding his case are fairly straightforward and are as follows:

Mayo was the only African-American driver with the company. SS 2. He was subjected to persistent racial discrimination in employment by both the company mechanic, Elwood, and his supervisor, O'Dahl. He was called a "coon-ass nigger" and "lazy, no-good nigger" repeatedly at work. <u>Declaration of Mayo</u>, paragraph 3, <u>Declaration of Serpo</u>, paragraph 3. When Mayo complained about his treatment by Elwood, and he complained repeatedly, his supervisor did nothing. SS 9, 10.

On October 13, 2009, Mayo was driving a very old trailer that was notorious for having bad brakes. The truck was used for only one route, and Mayo was forced to drive this route because none of the other white drivers wanted the route, and O'Dahl gave the best routes to the white drivers and the worst route(s) to Mayo, the lone black driver. Regarding the brakes, Elwood insisted the brakes were in perfectly good working order. <u>Mayo Declaration</u>, paragraphs 13, 14, SS 9.

On the date of the accident, Mayo was driving in a straight line, under the speed limit, in wet conditions, when the brakes just "locked up." The trailer of the big rig smashed into the cab, causing damage. Mayo called the accident in to the company and refused to drive the truck any further on account of the bad brakes.

Elwood came out and drove the truck back to the yard. <u>Mayo Declaration,</u> paragraph 13.

Once the truck was back at the yard, O'Dahl even admitted the accident was likely caused by faulty brakes. Subsequently, the route was given to a sub-hauler because none of the white drivers wanted the route. Notably, the sub-hauler himself refused to use the truck on account of its age and faulty brakes. After insisting they be repaired, the brakes were finally repaired. <u>Mayo Declaration</u>, paragraph 14.

Mayo continued to drive for the company for another three weeks, and even trained the person who would become his replacement (though he was not told this at the time). Most importantly, three other employees at the company, all Caucasian, had three or more accidents, and none of them were fired. But on October 30, 2009, Mayo was fired purportedly for violating the company's "two accident rule." SS 32, **Declaration of Mayo, paragraph 11**, Declaration of Bolanos, paragraph 3.

### III.  LAW AND ARGUMENT

A.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor. *Davis v. Team Elec. Co.*, 520 F. 3d 1080, 1089 (9th Cir. 2008). A plaintiff alleging employment discrimination need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record. <u>Id</u>. In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination

claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. Id.

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute, and in making this determination, the court resolves all ambiguities in favor of the non-movant and draws all reasonable inferences against the moving party. *American International Group, Inc. v. London American International Corp.*, 664 F. 2d 349, 351 (2d Cir. 1981), see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As set forth below, it is clear the defense cannot meet its heavy burden in this employment discrimination case because the basic facts related to Mr. Mayo's treatment are hotly disputed. They require a trier of fact.

### B. RACE DISCRIMINATION – DISPARATE TREATMENT

The *McDonnell-Douglas* burden shifting analysis has three steps. First, the employee must establish a *prima facie* case of discrimination. If he does, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. Finally, if the employer satisfies this burden, the employee must show that the reason is pretextual, either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence. *Davis v. Team Elec. Co.*, 520 F. 3d 1080, 1089.

Mayo establishes a *prima facie* case of disparate treatment discrimination by showing that 1) he belongs to a protected class; 2) he was qualified for his position; 3) he was subject to an adverse employment action; and 4) similarly situated individuals outside his protected class were treated more favorably. Id. "The requisite degree f proof necessary to establish a prima facie case for Title VII claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence. Id.

Here, Mr. Mayo is undisputedly a member of a protected class: African-American, and he undisputedly suffered an adverse employment action: he was terminated. He has also submitted evidence that he was qualified for the position of driver (having held the position for over ten years and holding a Class A license in good standing at all times), and that other employees – the white employee/drivers – were treated differently and preferentially.

Thus, it is clear the only issue on summary judgment is whether a reasonable jury could find that the purportedly legitimate reason for Mr. Mayo's termination, application of the company's "two accident rule," is in fact a mere pretext for race discrimination.

On the issue of pretext, Mayo may offer evidence, direct or circumstantial, that a discriminatory reason more likely motivated the employer to make the challenged employment decision. *Davis* at 1091. Alternatively, an employee may offer evidence that the employer's proferred explanation is unworthy of credence. Id. Employees may rely on both circumstantial and direct evidence because defendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence. Id. In the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more or better evidence than a plaintiff who relies on direct evidence. Id.

A single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer. *Davis* at 1092. The allegation that similarly-situated white employees were treated more favorably is itself probative of pretext. *Davis* at 1093.

Mayo has established a genuine factual issue with regard to RTC's motive in terminating him. He cites evidence of numerous instances in which white drivers were treated with preference over him, the lone black driver. White

drivers received the better routes, the better trucks, and better and faster repairs on their trucks. White drivers were able to rest easy in the knowledge that if they were in an accident, or even three or four accidents, they would not be terminated under the "two accident rule." The white mechanic was secure in his knowledge that he could express virulent anti-black animus toward Mayo and the white supervisor, O'Dahl, would do nothing about it, despite Mayo's complaints. In fact, O'Dahl persistently sided with white employees against Mayo and refused to hear, consider, or act on any and all of Mayo's many, many complaints.

Moreover, pretext is also shown by the fact that Mayo continued to drive for three weeks after he had the accident. Presumably, if RTC had actually terminated him for the accident, it would have done so immediately after the accident, and not waited and allowed Mayo to continue to drive for the company. It is clear that the real reason Mayo was terminated was not due to the accident, but was due instead to the color of his skin.

