UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

EDISON MAYO,

        Plaintiff,

    v.

RECYCLE TO CONSERVE, INC.,

        Defendant.
_____/

NO. CIV. 2:10-629 WBS EFB

MEMORANDUM AND ORDER RE:
MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION OF CLAIMS

----oo0oo----

        Plaintiff Edison Mayo brought this action alleging race discrimination and retaliation against defendant Recycle to Conserve, Inc. ("RTC").  Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

I.   <u>Factual and Procedural Background</u>

        Plaintiff, who is African-American, was a truck driver for defendant or its predecessor from 1997 or 1998 to October 30, 2009, when he was involuntarily terminated.  (Mayo Decl. ¶ 2 (Docket No. 24); Bolanos Decl. ¶ 3, Ex. 2 (plaintiff's employee separation notice) (Docket No. 25).)  Defendant purportedly

terminated plaintiff because he was involved in a second driving accident in violation of defendant's accident policy.  (Odahl Decl. in Supp. of Def.'s Mot. ("Odahl Decl.") ¶¶ 4-11 (Docket No. 9-4); McMullin Decl. in Supp. of Def.'s Mot. ("McMullin Decl.") ¶¶ 3-6 (Docket No. 9-5).)

Defendant, a nationwide company with multiple facilities, employed plaintiff at its Stockton, California, facility, at which fifteen to twenty employees worked.  (Kennaday Decl. in Supp. of Def.'s Mot. ("Kennaday Decl.") Ex. A ("Mayo Dep. Tr.") at 73:4-6, 74:14 (Docket No. 9-6).)  Plaintiff was one of only three drivers employed at that facility and the only African-American driver.  Two non-driver employees at the Stockton facility were also African-American.  (Odahl Decl. ¶ 3; Mayo Dep. Tr. at 73:24-74:2.)

In 2006 or 2007, defendant hired a Caucasian mechanic, Elwood Lindsey,[1] for the Stockton facility.  (Mayo Decl. ¶ 3.) Lindsey, whose responsibilities included servicing plaintiff's truck, called plaintiff names such as "coon-ass" and "coon-ass nigger." (Original[2] Mayo Decl. ¶¶ 3-4 (internal quotation marks

---

[1]    The record contains two spellings of this name: Lindsey and Lindsay.  Because declarations submitted by defendant use "Lindsey," (see Docket Nos. 9-4, 9-5), the court will also use this spelling.

[2]    At the hearing on defendant's motion, plaintiff requested, and the court granted, additional time to oppose the motion.  (Docket No. 21.)  Plaintiff then filed a new opposition memorandum, a new declaration by plaintiff, a new declaration by plaintiff's counsel, and a statement of undisputed facts. (Docket Nos. 22-25).  Defendant filed a new reply memorandum, supplemental evidentiary objections, and a new reply regarding its statement of undisputed facts.  (Docket No. 26.)  The court then took the motion under submission.
The new declaration by plaintiff is nearly identical to

omitted) (Docket No. 10); <u>see also</u> Mayo Dep. Tr. at 53:23-55:1,
57:21-58:10 (discussing name calling); <u>id.</u> at 52:2-15 (describing
incident in which Lindsey threw chain at plaintiff's feet instead
of handing it to plaintiff); Serpa Decl. ¶ 6 ("On many occasions
[Lindsey] would engage in the practice of bringing things to
[plaintiff] and then dropping them at his feet, and then looking
at [plaintiff] like [plaintiff] needed to pick it up.") (Docket
No. 11); Mayo Dep. Tr. at 53:23-55:1 (describing incident in
which plaintiff went into the shop and Lindsey "cuss[ed]
[plaintiff]," called him "[c]oon ass," told him to get out of the
shop, "thr[ew] things," "slamm[ed]" his toolbox, and "shoved in
doors").)

    Plaintiff states that Lindsey called him names such as
"coon-ass" and "coon-ass nigger" "very, very often" and
specifically recalls at least ten times.  (Original Mayo Decl. ¶
3 (internal quotation marks omitted in first and second
quotations).)  A co-employee, Joseph Serpa, states that Lindsey

---

the declaration by plaintiff originally submitted in opposition
to the motion, with only one significant difference: Plaintiff's
original declaration states that Lindsey called him "coon-ass"
<u>and</u> "coon-ass nigger," whereas the new declaration states only
that Lindsey called him "coon-ass."  (<u>Compare</u> Original Mayo Decl.
¶ 3 (Docket No. 10), <u>with</u> Mayo Decl. ¶ 3 (Docket No. 24).)
    It is not clear whether plaintiff intended his new
declaration to be the same as the original declaration or to
supplement or amend it.  The court is guided by plaintiff's
counsel's citation to the original declaration in the new
opposition memorandum, specifically the "coon-ass nigger" term.
(Pl.'s Mem. in Opp'n at 3:22-23 ("He was called a 'coon-ass
nigger' . . . .") (Docket No. 22).)  Thus, the court will treat
both the original and new declarations as operative.
    The court will treat the declaration by plaintiff's co-
employee Joseph Serpa, (Docket No. 11), as still operative, even
though plaintiff did not file it for a second time, because
plaintiff's counsel cites Serpa's declaration in the new
opposition memorandum.  (Pl.'s Mem. in Opp'n at 3:22-25.)

would "always talk badly about [plaintiff]" and referred to him as a "lazy, no-good nigger" approximately five to ten times in Serpa's presence.  (Serpa Decl. ¶ 3 (internal quotation marks omitted in second quotation).)

According to plaintiff, Lindsey also failed to properly service plaintiff's truck:

> [H]e never repaired my truck in a timely fashion, and he often did poor work repairing my truck.  In many instances, he simply refused to undertake needed repairs and I had to do the repairs myself or get the help of other employees.  Things that went wrong with the truck included changing lights on the truck.  As a driver, I was not supposed to do my own repairs.  But [Lindsey] refused to make these repairs on my truck.  And on those occasions when he did actually perform the repairs, it took a very long time, days and weeks, for him to do the repairs.

(Mayo Decl. ¶ 4; <u>see also</u> Mayo. Dep. Tr. at 60:13-62:6 (describing one occasion in which plaintiff was not able to use a particular truck for approximately three weeks because Lindsey did not repair it).)