### C.   RETALIATION

#### *1.   Prima Facie Case*

Administrative claims are to be construed broadly in the Title VII context. Davis at 1091. The elements of a *prima facie* retaliation claim are 1) the employee engaged in a protected activity; 2) she suffered an adverse employment action, and 3) there was a causal link between the protected activity and the adverse employment action. *Davis* at 1094. Causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. Id.

Here, Mayo made repeated and persistent complaints to O'Dahl that Elwood was engaging in race-based discrimination against him. He was not repairing his truck, he was calling him names on the job such as "lazy no good nigger" and "coon ass nigger" and O'Dahl consistently did nothing. The

complaints themselves are protected activity because Mayo was engaging in the opposition of violations of both state and federal law which prohibit a hostile work environment and prohibit race-based discrimination in employment. In response, he was terminated at the first opportunity by a supervisor who engaged in repeated instances of racial favoritism toward his white drivers in terms of routes, compensation, and vehicles, and who persistently failed to investigate or remedy any of Mayo's complaints, instead relating that he knew Elwood was "a racist" and to just let him "take care of it" or "talk" to him. But nothing was ever done and the pattern of oppressive conduct continued. Mayo Declaration, paragraphs 4-8.

2.  *Exhaustion*

Federal courts consider all claims to the extent they are reasonably related to those that the plaintiff did assert in a timely administrative charge. *Mathirampuzha v. Potter*, 548 F. 3d 70, 75. The exhaustion requirement is relaxed under the reasonably related doctrine if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. Id. This inquiry requires a fact-intensive analysis to determine whether the complaint filed gave the agency adequate notice to investigate discrimination on both bases. Id. The primary purpose of the administrative charge is to alert the administrative agency to the discrimination the employee claims he is suffering.

A good example is *Deravin v. Kerik*, 335 F. 3d 195, 200 (2nd Cir. 2003). In *Deravin*, the court concluded that a race discrimination charge was reasonably related to a charge of national-origin discrimination because "read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial discrimination in addition to illegitimate preference premised on national origin."

*Deravin* at 202. In an unrelated context the Supreme Court has described hostile work environment claims as follows: Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115.

*Mathirampuzha* can be distinguished here because in that case only a single act of discrimination was alleged – aggressive behavior on September 29, 2003. *Mathirampuzha* at 75. It the court's ruling against plaintiff – the single instance was a deciding factor: "We do not think that the plaintiff's allegation of a single incident of aggression by Sacco could reasonably be expected to blossom into an investigation covering allegations of unrelated misconduct by Sacco dating back several years." Id.

Here, Mayo's complaint about persistent race discrimination even in the face of repeated complaints clearly relates to a claim for retaliation for opposing race discrimination. Thus, under the relaxed relation standard the claim should not be barred under any exhaustion theory, and rather should be decided on its merits.

D.  LABOR CODE SECTION 1102.5

Defendants read this section too narrowly as requiring a reporting to a governmental agency. Instead, California *Labor Code* §1102.5 makes it unlawful for an employer to retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. *Labor Code* §1102.5(c).

Here, the employees protested against violations of *Title VII of the Civil Rights Act of 1965*, as well as violations of California's *Fair Employment and*

*Housing Act.* After the employees protested against this activity, they were subject to withering retaliation, as described above. Also, there is absolutely no requirement under California law that a party first file a complaint with the California Labor Commissioner before bringing a claim for violation of Labor Code §1102.5. On the contrary, the sole case cited by Reynolds which purports to make this holding, Ortiz v. Lopez, dealt with a public employee of a municipality and the requirement that he file a claim under the California Tort Claims Act. The Ortiz court cites to another case, Creighton v. City of Livingston, 628 F. Supp. 2d 1199, which dealt with another city employee making a wage and hour claim.

Contrast the defense position with *Lund v. Leprino Foods Co.*, 2007 WL 1775474, <u>*a case heard before this very court*</u>, where the court recognized there is no "mandatory or exclusive" requirement to file any claim with the Labor Commission, and that "a plaintiff merely has to exhaust her administrative remedies in some manner (in that case via the DFEH and EEOC). Any number of avenues may be used to exhaust them [administrative remedies]."

Moreover, regardless of administrative exhaustion, a plaintiff may still maintain a common law wrongful termination in violation of public policy claim. *Stevenson v. Superior Court of Los Angeles*, 16 Cal. 4th 880, 905.

Here, the plaintiffs were not government employee, and bring their claims under *Labor Code* section 1102.5(c). Not (b). Moreover both plaintiffs did in fact exhaust administrative remedies with the Equal Employment Opportunity Commission. The wrongful termination cause of action must be permitted to remain part of this case.

## IV.   CONCLUSION

The court must zealously guard the right of a Title VII plaintiff to a jury trial on the merits of his claim. Here, it is clear that substantial evidence supports Mr. Mayo's claim that he was treated differently from the white employees, and

he was purportedly fired for violating a policy that several white drivers had repeated violated without suffering any repercussion. He was subjected to withering racism in both word and deed throughout his employment by Elwood, and he received absolutely no support or protection from O'Dahl, who himself engaged in a more subtle form of racism by favoring the white drivers over the lone black one. Mr. Mayo, an American, deserves his day in court.

DATED: MARCH 25, 2011            LAW OFFICES OF ALDON BOLANOS

                                 */s/ Aldon Bolanos*
                                 ALDON L. BOLANOS, ESQ.
                                 ATTORNEY FOR PLAINTIFF
                                 EDISON MAYO