Plaintiff claims that the Caucasian drivers received better repairs:

> I would see the white drivers take their trucks in for repair, and then I would see the trucks come out of the repair shop after repairs were done.  From this, I am able to conclude that their trucks were repaired, whereas my truck never went into the repair shop to begin with, despite my request for repairs.

(Supplemental Mayo Decl. ¶ 3 (Docket No. 17).)

In the summer of 2007 or 2008, plaintiff first complained about Lindsey to the general manager of the Stockton

4

facility, Sean Odahl,[3] a Caucasian.  (Mayo. Dep. Tr. at 51:6-7.)
The parties agree that plaintiff complained to Odahl, but
disagree on whether plaintiff complained that Lindsey's conduct
related to plaintiff's race.

Plaintiff claims that he complained to Odahl that
Lindsey "was racist against" plaintiff:

> O'Dahl and I actually talked about how [Lindsey] was
> racist against me.  In fact, O'Dahl told me that
> [Lindsey] was racist, and had some kind of mental
> problem, and that I should just "stay away" from him.  We
> discussed this on at least three or four occasions when
> I would complain about [Lindsey].

(Mayo Decl. ¶ 7; <u>see also</u> Mayo Dep. Tr. at 50:4-51:24, 58:20-22
(discussing complaining about Lindsey's "racist way" to Odahl),
52:16-53:20 (discussing complaining to Odahl about the chain
incident), 53:21-54:5, 55:2-7 (discussing complaining to Odahl
about Lindsey telling plaintiff to leave the shop).  <u>But see</u> Mayo
Dep. Tr. at 55:2-7 (acknowledging that in complaining to Odahl
about Lindsey telling plaintiff to leave the shop he did not tell
Odahl that Lindsey called him "coon ass"), 58:20-22
(acknowledging that he never told anyone in management that
Lindsey had said "coon ass").  Plaintiff states that Odahl never
took a statement from him and Lindsey's mistreatment continued.
(Mayo Decl. ¶ 7.)

Plaintiff also reported to Odahl on five or six
occasions that Lindsey did not properly service plaintiff's
truck.  (Mayo Decl. ¶ 6; <u>see also</u> Mayo Dep. Tr. at 60:13-62:9
(discussing complaining to Odahl about Lindsey's failure to

---

[3]  Plaintiff and Serpa's declarations incorrectly spell
Odahl's name as "O'Dahl."

5

repair truck for three weeks).)   According to plaintiff, Odahl never took a statement from plaintiff and "would always only say 'I will talk to him' or 'I will take care of it.'" (Mayo Decl. ¶ 6.)   Plaintiff claims that Lindsey continued to refuse to properly repair his truck despite his complaints to Odahl.   (<u>Id.</u>)

Not only did Odahl fail to take a statement from plaintiff when he complained about Lindsey's failure to repair his truck, plaintiff also perceived that Odahl was "getting annoyed": "It's just the way he was acting when I would come in and complain about this.   I'll take care of it.   It's nothing to it."   (Mayo Dep. Tr. at 60:11-15; <u>see also</u> <u>id.</u> at 61:14-21 (describing Odahl's responses to multiple complaints about Lindsey's failure to repair truck for three weeks).)

With respect to Lindsey's authority and relationship with Odahl, plaintiff states:

> [Lindsey] always tried to tell everyone what to do.   He always tried to tell me what to do.   He acted like my supervisor.   O'Dahl never countermanded any of [Lindsey's] orders.   Thus, to me it was like I had two supervisors: both [Lindsey] and O'Dahl.
>
> I got the feeling that [Lindsey] and O'Dahl were close friends. . . . They often talked together privately and could be seen socializing at the yard.

(Mayo Decl. ¶¶ 9-10.)   Serpa, plaintiff's co-employee, states that Lindsey "acted like he was the boss, like he had authority over Sean O'Dahl. [Lindsey] would often try and give us orders and tell us what to do."   (Serpa Decl. ¶ 3.)

In his declaration, Odahl acknowledges that plaintiff complained to him about Lindsey "on several occasions." (Odahl Decl. ¶ 7.)   Odahl states that plaintiff did not complain that Lindsey's conduct was related to plaintiff's race:

> The nature of Mr. Mayo's complaints were that he and Mr. Lindsey were having a disagreement of some sort, or that Mr. Lindsey was not fixing his truck as quickly as Mr. Mayo would like.  Mr. Mayo never advised me that Mr. Lindsey had made any comments of a racial nature to him, nor did Mr. Mayo indicate that he believed Mr. Lindsey's actions toward him were based upon his race.

(Id.)  Odahl's declaration does not address how, if at all, he responded to those "several" complaints that Odahl acknowledges he received.

In addition to his termination, plaintiff points to other instances in which Odahl discriminated against him based on race during the course of his employment.  Plaintiff claims that Lindsey and Odahl "tried to blame [plaintiff] for allowing the truck to overheat and not bringing it in sooner." (Mayo Decl. ¶ 5.)  Plaintiff also claims that Odahl assigned the Caucasian drivers better routes and better trucks.  (Id. ¶¶ 13-15.)

In August of 2005, defendant implemented a policy related to accidents:

> Simply stated, if you are involved in two (2) accidents involving property damage or injury while operating company equipment, your employment may be terminated. This is in addition to the existing "zero-tolerance" drug policy, which includes the provision that a positive result from a single post-accident drug test can result in termination as well.

(McMullin Decl. Ex. A.)  While the policy does not appear to expressly contemplate whether an accident was a fault or no-fault accident, the "may" in the policy's language suggests that termination was permissive following two accidents.

In June of 2007, plaintiff was involved in an accident in which "the box" fell off of his truck when he turned left at a traffic light.  (Odahl Decl. ¶ 4, Ex. A.)  It appears from the evidence that Robert Standert, not Odahl, was the general manager

7

of the Stockton facility at the time of the first accident. While plaintiff testified that he understood that the accident counted as one accident under the accident policy, he testified that he did not think that after the 2007 accident a second accident could result in his termination.  Plaintiff's reasons were that the accident was not his fault because "the box" was not appropriate for the truck and "there were other people that had plenty of accidents that were not terminated."  (See Mayo Dep. Tr. 21:10-23:25 (discussing first accident).)

On October 13, 2009, plaintiff was involved in a second accident in which the "tractor jackknifed into the attached trailer."  (Odahl Decl. ¶ 5, Ex. B; see also Mayo Dep. Tr. at 27:13-25 (discussing second accident); Mayo Decl. ¶¶ 13-14 (same)).  The accident occurred when plaintiff was driving below the speed limit, at twenty-five miles per hour, and breaking as he approached a red light in wet or rainy conditions. Plaintiff's position is the accident was not his fault because the breaks were faulty and locked when he pressed them.

Plaintiff refused to drive the truck back to the facility and Lindsey was dispatched to inspect the truck and drive it back.  Plaintiff claims that a week before the accident Lindsey had worked on the truck and had told plaintiff everything was "fine."  (Mayo Decl. ¶ 13.)  As evidence that the accident was not his fault and that the breaks were faulty, plaintiff states that he was told by another driver that the "sub-hauler" who assumed that route and truck following plaintiff's accident refused to drive the truck until the breaks were fixed, and they were then fixed.  Plaintiff and the other drivers had also

8

previously discussed that the truck had problems.

Plaintiff states that when he returned to the facility on the day of the second accident Odahl told plaintiff "that it was likely the case that the truck just malfunctioned, and that the brakes locked up." (Id. ¶ 13.)  Nonetheless, Odahl in his Supervisor's Incident Investigation Report places the blame on plaintiff:

> Excessive braking in rainy conditions was the cause of this accident.  Of which the driver operating the vehicle has total control.  Given the fact that another driver operated this very same vehicle after the incident in the same rainy conditions safely, [sic] indicates that excessive breaking and possible negligence was the root cause of the accident.

(Odahl Decl. Ex. B.)  According to Odahl's report, Lindsey did not find any mechanical problems with the truck.  (Id.)

Plaintiff claims he was not aware during the days following the accident that he could be terminated.  (See Mayo Decl. ¶ 16.)  Defendant allowed plaintiff to continue driving for over two weeks following the accident and to train a new driver. (Id.)  However, Odahl initiated plaintiff's termination following the accident:

> Following Mr. Mayo's second accident, I determined that Mr. Mayo had violated RTC's two-accident policy and recommended that his employment be terminated based upon his violation of that policy.  I made my recommendation to Robert McMullin, RTC's President.

(Odahl Decl. ¶ 6.)  Based upon Odahl's recommendation, president of defendant, Robert McMullin, approved the termination of plaintiff.  (McMullin Decl. ¶¶ 3-5.)  McMullin states that he approved the termination based on plaintiff's violation of the accident policy.  (Id.)  On October 30, 2009, over two weeks following the accident, Odahl informed plaintiff of his

9

termination.  (See generally Mayo Dep. Tr. 45:1-46:19 (discussing termination meeting.)

Plaintiff claims that the accident policy was applied differently to him than to other drivers.  Plaintiff's declaration states that he is "personally aware" of four accidents involving Caucasian driver Ralph Lantz and a failed drug test following one of them, four accidents involving Caucasian driver Kevin Christian,[4] including one in which Christian "ran his truck into [plaintiff's] vehicle," and several accidents involving Caucasian mechanic Lindsey driving defendant's trucks.  (Mayo Decl. ¶ 11.)  On one occasion, Lindsey "backed into [plaintiff] with his truck into [plaintiff's] company truck."  (Id. ¶ 12.)  Plaintiff claims that defendant did not even take a statement from him following the two accidents in which his vehicle was hit.  Odahl disagrees that the policy was applied unevenly and states that only Lantz was involved in one accident following implementation of the policy.  (Odahl Decl. ¶ 8.)

On March 16, 2010, plaintiff filed the instant action.  (Docket No. 2.)  Plaintiff alleges claims for race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).  Plaintiff also alleges a claim for violation of California Labor Code section 1102.5(c).  See Cal. Labor Code § 1102.5(c).

II.  Discussion

---

[4]     The record contains multiple spellings of this name: Christian, Christiansen, and Christianson.  Plaintiff's declaration uses "Christian."  The court will also use "Christian."

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must

11

view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  <u>Id.</u> at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  <u>Id.</u>

A.   <u>Evidentiary Objections</u>

Federal Rule of Civil Procedure 56, as amended on December 1, 2010, now states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  The Advisory Committee notes to the amended rule explain that an objection to evidence on a motion for summary judgment "functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  <u>Id.</u> advisory committee's notes on 2010 amendments.  A party may also object to summary judgment evidence based on the "sham affidavit rule."[5]

---

[5]    "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991).  "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  <u>Id.</u> (quoting <u>Foster v. Arcata Assocs., Inc.</u>, 772 F.2d 1453, 1462 (9th Cir. 1985)) (alteration in original) (internal quotation marks omitted).
The sham affidavit rule may be invoked only if a district court makes "a factual determination that the contradiction was actually a 'sham'" and "the inconsistency between a party's deposition testimony [or interrogatory response] and subsequent affidavit . . . [is] clear and

12

1    Following the filing of defendant's thirteen objections

2  to plaintiff's original declaration and eight objections to

3  plaintiff's co-employee Serpa's declaration, (Docket No. 15-1),

4  the court continued the hearing and allowed plaintiff to file a

5  response to the objections.  (Docket Nos. 16-18.)  The court

6  allowed defendant to file a reply to plaintiff's response.[6]

7  (Docket No. 19.)

8         1.  Plaintiff's Original Declaration

9    Defendant objects to statements in plaintiff's original

10 declaration pursuant to evidentiary rules governing personal

11 knowledge, relevance, hearsay, legal conclusions, conclusory

12 statements, and sham affidavits.  Based on evidentiary rules

13 governing personal knowledge and hearsay, the court sustains in

14 full objections 3 and 7 and sustains in part objections 4-5, 8,

15 and 9 to plaintiff's original declaration.[7]  The court overrules

16

17 unambiguous."  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998
   (9th Cir. 2009) (quoting Kennedy, 952 F.2d at 267) (internal

18 quotations marks omitted in first quotation).  Accordingly, "the
   non-moving party is not precluded from elaborating upon,

19 explaining or clarifying prior testimony elicited by opposing
   counsel on deposition; minor inconsistencies that result from an

20 honest discrepancy, a mistake, or newly discovered evidence
   afford no basis for excluding an opposition affidavit."  Messick

21 v. Horizon Indus., Inc., 62 F.3d 1227, 1231 (9th Cir. 1995).

22     [6]   Defendant withdrew in part objection 2 to plaintiff's
   original declaration.  Plaintiff withdrew plaintiff's

23 objectionable statement in response to objection 12.
       Defendant withdrew objection 1 to Serpa's declaration.

24 Plaintiff expressly withdrew a statement in response to objection
   2.  The court finds that plaintiff implicitly withdrew Serpa's

25 statements in response to objections 6-8 because plaintiff did
   not respond to the objections despite expressly acknowledging

26 these three objections in his response.

27     [7]   The court sustains the objections to the following
   statements in plaintiff's original declaration: (1) "[a]nother

28 driver also drove the truck, Kevin Christian, and it continued to
   have problems" and "Kevin Christian is Caucasian, and he was not

1  defendant's objections to plaintiff's original declaration in all
2  other respects.

3       While the court declines to address each objection in
4  detail, two statements, objections to which the court overrules,
5  are particularly important to defendant's motion and warrant
6  analysis.  First, defendant objects to the following statement
7  based on the sham affidavit rule:

> O'Dahl and I actually talked about how [Lindsey] was
> racist against me.  In fact, O'Dahl told me that
> [Lindsey] was racist, and had some kind of mental
> problem, and that I should just "stay away" from him.  We
> discussed this on at least three or four occasions when
> I would complain about [Lindsey].

12  (Original Mayo Decl. ¶ 7.)

13       Defendant fails to recognize that, while plaintiff
14  testified that he did not use the "exact words," he told Odahl
15  that "[Lindsey] was coming at [plaintiff] in a negative way, in
16  a, in a <u>racist way</u>."  (<u>Id.</u> at 50:6-11 (emphasis added).)
17  Plaintiff also testified that he told Odahl that Lindsey was
18  saying things "he shouldn't be saying" and "talking to
19  [plaintiff] in a, in a bad way," and that Odahl just told him to

20

21  ─────────────────────────

even blamed for causing the problem"; (2) "[i]f a white driver
went to O'Dahl and asked for a repair or a different truck, the
white driver would get the work done"; (3) "O'Dahl never . . .
took any action against [Lindsey in response to my complaints
about repairs]"; (4) "whenever I brought my problems to O'Dahl
about [Lindsey's failure to repair my truck], he never did
anything for me"; (5) "nothing was ever done [in response to my
complaints to Odahl that Lindsey was racist against me]: no
investigation, . . . ., nothing"; (6) "O'Dahl never took any action
against [Lindsey] for anything he did to me"; (7) "[t]he company
did nothing [when Kevin Christian ran his truck into my vehicle].
. . . Nothing was ever done about it [when Lindsey had several
accidents driving company trucks]"; and (8) "no report was ever
made [when Lindsey ran his truck into plaintiff's company
truck]."  (Original Mayo Decl. ¶¶ 5-7, 10-12, 16.)

14

not "worry about him, just play him off, stay away from him the
best [plaintiff] [could]." (<u>Id.</u> at 50:1-3.)  When defendant's
counsel asked if plaintiff "just" told Odahl that Lindsey was
"making negative comments," plaintiff agreed but added: "You
know, [Odahl] got my point on how I said it.  I mean, he knew
what I was talking about. . . . His response was, you know, just
stay away from him, that's kind of how he is." (<u>Id.</u> at 50:15-
25.)  In sum, plaintiff declaration statement that he told Odahl
that Lindsey "was racist against" plaintiff is not in direct
contradiction to his deposition testimony. (<u>See</u> Original Mayo
Decl. ¶ 7.)

Moreover, the number of times that plaintiff complained
about Lindsey's racism, three or four times according to
plaintiff's original declaration, is not in direct contradiction
to his deposition testimony.  "[T]he non-moving party is not
precluded from elaborating upon, explaining or clarifying prior
testimony elicited by opposing counsel on deposition." <u>Messick</u>
<u>v. Horizon Indus., Inc.</u>, 62 F.3d 1227, 1231 (9th Cir. 1995).

Second, defendant objects to plaintiff's statement
relating to Lantz's and Christian's accidents based on the sham
affidavit rule, personal knowledge, and hearsay:

> I personally know of two other drivers who had two
> accidents and were not terminated under the two accident
> rule.  They were white drivers.  The two other drivers
> are Ralph and Kevin Christian.  Ralph had at least four
> accidents that I am personally aware of, and had failed
> a drug test after one of the accidents.  But he was not
> terminated.  Kevin Christian had four accidents as well.

(Original Mayo Decl. ¶ 11.)

Defendant's sham affidavit rule objection is based on
plaintiff providing a different number of accidents involving

15

1  Lantz and Christian at the deposition.   However, "the non-moving
2  party is not precluded from elaborating upon, explaining or
3  clarifying prior testimony elicited by opposing counsel on
4  deposition."  <u>Messick</u>, 62 F.3d at 1231.

5        The court declines to find that plaintiff lacks
6  personal knowledge when plaintiff testified at the deposition
7  that Lantz and Christian told him about their accidents.  (<u>See</u>
8  Mayo Dep. Tr. at 68:13-15, 69:8-10.)  In his supplemental
9  declaration following defendant's objections, plaintiff also
10 states: "I talked with these other drivers about their accidents.
11 We talked when we were at the yard, or on break." (Supplemental
12 Mayo Decl. ¶ 5.)  While plaintiff may not have personal knowledge
13 that the accidents in fact occurred, plaintiff has personal
14 knowledge that Lantz and Christian told him about their
15 accidents.

16        Lastly, with respect to whether plaintiff's statement
17 contains inadmissible hearsay, there appears to be a number of
18 ways in which the evidence could be presented in an admissible
19 form at trial.  First, plaintiff states in his supplemental
20 declaration: "I also know that these individuals do not want to
21 jeopardize their place in the company, but that if they are
22 forced to testify, that they would testify truthfully about their
23 accidents." (Supplemental Mayo Decl. ¶ 5.)  Second, plaintiff's
24 original declaration states that he observed first-hand one of
25 Christian's accidents because Christian "ran his truck into
26 [plaintiff's] vehicle." (Original Mayo Decl. ¶ 7.)

27        Third, Lantz's and Christian's out of court statements
28 about their accidents could be admissible as an admission by a

1   party-opponent.  Federal Rule of Evidence 801(d)(2)(d) provides

2   that a statement is not hearsay if it is offered against a party

3   and is "a statement by the party's agent or servant concerning a

4   matter within the scope of the agency or employment, made during

5   the existence of the relationship."  Fed. R. Evid. 801(d)(2)(d).

6          Fourth, even if the statements were not admissions by a

7   party-opponent, plaintiff could offer them for the limited

8   purpose of showing that defendant was <u>on notice</u> of the accidents,

9   not for the truth of the matter asserted, i.e., whether the

10  accidents in fact occurred.  <u>See</u> <u>id.</u> 801(c).

11             2.   <u>Serpa's Declaration</u>

12         Defendant objects to statements in the declaration of

13  plaintiff's co-employee Serpa based on evidentiary rules

14  governing hearsay, personal knowledge, and conclusory statements.

15  The court sustains the contested objections, objections 3-5, for

16  lack of personal knowledge.

17             3.   <u>Supplemental Objections</u>

18         In connection with its new reply, defendant filed

19  "supplemental" objections to plaintiff's new declaration, Serpa's

20  declaration, and plaintiff's counsel's new declaration, although

21  defendant acknowledges that the objections only "reiterate its

22  evidentiary objections in relation to the 'new,' but

23  substantially unchanged, submissions by Plaintiff."  (Def. RTC's

24  Supplemental Evidentiary Objections at 1:21-22 (Docket No. 26-

25  2).)

26         Defendant's objections to plaintiff's new declaration

27  merely repeat the same objections it made to plaintiff's original

28  declaration, which is understandable because the two declarations

1  are nearly identical.  The only truly supplemental objection to

2  plaintiff's new declaration is based on the assumption that

3  plaintiff's original declaration has been superseded.  (See Def.

4  RTC's Supplemental Evidentiary Objections at 4:14-5:1 (objecting

5  to plaintiff's statement that Lindsey called him "coon ass"

6  because plaintiff's original declaration states that plaintiff

7  called him "coon-ass" and "coon-ass nigger").)  However, because

8  plaintiff's counsel cites the original declaration in his new

9  opposition memorandum, (see Pl.'s Mem. in Opp'n at 3:22-23

10  (Docket No. 22)), the court treats both plaintiff's original and

11  new declaration as operative.

12       Defendant's objections to Serpa's declaration are

13  identical to objections upon which the court has previously

14  ruled.

15       The only other truly supplemental objection is to

16  plaintiff's counsel's new declaration statement[8] describing an

17  attached exhibit.  Based on the original document rule, the court

18  sustains this objection.

19   B.   Merits

20       Plaintiff's claims for race discrimination and

21  retaliation under Title VII are subject to the McDonnell Douglas

22  burden-shifting analysis used at summary judgment to determine

23  whether there are triable issues of fact for resolution by a

24  jury.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

25  _____

26       [8]   Plaintiff's counsel states: "plaintiff discovered a
   court-filed document from San Joaquin County Superior Court in
27  which one of the company's Caucasian drivers, Kevin Christian,
   was involved in an accident while on company time, and using a
28  company truck, causing property damage . . . ."  (Bolanos Decl. ¶
   6 (Docket No. 25).)

Under <u>McDonnell Douglas</u>,

> a plaintiff must first establish a prima facie case of discrimination [or other illegal conduct].  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action.  If the employer meets this burden, the presumption of intentional discrimination [or other illegal conduct] disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

<u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 50 n.3 (2003) (citations omitted).  "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."[9] <u>Chuang v. Univ. of Cal. Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998)).

   1.   <u>Race Discrimination</u>

   Plaintiff has the burden of establishing a prima facie

---

   [9]   Earlier case law suggests that circumstantial evidence to show pretext must be "specific" and "substantial." <u>See e.g.</u>, <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1222 (9th Cir. 1998). The "specific" and "substantial" evidence requirement has been questioned in light of <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003), in which the Supreme Court recognized that circumstantial evidence may be "more certain, satisfying and persuasive than direct evidence." <u>Id.</u> at 100; <u>see</u> <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1030-31 (9th Cir. 2006) (questioning the continued viability of <u>Godwin</u> and "conclud[ing] that in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence"); <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1124 (9th Cir. 2004) (holding that a disparate treatment plaintiff can defeat summary judgment motion relying on circumstantial evidence).

case by showing that "(1) he is a member of a protected class;
(2) he was qualified for his position; (3) he experienced an
adverse employment action; and (4) similarly situated individuals
outside his protected class were treated more favorably, or other
circumstances surrounding the adverse employment action give rise
to an inference of discrimination." Peterson v. Hewlett-Packard
Co., 358 F.3d 599, 603 (9th Cir. 2004).  The Ninth Circuit has
held that a plaintiff's burden in establishing a prima facie case
of discrimination is "minimal." Coghlan v. Am. Seafoods Co., 413
F.3d 1090, 1094 (9th Cir. 2005).

Plaintiff is an African-American who was terminated,
thus satisfying the first and third elements for prima facie race
discrimination.  Defendant argues that plaintiff does not satisfy
the second element, which requires that he was qualified for his
position, because "Plaintiff was not performing competently at
the time of his termination.  Specifically, Plaintiff had two
accidents which damaged Company property and which violated RTC's
two-accident policy."[10]  (Mem. of P. & A. in Supp. of Def.'s Mot.
at 5:12-14 (Docket No. 9-1).)  However, plaintiff has pointed to

---

[10]    On its face, defendant's argument that plaintiff is not
qualified is the same argument that it had a legitimate,
nondiscriminatory reason for terminating plaintiff: violation of
defendant's accident policy.  See, e.g., Gosho v. U.S. Bancorp
Piper Jaffray Inc., No. 00-1611, 2002 WL 34209804, at *3 (N.D.
Cal. Oct. 1, 2002) (defendant argued that plaintiff was not
qualified because plaintiff violated defendant's policies).
However, defendant's argument that plaintiff is not qualified is
slightly different because defendant seems to argue that even if
it did not have an accident policy, plaintiff would be
unqualified because he was performing incompetently, i.e., he was
at fault for his accidents.
Even if defendant's qualification argument were
identical to its legitimate, nondiscriminatory reason, the court
would find that plaintiff has met his burden.

1  evidence suggesting that the accidents were not his fault.  (See

2  Mayo Dep. Tr. 21:10-23:25, 27:13-25; Mayo Decl. ¶¶ 13-14.)

3  Moreover, with regards to his qualifications, plaintiff states:

4          I am a truck driver with a Class A license in good
        standing and all endorsements.  I have been a certified
5       and licensed truck driver for approximately thirteen
        years.  During my entire career, I was never disciplined
6       or written-up [sic] and every year I always received a
        raise.  I also have received a bonus for good driving in
7       2006.

8  (Mayo Decl. ¶ 2.)  Thus, plaintiff has presented sufficient

9  evidence to satisfy the second element of prima facie race

10 discrimination.

11         Plaintiff has satisfied the final element of prima

12 facie race discrimination that "similarly situated individuals

13 outside his protected class were treated more favorably."

14 Peterson, 358 F.3d at 603.  Plaintiff states in his declaration:

15         I personally know of two other drivers who had two
        accidents and were not terminated under the two accident
16      rule.  They were white drivers.  The two other drivers
        are Ralph and Kevin Christian.  Ralph had at least four
17      accidents that I am personally aware of, and had failed
        a drug test after one of the accidents.  But he was not
18      terminated.  Kevin Christian had four accidents as well.
        In fact, on one occasion he ran his truck into my
19      vehicle.  I had to take him to court for that. . . . No
        statements were taken [by defendant].  Kevin Christian is
20      white.[11]

21 (Mayo Decl. ¶ 11.)  Plaintiff's supplemental declaration adds

22 that plaintiff was told about these accidents by Lantz and

23 Christian "when [they] were at the yard, or on break."

24 (Supplemental Mayo Decl. ¶ 5.)  Plaintiff claims that he "know[s]

25 _____

26         [11]  Plaintiff also states that Lindsey was involved in
   accidents.  However, Lindsey was a mechanic and thus not
27 similarly situated to plaintiff.  See Vasquez v. Cnty. of Los
   Angeles, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are
28 similarly situated when they have similar jobs and display
   similar conduct.").

that these individuals do not want to jeopardize their place in the company, but that if they were forced to testify, that they would testify truthfully about their accidents."  (Id.)

       To satisfy this final element of a prima facie race discrimination claim, the evidence need only be "minimal." Coghlan, 413 F.3d at 1094.  Plaintiff has provided more than adequate evidence to establish at the prima facie stage that similarly situated employees were treated differently.  See Singson v. Farber, No. C 09-5023, 2010 WL 5399217, at *10 (N.D. Cal. Dec. 23, 2010) (holding that race discrimination plaintiff who was disciplined for violating internal policy did not have to provide "specific evidence of other individuals" who violated policy and "who were treated differently" to establish a prima facie case).  Accordingly, the court finds that plaintiff has established a prima facie case of race discrimination.

       Defendant has offered a legitimate, nondiscriminatory reason for plaintiff's termination.  Defendant presents evidence that plaintiff was involved in two accidents in violation of defendant's accident policy.  Subsequent to the second accident, Odahl, general manager of the Stockton facility, recommended plaintiff's termination and McMullin, president of defendant, approved the termination.  (See Odahl Decl. ¶¶ 4-5, Exs. A-B; McMullin Decl. Ex. A.)  Thus, the McDonnell Douglas presumption that defendant terminated plaintiff because of his race "drops out of the picture."  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1032 (9th Cir. 2006) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)) (internal quotation marks omitted).

1   　　　　Plaintiff has presented sufficient evidence that

2   defendant's proffered legitimate, nondiscriminatory reason is

3   pretextual.  Plaintiff presents evidence that the accident policy

4   was applied differently to two similarly situated Caucasians,

5   Lantz and Christian, as discussed above.  See Vasquez v. Cnty. of

6   Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) ("A showing that

7   the County treated similarly situated employees outside Vasquez's

8   protected class more favorably would be probative of pretext.");

9   id. ("[I]ndividuals are similarly situated when they have similar

10  jobs and display similar conduct.").

11  　　　　In response to plaintiff's claims, Odahl's declaration

12  only offers qualified, conclusory statements about whether Lantz

13  and Christian were involved in accidents as defined under the

14  policy:

15  　　　To my knowledge, no other driver at the Stockton facility
    　　　has been involved in two accidents involving property
16  　　　damage or injury while operating Company equipment
    　　　following implementation of the two-accident policy,
17  　　　other than Mr. Mayo.  I understand that Mr. Mayo claims
    　　　that Mr. Lindsey, Mr. Christian, and Mr. Lantz were
18  　　　involved in two accidents at some point in time.  Mr.
    　　　Lindsey is not a driver and RTC's two-accident policy
19  　　　applies only to drivers.  Moreover, to my knowledge, Mr.
    　　　Lindsey has not been involved in any accidents involving
20  　　　injury or property damage since the two-accident policy
    　　　was implemented.  Mr. Christiansen has not been involved
21  　　　in any accidents following implementation of the
    　　　two-accident policy, and Mr. Lantz was involved in only
22  　　　one accident following implementation of the two-accident
    　　　policy.
23

24  (Odahl Decl. ¶ 8.)

25  　　　　It does not appear that Odahl even has personal

26  knowledge on this issue.  It appears that Odahl was not the

27  facility's general manager the entire period that the accident

28  policy had been in effect.  The policy was implemented in August

of 2005.  When plaintiff was terminated in October of 2009, Odahl had been his supervisor for only two or three years.  (Mayo Dep. Tr. at 18:6-8.)  As noted earlier, when plaintiff was involved in his first accident in June of 2007 the general manager was Standert, not Odahl.  Defendant has not submitted declarations from Standert, other former general managers, or declarations from Lantz and Christian themselves.  No documentary evidence has been presented to the court.

A jury could reasonably infer that, if defendant's reason for terminating plaintiff was a violation of the accident policy, defendant would not have permitted plaintiff to continue driving for over two weeks and to train a new driver.  Not only did defendant permit plaintiff to continue working as usual, defendant did not even suggest to plaintiff that he could be terminated under the accident policy.

Further, the notion that defendant had no choice but to terminate plaintiff "may reasonably appear to be an overstatement sounding in pretext."  Rosales v. Career Sys. Develop. Corp., No. Civ. 08-1383 WBS KJM, 2009 WL 3644867, at *12 (E.D. Cal. Nov. 2, 2009).  The accident policy appears to be discretionary, providing that two accidents "may" result in termination. (McMullin Decl. Ex. A.)  Odahl does not even acknowledge the discretionary nature of the accident policy.  Odahl's declaration implies that he was required to recommend plaintiff's termination following plaintiff's second accident.  (See Odahl ¶ 6.) Defendant's president makes a similar implication.  (See McMullin ¶ 4.)

24

Even if Odahl[12] and McMullin had stated that they
decided to exercise their discretion under the accident policy
because plaintiff was at fault for his two accidents,[13] the court
would still find sufficient evidence of pretext.  Odahl placed
the blame on plaintiff in his Supervisor's Incident Investigation
Report.  However, Odahl told plaintiff immediately after the
accident "that it was likely the case that the truck just
malfunctioned, and that the brakes locked up."  (Mayo Decl. ¶
13.)  Thus, a reasonable jury could find that defendant was not
actually motivated by plaintiff's fault in light of these
inconsistent statements.

A reasonable jury could also find that Odahl did not
believe Lindsey when Lindsey essentially told Odahl that
plaintiff was at fault for the second accident.  Odahl's basis
for blaming plaintiff is what Lindsey had told Odahl following
the accident: Lindsey had been able to drive the truck back
safely to the facility and had not found mechanical problems.

---

[12]   Defendant has not argued that Odahl's motivation is not
imputed to McMullin, who approved Odahl's recommendation to
terminate plaintiff.  See Galdamez v. Potter, 415 F.3d 1015, 1026
n.9 (9th Cir. 2005) ("Title VII may still be violated where the
ultimate decision-maker, lacking individual discriminatory
intent, takes an adverse employment action in reliance on factors
affected by another decision-maker's discriminatory animus.").
Cf. Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007) ("We
hold that if a subordinate, in response to a plaintiff's
protected activity, sets in motion a proceeding by an independent
decisionmaker that leads to an adverse employment action, the
subordinate's bias is imputed to the employer if the plaintiff
can prove that the allegedly independent adverse employment
decision was not actually independent because the biased
subordinate influenced or was involved in the decision or
decisionmaking process.").

[13]   In their declarations, Odahl and McMullin do not
mention fault.

1  However, Odahl knew that plaintiff had complained on three or

2  four occasions that Lindsey "was racist against" plaintiff and

3  had complained on five or six occasions that Lindsey failed to

4  properly service plaintiff's truck. (Mayo Decl. ¶ 7.)  According

5  to plaintiff and his co-employee Serpa, Odahl and Lindsey

6  appeared to be "close friends" and Odahl did not "countermand[]"

7  orders from Lindsey, who acted as if he had authority to make

8  orders.[14]  (Id. ¶¶ 9-10.)

9        Other evidence suggesting pretext includes Odahl's

10 failure to respond to plaintiff's complaints about the quality of

11 Lindsey's truck repairs.  See Cornwell, 439 F.3d at 1032

12 (explaining that a reasonable jury could conclude that

13 defendant's CEO's treatment of plaintiff, specifically a lack of

14 interaction with plaintiff, in the months preceding plaintiff's

15 demotion, resulted from racial animus).  Odahl did not take a

16 statement from plaintiff and even appeared to be annoyed by some

17 of plaintiff's complaints.  Plaintiff states that his inability

18 to receive repairs for his truck continued following his

19 complaints to Odahl.  On the other hand, the Caucasian drivers

20 received repairs.  (See Supplemental Mayo Decl. ¶ 3.)

21        Plaintiff also claims that Odahl gave the other drivers

22 better routes and trucks.  According to plaintiff, the other

23

24      [14]  Additionally, if defendant based its termination of

25 plaintiff on plaintiff's fault for the accident, a reasonable
   jury could find that Lindsey made the determination that
26 plaintiff was at fault, and that Odahl did not make an
   independent determination.  Cf. Willis v. Marion Cnty. Auditor's
27 Office, 118 F.3d 542, 548 (7th Cir. 1997) (indicating that, when
   the decision-maker conducts an independent evaluation of the
28 employee's alleged policy violations, the subordinate's
   discriminatory motive is not attributed to the employer).

drivers told him that they did not want the Cottage Bakery route or the "very old trailer" assigned to that route. (See Mayo Decl. ¶¶ 13-14.)  Plaintiff claims that Odahl "forced" plaintiff to take the route and trailer. (Id. ¶ 14.)  When another driver quit, plaintiff "had to assume" both that driver's route and the Cottage Bakery route. (Id. ¶ 15.)  However, when that driver decided to return, he was allowed to resume his old route and plaintiff "was forced to again take the route none of the other white drivers wanted," the Cottage Bakery route. (Id.)  Plaintiff was told by another driver after his second accident that the "route was [later] assigned to a sub-hauler because none of the other drivers wanted the route or to use the trailer." (Id. ¶ 14.)

        In sum, plaintiff has presented evidence sufficient to create a genuine issue of material fact regarding the motivation behind his termination.  Accordingly, the court will deny defendant's motion for summary judgment as it relates to the race discrimination claim.

        2.   Retaliation

        Defendant argues that plaintiff failed to exhaust his retaliation claim.  "A person seeking relief under Title VII must first file a charge with the [Equal Employment Opportunity Commission [("EEOC")] within 180 days of the alleged unlawful employment practice . . . ."  Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1104 (9th Cir. 2008).  "Under [a] workshare agreement, a charge filed with the [Department of Fair Employment and Housing] is deemed constructively filed with the EEOC, because the EEOC and DFEH cross-designate the other as its agent

for the purpose of receiving charges." EEOC v. Dinuba Med.
Clinic, 222 F.3d 580, 585 (9th Cir. 2000).

        "Even when an employee seeks judicial relief for claims
not listed in the original EEOC charge, the complaint
'nevertheless may encompass any discrimination like or reasonably
related to the allegations of the EEOC charge.'" Freeman v.
Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002)
(quoting Oubichon v. N. Am. Rockwell Corp., 482 F.2d 569, 571
(9th Cir. 1973)).  Allegations are "reasonably related" if they
either "fell within the scope of the EEOC's actual investigation
or an EEOC investigation which can reasonably be expected to grow
out of the charge of discrimination." Id. (quoting B.K.B. v.
Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir. 2002)) (internal
quotation marks omitted).  "[I]t is appropriate to consider such
factors as the alleged basis of the discrimination, dates of
discriminatory acts specified within the charge, perpetrators of
discrimination named in the charge, and any locations at which
discrimination is alleged to have occurred." Id. (quoting
B.K.B., 276 F.3d at 1100).

        Here, defendant has provided a copy of the
administrative complaint filed with the DFEH.  (Kennaday Decl.
Ex. C.)  The complaint filed with the DFEH alleged that plaintiff
was terminated because of his race and age.  The complaint did
not allege termination in retaliation for engaging in protected
activity.

        The court finds that an investigation into whether
plaintiff was terminated to retaliate against plaintiff for
engaging in protected activity could not "reasonably be expected

to grow out of the charge" that defendant terminated plaintiff

because of his race.  Freeman, 291 F.3d at 636 (quoting B.K.B.,

276 F.3d at 1100).  Thus, plaintiff has not exhausted his Title

VII retaliation claim.  See Latu v. Am. Airlines, No. C

00-3301SI, 2001 WL 1658289, at *6 (N.D. Cal. Dec. 6, 2001) ("The

claim of retaliation is not like or reasonably related to the

allegations in his EEOC charge, which focused solely on his claim

that he was harassed and discharged based on his race."); Barron

v. United Air Lines, Inc., No. C 92 1364, 1993 WL 140630, at *6

(N.D. Cal. Apr. 20, 1993); see also Miles v. Dell, Inc., 429 F.3d

480, 492 (4th Cir. 2005); Wallin v. Minn. Dep't of Corr., 153

F.3d 681, 688 (8th Cir. 1998); Beane v. Agape Mgmt. Servs., Inc.,

C/A No. 3:08-3445, 2009 WL 2476629, at *3 (D.S.C. Aug. 11, 2009);

Donald v. BWX Techs., Inc., Civil No. 6:09CV00028, 2009 WL

2170170, at *3 (W.D. Va. July 21, 2009); Figueroa v. Riverbay

Corp., No. 06 CIV. 5364, 2006 WL 3804581, at *5 (S.D.N.Y. Dec.

22, 2006); Dowlatpanah v. Wellstar Douglas Hosp., Civil Action

No. 1:05-CV-2752, 2006 WL 4093123, at *13 (N.D. Ga. Dec. 5, 2006)

(magistrate judge's findings and recommendations), adopted by No.

1:05-cv-2752, 2007 WL 639875 (Feb. 26, 2007); Hudgens v. Wexler &

Wexler, 391 F. Supp. 2d 634, 649 (N.D. Ill. 2005).

        Under some facts, retaliation can be reasonably related

to discrimination based on race.  Cf. Russell v. TG Mo. Corp.,

340 F.3d 735, 748 (8th Cir. 2008) (noting in dicta that an

allegation in an administrative complaint that defendant wanted

to terminate plaintiff because she could only work 40 hours per

week because of her "condition" arguably provides notice that

retaliatory discharge is alleged); Amin v. Akzo Nobel Chems.,

1   <u>Inc.</u>, 282 Fed. App'x 958, 961 (2d Cir. 2008) (holding that

2   because relevant evidence of defendant's stated reason for

3   discharging plaintiff would include performance reviews, which

4   included documents in which plaintiff complained that defendant

5   engaged in discriminatory practices, the EEOC investigation into

6   discharge based on national origin would "reasonably be expected

7   to assess whether his complaints to Akzo of discrimination on

8   that basis played a role in Akzo's decision to discharge him");

9   <u>Hudson v. Chertoff</u>, No. C05-01735RSL, 2007 WL 2288062, at *7

10  (W.D. Wash. Aug. 3, 2007) ("Plaintiff's unsworn declaration and

11  formal complaint contain a multitude of references to concerns

12  that he was terminated in response to his efforts to obtain

13  accommodations for his disability."), <u>aff'd on other grounds</u>, 304

14  Fed. App'x 540 (9th Cir. 2008).

15          There are no such facts here, however.  Plaintiff makes

16  no meaningful attempt to argue that the administrative complaint

17  for termination based on race is reasonably related to a claim

18  for termination based on retaliation.  Instead, plaintiff

19  incorrectly describes the content of the administrative complaint

20  and argues that the incorrect version of the administrative

21  complaint "clearly relates" to his retaliation claim: "Here,

22  Mayo's complaint about persistent race discrimination even in the

23  face of repeated complaints clearly relates to a claim for

24  retaliation for opposing race discrimination." (Pl.'s Mem. in

25  Opp'n at 12:26-13:1.)  However, plaintiff's administrative

26  complaint only alleged that he had been <u>terminated</u> because of his

27  race; plaintiff's administrative complaint did not allege

28  "persistent race discrimination."  The administrative complaint

1  also makes no mention of plaintiff complaining to defendant about

2  race discrimination.  Because the retaliation claim is not

3  reasonably related to plaintiff's administrative complaint and

4  thus plaintiff did not exhaust his administrative remedies, the

5  court will grant summary judgment in favor of defendant on this

6  claim.

7              3.   Violation of California Labor Code Section 1102.5

8              Section 1102.5(c) provides that "[a]n employer may not

9  retaliate against an employee for refusing to participate in an

10  activity that would result in a violation of state or federal

11  statute, or a violation or noncompliance with a state or federal

12  rule or regulation."  Cal. Labor Code § 1102.5(c).  Plaintiff has

13  not presented evidence that he refused "to participate in an

14  activity that would result in a violation of state or federal

15  statute, or a violation or noncompliance with a state or federal

16  rule or regulation."  Id.  Accordingly, the court will grant

17  defendant's motion for summary judgment as to this claim.

18              IT IS THEREFORE ORDERED that defendant's motion for

19  summary judgment be, and the same hereby is, GRANTED with respect

20  to plaintiff's claims for Title VII retaliation and violation of

21  California Labor Code section 1102.5(c) and DENIED with respect

22  to plaintiff's claim for Title VII race discrimination.

23  DATED:  June 10, 2011

24

25  _____

26  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

27

28