Wilke, Fleury, Hoffelt, Gould & Birney, LLP
Kelli M. Kennaday, Bar No. 155153
kkennaday@wilkefleury.com
400 Capitol Mall, Twenty-Second Floor
Sacramento, CA  95814

Telephone:     (916) 441-2430
Facsimile:     (916) 442-6664

Attorneys for Defendant
RECYCLE TO CONSERVE, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDISON MAYO,<br><br>Plaintiff,<br><br>v.<br><br>RECYCLE TO CONSERVE, INC.,<br><br>Defendant. | Case No.  2:10-cv-00629-WBS-EFB<br><br>**DEFENDANT RECYCLE TO CONSERVE, INC.'S TRIAL BRIEF**<br><br>**[Local Rule 285]**<br><br>Trial Date:   November 1, 2011<br>Time:         9:00 a.m.<br>Courtroom:  5<br>Judge:        Hon. William B. Shubb |

Defendant Recycle to Conserve, Inc. (RTC) submits the following Trial Brief pursuant to the Local Rules for the Eastern District, Rule No. 285.

## PROCEDURAL BACKGROUND

Plaintiff's lawsuit originally contained three claims:  (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) retaliation in violation of Title VII of the Civil Rights Act of 1964; and (3) violation of California Labor Code section 1102.5.  RTC moved for summary judgment on all three of these claims.  The Court granted RTC's motion for summary judgment on the retaliation claim because it found that Plaintiff had failed to exhaust his administrative remedies as to that claim.  (A true and correct copy of the Court's Order is attached as Exhibit A.)  The Court also granted summary judgment on the Labor Code claim because it found that Plaintiff had not refused to participate in any illegal activity, and that RTC

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 1 -

DEFENDANT RECYCLE TO CONSERVE, INC.'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

1  thus could not have retaliated against him for doing so.  Thus, the sole remaining claim in this

2  case is Plaintiff's race discrimination claim.  In this claim, Plaintiff alleges that he was terminated

3  because of his race.

4                                    **STATEMENT OF FACTS**

5        RTC anticipates proving the following facts at trial.

6        Plaintiff is African-American.  He began working for RTC or its predecessor in 1998 as a

7  truck driver.   At all times during his employment, Plaintiff worked out of RTC's Stockton

8  location.  The Stockton location had between 15 to 20 employees.  Of these 15 to 20 employees,

9  approximately three were drivers.   During the relevant time period, the Stockton location

10  employed three African-Americans; Plaintiff, however, was the only African-American driver.

11        In August of 2005, RTC instituted a "two-accident" policy, which applied to "all drivers."

12  The policy provides:  "[I]f you are involved in two (2) accidents involving property damage or

13  injury while operating Company equipment, your employment may be terminated."  Plaintiff was

14  provided with a copy of this policy on or about August 18, 2005, and he acknowledged receipt

15  thereof.

16        In May of 2007, the Stockton location hired a mechanic named Elwood Lindsey.  Lindsay

17  is Caucasian.  Plaintiff alleges that Lindsey failed to properly service his truck and called him

18  racist names.[1]  Lindsey, however, was not Plaintiff's supervisor and Lindsey had no involvement

19  in the termination decision that is at issue in this case.

20        In June of 2007, Plaintiff was involved in his first accident after the institution of the two-

21  accident policy.  Plaintiff was making a left turn when a box fell off the back of Plaintiff's truck,

22  damaging the truck.  Plaintiff understood this accident counted as one accident pursuant to the

23  two-accident policy.

24        In October of 2009, Plaintiff was involved in a second accident.  Plaintiff braked as he

25  was approaching a stoplight, and the tractor part of the truck jack-knifed into the trailer.  This

26  second accident also involved property damage.  Following this second accident, Sean Odahl, the

27  ───────────────

28  [1] Plaintiff's Complaint does not contain a claim for racial harassment.  Instead, as noted above, his sole claim is that
   he was terminated because of his race.

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                         - 2 -                    DEFENDANT RECYCLE TO CONSERVE'S
                                                                    TRIAL BRIEF
                                                            2:10-CV-00629-WBS-EFB

1 General Manager of RTC's Stockton location and Plaintiff's direct supervisor at the time,
2 recommended that Plaintiff's employment be terminated pursuant to the two-accident policy.
3 Odahl's recommendation was approved by Robert McMullin, RTC's President. Plaintiff was
4 terminated effective October 30, 2009. At the time of Plaintiff's termination, no other drivers had
5 had two accidents under the two-accident policy.

6 In approximately June of 2010, RTC learned that Plaintiff had stolen substantial amounts
7 of company property while he was employed. Had it know of this theft, it would have
8 immediately terminated Plaintiff.

### ADMISSIONS AND STIPULATIONS

10 None.

### POINTS OF LAW

12 **1. Sole-Reason vs. Mixed-Motive**

13 Plaintiff has the burden of establishing that his race was either the sole reason or a
14 motivating factor for RTC's decision to terminate him. Costa v. Desert Palace, Inc., 299 F.3d
15 838, 856-857 (9th Cir. 2002). RTC denies that Plaintiff's race was either the sole reason or a
16 motivating factor for its decision to terminate him and further claims that the decision to
17 terminate Plaintiff was based upon his violation of the Company's two-accident policy. In the
18 event Plaintiff requests and is given a mixed motive instruction, RTC will assert the affirmative
19 defense that it would have made the same decision even if it had not taken Plaintiff's race into
20 account. Id.

21 **2. After-Acquired Evidence**

22 As noted above, in approximately June of 2010, eight months after Plaintiff's termination,
23 RTC learned that he had stolen substantial amounts of company property while he was employed.
24 Had it know of this theft, RTC would have immediately terminated Plaintiff. RTC has thus
25 asserted the affirmative defense of after-acquired evidence. In order to prevail on this defense,
26 RTC must prove that "Plaintiff committed an act of wrongdoing . . . of such severity that the
27 employee in fact would have been terminated on these grounds alone if the employer had known
28 of it at the time of the discharge." O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756,

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 3 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

1 | 759 (9th Cir. 1996); see also McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 130 L.Ed.

2 | 2d 852, 115 S. Ct. 879 (1995). If RTC establishes this defense, then it "does not have to offer

3 | reinstatement or provide front pay, and only has to provide backpay from the date of the unlawful

4 | discharge to the date the new information was discovered." O'Day, supra, 79 F.3d at 759

5 | (internal quotes and cite omitted). In addition to cutting off liability for back pay, after-acquired

6 | evidence can also limit the "other remedies" available in a Title VII case. Id. at 761. Thus, even

7 | assuming that Plaintiff can establish his termination was discriminatory, his remedies will be

8 | limited by this after-acquired evidence.

9 | **3.  Damages/Remedies Issues**

10 | Plaintiff seeks the following damages in this case: (1) back pay and front pay; (2) general

11 | damages; (3) punitive damages; and (4) attorney's fees and costs of suit.

12 | **A.  Back pay and front pay**

13 | A successful plaintiff in a Title VII case is potentially entitled to back pay and front pay.

14 | Plaintiff was terminated on October 30, 2009. At the time of his termination, he was making

15 | $19.10 an hour. Assuming a 40 hour work week, Plaintiff's wage loss totals approximately

16 | $3056 per month. In April or May of 2010, approximately six months after his termination,

17 | Plaintiff was hired by Cherokee Freight Lines as a driver. (Ps Depo. at 13:7-23.) He "think[s]"

18 | he makes $13.75 an hour, or approximately $2200 per month. (Ps Depo. at 81:25 to 822.) Any

19 | back pay to which Plaintiff is entitled must be reduced by the amount he has actually earned at his

20 | new job, and any additional amounts he could have earned through reasonable mitigation efforts.[2]

21 | Furthermore, as noted above, Plaintiff's damages will be further limited by the after-acquired

22 | evidence defense, because he will only be entitled to, at most, eight months of back pay. Even if

23 | Plaintiff prevails on his discrimination claim, he will be entitled to less than $21,000 in back pay.

24 | **B.  Cap on compensatory and punitive damages**

25 | Plaintiff requests compensatory and punitive damages. Although a successful Title VII

26 | plaintiff is entitled to such damages, they are subject to a statutory cap. 42 U.S.C. § 1981a(a) and

27 | (b). The amount of the cap depends on the size of the employer. In 2009, RTC had between 50

---

28 | [2] With his new job, Plaintiff's wage loss is reduced to only $856 per month.

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 4 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

and 60 employees, and that number has not changed in any material way. Accordingly, "the sum of the amount of compensatory damages . . . and the amount of punitive damages" awarded in this case cannot exceed $50,000. 42 U.S.C. § 1891a(b)(3)(A). "[T]he court shall not inform the jury of the limitations" on compensatory and punitive damages. 42 U.S.C. § 1891a(c)(2). If the jury returns an award over the cap, RTC will, and hereby does, ask the Court to reduce the award to an amount not to exceed $50,000.

### C.  Availability of punitive damages

In order to recover punitive damages in this case, Plaintiff must prove that RTC discriminated against him "with malice or reckless indifference" to his "federally protected rights." 42 U.S.C. § 1981a(b)(1). The questions of malice and reckless indifference "focus on the actor's state of mind." Kolstad v. American Dental Assoc., 527 U.S. 526, 535 (1999). The phrase "federally protected rights" means that the employer must know that it is "acting in violation of federal law," not merely that it is "engaging in discrimination." Id. This means that Plaintiff must prove that RTC discriminated against him "in the face of a *perceived risk* that its actions [would] violate federal law." Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1041 (9th Cir. 2003) (italics added) (internal quotes and cite omitted). Moreover, because the law has long imposed limits on imposing vicarious liability for punitive damages, Plaintiff must also "impute liability for punitive damages" to RTC. Kolstad, supra, 527 U.S. at 539. In order to do so, Plaintiff must show that the RTC employee who acted with the requisite malice or reckless indifference was sufficiently senior to impute liability for that employee's actions to RTC.[3] See Kolstad, supra, 527 U.S. at 542-43; Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516-17 (9th Cir. 2000). Finally, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." Kolstad, supra, 527 U.S. at 545. RTC may thus avoid punitive damages liability by showing that "it has adopted an anti-discrimination policy, [and] that it has implemented that policy in good

---

[3]  The only challenged action in this case is Plaintiff's termination. Accordingly, the requisite malice or reckless indifference must be on the part of either Sean Odahl or Robert McMullin, because they were the only people involved in the termination decision.

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 5 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

faith." Passantino, supra, 212 F.3d at 517. RTC will request that the jury be so instructed.

## DISPUTED EVIDENTIARY ISSUES/MOTIONS IN LIMINE

Pursuant to Local Rule 285 and the Court's Final Pretrial Order, RTC is including all of its motions in limine in this trial brief. RTC hereby moves in limine to exclude the evidence identified below.

### 1. Motion in Limine to Exclude Evidence Regarding Retaliation.

As noted above, Plaintiff's complaint originally contained a claim for retaliation. In this claim, Plaintiff alleged that RTC retaliated against him "by terminating him under the pretext of the two-accident rule" after he complained about racial comments made by a co-worker, Elwood Lindsey. (Compl. ¶ 16.) As also noted above, the Court granted RTC's motion for summary judgment as to the retaliation claim, and the only remaining claim is for race discrimination. Evidence about whether Plaintiff was retaliated against for complaining about discrimination or harassment is thus irrelevant, and must be excluded. Fed. R. Evid. 402 (only relevant evidence admissible). Even if the Court were to find such evidence was relevant, it must still be excluded. Federal Rule of Evidence 403 provides that:

> Although relevant, evidence may be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by considerations
> of undue delay, waste of time, or needless presentation of
> cumulative evidence.

In this case, any minimal probative value of evidence of retaliation would be outweighed by precisely these dangers. If evidence of retaliation were introduced, RTC could be forced to conduct a time-consuming mini-trial into the merits of a claim that has been dismissed, and there is a grave danger that the jury would find for Plaintiff (or be biased against RTC) based on that dismissed claim.

### 2. Motion in Limine to Exclude Evidence Of Whether Plaintiff Told Serpa That He Had Complained to Odahl about Lindsay.

Plaintiff intends to call Joseph Serpa as a witness in this case. In opposition to RTC's motion for summary judgment, Plaintiff submitted a declaration from Serpa. In this declaration, Serpa stated that Plaintiff had complained to Sean Odahl about Elwood Lindsay, and RTC

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 6 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

1    anticipates that Plaintiff will seek to elicit similar testimony at trial.  Such testimony must be

2    excluded as inadmissible hearsay.  Fed. R. Evid. 802.

3           Moreover, such evidence must be excluded as irrelevant.  Fed. R. Evid. 402.  The issue in

4    this case is whether RTC discriminated against Plaintiff when Sean Odahl and Robert McMullin

5    made the decision to terminate him for violating the two-accident policy.  Whether or not Plaintiff

6    had previously complained about Elwood Lindsay is irrelevant to this issue.

7           Finally, such evidence must be excluded under Federal Rule of Evidence 403 as unduly

8    time consuming.  If such evidence were admitted, RTC would be forced to spend an inordinate

9    amount of time questioning Serpa about the basis for his belief that Plaintiff complained to Odahl,

10   about what Plaintiff had told him, when Plaintiff had told him, etc.  Spending so much time

11   questioning Serpa about the basis for his hearsay statements on an irrelevant issue would be an

12   undue waste of time.

13   **3.    Motion in Limine to Exclude Evidence of Whether RTC Discriminated Against
         Plaintiff by Taking Actions Against Him Short of Termination.**

14

15          In his complaint, Plaintiff alleges that RTC "intentionally terminated [him] because of

16   [his] race."  (Compl. ¶ 9.)  In the administrative complaint he filed with the Department of Fair

17   Employment and Housing ("DFEH"), Plaintiff also alleged that he had been terminated because

18   of his race.  (A true and correct copy of Plaintiff's DFEH complaint is attached as Exhibit B.)

19   The sole issue in this case is thus whether RTC terminated Plaintiff because of his race.  RTC

20   believes, however, that Plaintiff will attempt to introduce evidence or argument that RTC also

21   discriminated against him short of termination by giving him a bad route, a bad truck, and fewer

22   repairs.  Plaintiff failed to exhaust his administrative remedies with respect to any alleged

23   discriminatory conduct other than his termination, and evidence of such conduct must be

24   excluded.

25          As RTC established in its motion for summary judgment, a jurisdictional prerequisite to

26   filing a Title VII claim includes exhausting administrative remedies by filing an administrative

27   complaint with the Equal Employment Opportunity Commission ("EEOC") specifying the

28

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                                        - 7 -                     DEFENDANT RECYCLE TO CONSERVE'S
                                                                          TRIAL BRIEF
                                                                          2:10-CV-00629-WBS-EFB

1   alleged wrongful act.[4]  Surrell v. Cal. Water Serv., 518 F.3d 1097, 1104 (9th Cir. 2008).  A federal

2   court cannot consider incidents of discrimination not included in the administrative complaint

3   unless the new claims are "like or reasonably related" to the allegations in the administrative

4   complaint.  Green v. Los Angeles County Superintendent of Sch., 883 F.2d 1472, 1476 (9th Cir.

5   1989).   In this case, "termination" is the only discriminatory act identified by Plaintiff.

6   Accordingly, Plaintiff has failed to exhaust his administrative remedies as to any acts short of

7   termination, and evidence of such acts must be excluded as irrelevant.

8   **4.     Motion in Limine to Exlcude Evidence of Whether Elwood Lindsay Had Two Or
        More Accidents.**

9

10          RTC believes that Plaintiff may attempt to introduce evidence that Elwood Lindsay had

11  two accidents but was not terminated, because Plaintiff submitted a declaration in opposition to

12  RTC's motion for summary judgment in which he stated: "Elwood himself had several accidents

13  driving company trucks.  Nothing was done about it."  (Ps Decl. ¶ 11.)  In ruling on RTC's

14  motion for summary judgment, this Court found such testimony inadmissible when it sustained

15  RTC's objection thereto. (Exhibit A, pages 13-14, fn. 7.)  In a discrimination case, "[a] showing

16  that [the defendant] treated similarly situated employees outside [the plaintiff's] protected class

17  more favorably could be probative of pretext."  Vasquez v. County of Los Angeles, 349 F.3d 634,

18  641 (9th Cir. 2003).  "[I]ndividuals are similarly situated when they have similar jobs and display

19  similar conduct."  Id.  As this Court has already ruled, Lindsay was a mechanic, not a driver, and

20  was thus not similarly situated to Plaintiff.  (Exhibit A, page 21, fn 11.)  Accordingly, evidence

21  regarding Lindsay's alleged accidents is irrelevant, prejudicial and unduly time-consuming, and

22  must be excluded. Fed. R. Evid. 402, 403.

23  **5.     Motion in Limine to Exlcude Evidence of Other Drivers Had Accidents Before
        Implementation of the Two-Accident Rule.**

24

25          As noted above, RTC's two-accident policy was not implemented until August of 2005.

26  RTC nonetheless anticipates that Plaintiff will attempt to introduce evidence that other drivers

27  ---
    [4]  Plaintiff actually filed his administrative complaint with the Department of Fair Employment and Housing, not the
    EEOC; however, "[u]nder [a] workshare agreement, a charge filed with the DFEH is deemed constructively filed
28  with the EEOC . . . ."  EEOC v. Dinuba Med. Clinic, 222 F.3d 580, 585 (9th Cir. 2000).

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                                        - 8 -                        DEFENDANT RECYCLE TO CONSERVE'S
                                                                                          TRIAL BRIEF
                                                                                  2:10-CV-00629-WBS-EFB

1   had accidents ***before*** the implementation of this policy. Plaintiff was fired because he was

2   involved in two accidents ***after*** the policy was implemented. It is quite obvious that no one could

3   be terminated pursuant to a policy that had not yet been implemented. Accordingly, evidence that

4   other drivers had accidents before the policy was implemented is irrelevant, and should be

5   excluded on this ground. Fed. R. Evid. 402. Such evidence would also be both unduly time-

6   consuming, confusing and misleading, because RTC would be forced to conduct mini-trials into

7   the facts and circumstances surrounding accidents that pre-dated the implementation of the policy

8   under which Plaintiff was terminated. Fed. R. Evid. 403.

9   **6.      Motion in Limine to Exclude Evidence that RTC Fought Plaintiff's Claim for Unemployment Insurance Benefits.**

10

11          After Plaintiff was terminated, he applied for unemployment insurance benefits. Under

12   California law, an employee who is terminated for "misconduct" is not entitled to unemployment

13   benefits. Cal. Unemp. Ins. Code § 1256. Regulations provide that "misconduct" includes the

14   violation of a rule regarding the operation of a motor vehicle if the violation "involves potential

15   substantial injury to the employer's interests. . . . If a violation of an employer rule involves less

16   serious consequences, a discharge for the violation is not for misconduct in the absence of prior

17   warnings or reprimands for similar violations by the employee." 22 Cal.Code Regs. 1256-42(g).

18   When someone files a claim for unemployment benefits with the Employment Development

19   Department (EDD), their former employer is sent a copy of the claim, and given the right to

20   submit facts that may affect the claimant's eligibility for benefits. Cal. Unemp. Ins. Code § 1327.

21   RTC believed that Plaintiff's second accident constituted misconduct, and it so informed the

22   EDD. The EDD ultimately determined that Plaintiff was entitled to unemployment benefits, and

23   he received benefits back to the date of his termination. (Mayo Depo. at 80:1-7.) RTC believes,

24   however, that Plaintiff may try to introduce evidence that it "fought" his claim for unemployment

25   benefits.

26          The sole issue remaining in this case is whether RTC terminated Plaintiff because of his

27   race, or for a legitimate, non-discriminatory reason. Evidence that, after Plaintiff's termination,

28   RTC contested his right to receive unemployment benefits is irrelevant to this issue and must be

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                          - 9 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

excluded. Fed. R. Evid. 402. Even if the Court were to conclude that this evidence is relevant, it must still be excluded under Federal Rule of Evidence 403. The introduction of such evidence would require RTC to conduct a mini-trial into the circumstances surrounding Plaintiff's claim for unemployment benefits, and the reasons it contested that claim. This would also require RTC to introduce evidence into the meaning of "misconduct" under the Unemployment Insurance Code. All of this would constitute an undue waste of time, and would confuse the issues and mislead the jury by shifting the focus from *discrimination* under Title VII to the entirely different issue of *misconduct* under the Unemployment Insurance Code. See, e.g., Liburd v. Bronx Lebanon Hosp. Ctr., 2009 U.S. Dist. LEXIS 48477, *11-13 (S.D.N.Y. 2009) (issue whether plaintiff guilty of misconduct sufficient to disqualify her from receiving unemployment benefits is distinct from issue raised by discrimination claim).

## 7.   Motion in Limine to Exlcude the Opinion of Joseph Serpa that White Drivers were Treated Better than Plaintiff.

In opposition to RTC's motion for summary judgment, Plaintiff submitted a declaration from Joseph Serpa, in which Serpa stated: "*I think the white drivers were treated better than Edison was.* They got better routes, Elwood would treat them better, perform repairs faster for them. They would get better trucks while if Edison needed another truck, Elwood and management would never accommodate his request for a different truck." (Serpa Decl., ¶ 11.) RTC anticipates that Plaintiff will attempt to introduce similar testimony at trial. RTC requests an order preventing Serpa from testifying to his *opinion* that white drivers were treated better than Plaintiff.

Federal Rule of Evidence 701 provides that a witness not testifying as an expert may not offer an opinion unless that opinion: (1) is rationally based on the perception of the witness; *and* (2) helpful to a clear understanding of the witness' testimony. The Ninth Circuit has explained this requirement as follows:

> *Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury* in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. *If it is impossible or difficult to reproduce the data observed by the witnesses,* or the facts are difficult to

> explanation, or complex, or are of a combination of circumstances and appearance which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed. ... ***If the jury can be put into a position of equal vantage with the witness for drawing the opinion, then the witness may not give an opinion***.

United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982) Serpa's opinion that white drivers were treated better than Plaintiff is not helpful, because he can easily describe his observations, and thus enable the jury to form its own opinion. See, e.g., United States v. Dillon, 2008 U.S. Dist. LEXIS 97234 (C.D. Cal. 2008) (excluding lay opinion that nickname used on intercepted phone call referred to plaintiff because government could just as easily present underlying facts in such a way as to enable jury to form its own opinion); Brown v. Good Samaritan Hosp., 2006 U.S. Dist. LEXIS 96696, *34 (C.D. Cal. 2006) (excluding lay opinion that schedule not prepared in "discriminatory" manner because not "helpful" to jury).

**8.     Motion in Limine to Exclude Evidence That a White Driver Failed a Drug Test.**

Plaintiff was terminated solely because he violated RTC's two-accident policy. Plaintiff was not terminated because he failed a drug test, and no one has ever suggested that Plaintiff either failed a drug test or took drugs. RTC anticipates, however, that Plaintiff will attempt to introduce evidence that a white driver, Ralph Lantz, failed a drug test, because in opposition to RTC's motion for summary judgment, he submitted a declaration in which he stated that Lantz failed a drug test after an accident but was not terminated. (Mayo Decl., ¶ 11.) Testimony or other evidence that another driver failed a drug test must be excluded because it is not relevant, and even if the Court were to find it was relevant, its probative value would be outweighed by the danger of confusing the issues, misleading the jury, and consuming undue amounts of time.

Such evidence is not relevant because Plaintiff was not terminated for failing a drug test. Accordingly, Lantz is not similarly situated to Plaintiff, and provides no evidence that RTC's decision to terminate Plaintiff was discriminatory. See, e.g., Vasquez v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) (noting discrimination plaintiff may show pretext by showing defendant treated "similarly situations" employees more favorably than plaintiff, but noting "similarly situated" employees must "display similar conduct.") Moreover, if such evidence were

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 11 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

1  introduced, RTC would be forced to conduct a mini-trial into the facts and circumstances of

2  Lantz's situation, which, in addition to being unduly time-consuming, would confuse the issues

3  and mislead the jury by focusing on a driver who violated a different policy than Plaintiff.

4       Even if the Court were to find that such evidence was both relevant and was not unduly

5  confusing, etc., it must still be excluded absent evidence that Plaintiff has personal knowledge

6  regarding Lantz' situation, and that he is not merely repeating hearsay.   Fed. R. Evid. 602

7  (witness may only testify about matters of which he has personal knowledge); Fed. R. Evid. 802

8  (hearsay inadmissible).

9  **9.    Motion in Limine to Exclude Testimony About What Another Driver Told Plaintiff
        About the Refusal of a "Sub-Hauler" to Drive Plaintiff's Truck Unless the Brakes
10       Were Fixed.**

11      RTC believes that Plaintiff intends to testify that, after his second accident, he was told

12  by another RTC driver that a "sub-hauler" who had assumed Plaintiff's route and his truck

13  would not use that truck unless the brakes were fixed, and that they were subsequently fixed.

14  RTC believes that Plaintiff intends to so testify because he submitted a declaration in opposition

15  to RTC's motion for summary judgment in which he stated the following:  "I was told by the

16  driver that I trained (and who eventually took my job) that the sub-hauler would not use that

17  trailer unless and until the brakes on it were repaired, and he insisted they be repaired, and they

18  were repaired."  (Ps Decl. ¶ 14.)  RTC moves for an order in limine excluding such testimony on

19  the ground that it constitutes inadmissible hearsay.  Fed. R. Evid. 802.  Indeed, it constitutes

20  double hearsay, because Plaintiff would be testifying about an out of court statement made by

21  the other (unnamed) RTC driver, who was, in turn, reporting an out of court statement made by

22  the (unnamed) "sub-hauler."

23  **10.   Motion in Limine to Exlcude any Testimony, Evidence, Argument or Comment
        Concerning RTC's Failure to Call a Witness who is Equally Available to Either
24       Party.**

25

26      It is well established that where a witness is equally available to both parties through the

27  subpoena process, it is error for one party to comment on the opposing party's failure to call that

28  witness.  See Herbert v. Wal-Mart Stores, Inc., 911 F.2d 1044, 1048 (5th Cir. 1990) (trier of fact

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                    - 12 -              DEFENDANT RECYCLE TO CONSERVE'S
                                                TRIAL BRIEF
                                                2:10-CV-00629-WBS-EFB

may draw no inference from a party's failure to call a witness who is susceptible to subpoena by either party, and it is inappropriate for counsel to argue to the fact finder that such an inference is permissible); McQuaig v. McCoy, 806 F.2d 1298, 1303 (5th Cir. 1987) ("missing witness" appeared to be equally available to both parties and counsel's reference to other party's failure to call this witness was inappropriate); see also, e.g., Fleming v. Safeco Ins. Co., 160 Cal.App.3d 31, 42 (1984) ("[w]here a witness is equally available to both parties, it is error to comment upon the failure of the opposing party to produce that witness"). RTC thus moves for an order in limine prohibiting Plaintiff from making any argument, comment, or statement to the effect that it has failed to call any particular witness who would be equally available to either Plaintiff or RTC through the subpoena process.

**11.** **Motion in Limine to Exlcude Evidence, Comment, Argument, or Testimony Regarding the Existence or Outcome of Pretrial Motions or Discovery Disputes.**

RTC anticipates that Plaintiff may attempt to introduce testimony and evidence regarding the existence or outcome of discovery disputes and pretrial motions in this case. RTC hereby moves for an order in limine excluding such testimony and evidence, in addition to any argument or comment thereon. The sole issue in this case is whether RTC discriminated against Plaintiff because of his race. The existence or outcome of discovery disputes or pretrial motions is irrelevant to this issue, and evidence thereon thus must be excluded. Fed. R. Evid. 402 (only relevant evidence admissible).

Moreover, even if the Court were to find that such evidence is relevant, it must still be excluded because the probative value of such evidence would be outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403. For example, if Plaintiff believed that RTC failed to adequately respond to discovery requests, his proper remedy was to file a motion to compel further responses rather than attempting to prejudice the jury against RTC by raising these issues at trial. As another example, if evidence regarding pretrial motions were introduced, the jury might be improperly influenced by knowing how the Court ruled on a particular motion. See, e.g., Sanguinetti v. Moore Dry Dock Co., 36 Cal.2d 812, 818 (1951) (holding it improper to make motion in presence of jury to increase amount of damages

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2

- 13 -

DEFENDANT RECYCLE TO CONSERVE'S
TRIAL BRIEF
2:10-CV-00629-WBS-EFB

requested because judge has great influence on jury, and jury may be influenced by knowing how judge ruled on motion). Finally, if Plaintiff's counsel is allowed to question RTC's representatives regarding the adequacy of their responses to discovery, those representatives will have to testify about RTC's counsel's instructions regarding discovery, which would violate the attorney-client privilege. See, e.g., Hawk v. Superior Court, 42 Cal.App.3d 108, 126 (1974) (holding it misconduct to ask questions calling for inadmissible testimony). Accordingly, all evidence, testimony, argument, and comment regarding the existence or outcome of discovery disputes or pretrial motions should be excluded.

DATED:        October 17, 2011            WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP


                                          By: /s/        Kelli M. Kennaday
                                          KELLI M. KENNADAY
                                          Attorneys for Defendant
                                          RECYCLE TO CONSERVE, INC.

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

717292.2                                  - 14 -            DEFENDANT RECYCLE TO CONSERVE'S
                                                            TRIAL BRIEF
                                                            2:10-CV-00629-WBS-EFB

# EXHIBIT A

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   EDISON MAYO,                        NO. CIV. 2:10-629 WBS EFB

13         Plaintiff,
                                         MEMORANDUM AND ORDER RE:
14     v.                                MOTION FOR SUMMARY JUDGMENT
                                         OR, IN THE ALTERNATIVE,
15   RECYCLE TO CONSERVE, INC.,          SUMMARY ADJUDICATION OF CLAIMS

16         Defendant.
     _____/
17

18                         ----oo0oo----

19         Plaintiff Edison Mayo brought this action alleging race

20   discrimination and retaliation against defendant Recycle to

21   Conserve, Inc. ("RTC").  Defendant now moves for summary judgment

22   pursuant to Federal Rule of Civil Procedure 56.

23   I.   Factual and Procedural Background

24         Plaintiff, who is African-American, was a truck driver

25   for defendant or its predecessor from 1997 or 1998 to October 30,

26   2009, when he was involuntarily terminated.  (Mayo Decl. ¶ 2

27   (Docket No. 24); Bolanos Decl. ¶ 3, Ex. 2 (plaintiff's employee

28   separation notice) (Docket No. 25).)  Defendant purportedly

                                1

1  terminated plaintiff because he was involved in a second driving
2  accident in violation of defendant's accident policy.  (Odahl
3  Decl. in Supp. of Def.'s Mot. ("Odahl Decl.") ¶¶ 4-11 (Docket No.
4  9-4); McMullin Decl. in Supp. of Def.'s Mot. ("McMullin Decl.")
5  ¶¶ 3-6 (Docket No. 9-5).)

6         Defendant, a nationwide company with multiple
7  facilities, employed plaintiff at its Stockton, California,
8  facility, at which fifteen to twenty employees worked.  (Kennaday
9  Decl. in Supp. of Def.'s Mot. ("Kennaday Decl.") Ex. A ("Mayo
10 Dep. Tr.") at 73:4-6, 74:14 (Docket No. 9-6).)  Plaintiff was one
11 of only three drivers employed at that facility and the only
12 African-American driver.  Two non-driver employees at the
13 Stockton facility were also African-American.  (Odahl Decl. ¶ 3;
14 Mayo Dep. Tr. at 73:24-74:2.)

15        In 2006 or 2007, defendant hired a Caucasian mechanic,
16 Elwood Lindsey,[1] for the Stockton facility.  (Mayo Decl. ¶ 3.)
17 Lindsey, whose responsibilities included servicing plaintiff's
18 truck, called plaintiff names such as "coon-ass" and "coon-ass
19 nigger."  (Original[2] Mayo Decl. ¶¶ 3-4 (internal quotation marks
20

21        [1]    The record contains two spellings of this name: Lindsey
   and Lindsay.  Because declarations submitted by defendant use
22 "Lindsey," (see Docket Nos. 9-4, 9-5), the court will also use
   this spelling.
23
          [2]    At the hearing on defendant's motion, plaintiff
24 requested, and the court granted, additional time to oppose the
   motion.  (Docket No. 21.)  Plaintiff then filed a new opposition
25 memorandum, a new declaration by plaintiff, a new declaration by
   plaintiff's counsel, and a statement of undisputed facts.
26 (Docket Nos. 22-25).  Defendant filed a new reply memorandum,
   supplemental evidentiary objections, and a new reply regarding
27 its statement of undisputed facts.  (Docket No. 26.)  The court
   then took the motion under submission.
28        The new declaration by plaintiff is nearly identical to

                                    2

1  omitted) (Docket No. 10); <u>see also</u> Mayo Dep. Tr. at 53:23-55:1,
2  57:21-58:10 (discussing name calling); <u>id.</u> at 52:2-15 (describing
3  incident in which Lindsey threw chain at plaintiff's feet instead
4  of handing it to plaintiff); Serpa Decl. ¶ 6 ("On many occasions
5  [Lindsey] would engage in the practice of bringing things to
6  [plaintiff] and then dropping them at his feet, and then looking
7  at [plaintiff] like [plaintiff] needed to pick it up.") (Docket
8  No. 11); Mayo Dep. Tr. at 53:23-55:1 (describing incident in
9  which plaintiff went into the shop and Lindsey "cuss[ed]
10 [plaintiff]," called him "[c]oon ass," told him to get out of the
11 shop, "thr[ew] things," "slamm[ed]" his toolbox, and "shoved in
12 doors").)

13          Plaintiff states that Lindsey called him names such as
14 "coon-ass" and "coon-ass nigger" "very, very often" and
15 specifically recalls at least ten times. (Original Mayo Decl. ¶
16 3 (internal quotation marks omitted in first and second
17 quotations).) A co-employee, Joseph Serpa, states that Lindsey

18

19 the declaration by plaintiff originally submitted in opposition
20 to the motion, with only one significant difference: Plaintiff's
   original declaration states that Lindsey called him "coon-ass"
21 <u>and</u> "coon-ass nigger," whereas the new declaration states only
   that Lindsey called him "coon-ass." (<u>Compare</u> Original Mayo Decl.
22 ¶ 3 (Docket No. 10), <u>with</u> Mayo Decl. ¶ 3 (Docket No. 24).)
           It is not clear whether plaintiff intended his new
23 declaration to be the same as the original declaration or to
   supplement or amend it.  The court is guided by plaintiff's
24 counsel's citation to the original declaration in the new
   opposition memorandum, specifically the "coon-ass nigger" term.
25 (Pl.'s Mem. in Opp'n at 3:22-23 ("He was called a 'coon-ass
   nigger' . . . .") (Docket No. 22).)  Thus, the court will treat
26 both the original and new declarations as operative.
           The court will treat the declaration by plaintiff's co-
27 employee Joseph Serpa, (Docket No. 11), as still operative, even
   though plaintiff did not file it for a second time, because
28 plaintiff's counsel cites Serpa's declaration in the new
   opposition memorandum.  (Pl.'s Mem. in Opp'n at 3:22-25.)

                                3

would "always talk badly about [plaintiff]" and referred to him as a "lazy, no-good nigger" approximately five to ten times in Serpa's presence.  (Serpa Decl. ¶ 3 (internal quotation marks omitted in second quotation).)

According to plaintiff, Lindsey also failed to properly service plaintiff's truck:

> [H]e never repaired my truck in a timely fashion, and he often did poor work repairing my truck.  In many instances, he simply refused to undertake needed repairs and I had to do the repairs myself or get the help of other employees.  Things that went wrong with the truck included changing lights on the truck.  As a driver, I was not supposed to do my own repairs.  But [Lindsey] refused to make these repairs on my truck.  And on those occasions when he did actually perform the repairs, it took a very long time, days and weeks, for him to do the repairs.

(Mayo Decl. ¶ 4; see also Mayo. Dep. Tr. at 60:13-62:6 (describing one occasion in which plaintiff was not able to use a particular truck for approximately three weeks because Lindsey did not repair it).)

Plaintiff claims that the Caucasian drivers received better repairs:

> I would see the white drivers take their trucks in for repair, and then I would see the trucks come out of the repair shop after repairs were done.  From this, I am able to conclude that their trucks were repaired, whereas my truck never went into the repair shop to begin with, despite my request for repairs.

(Supplemental Mayo Decl. ¶ 3 (Docket No. 17).)

In the summer of 2007 or 2008, plaintiff first complained about Lindsey to the general manager of the Stockton

4

facility, Sean Odahl,[3] a Caucasian.  (Mayo. Dep. Tr. at 51:6-7.)
The parties agree that plaintiff complained to Odahl, but
disagree on whether plaintiff complained that Lindsey's conduct
related to plaintiff's race.

Plaintiff claims that he complained to Odahl that
Lindsey "was racist against" plaintiff:

> O'Dahl and I actually talked about how [Lindsey] was
> racist against me.   In fact, O'Dahl told me that
> [Lindsey] was racist, and had some kind of mental
> problem, and that I should just "stay away" from him.  We
> discussed this on at least three or four occasions when
> I would complain about [Lindsey].

(Mayo Decl. ¶ 7; <u>see also</u> Mayo Dep. Tr. at 50:4-51:24, 58:20-22
(discussing complaining about Lindsey's "racist way" to Odahl),
52:16-53:20 (discussing complaining to Odahl about the chain
incident), 53:21-54:5, 55:2-7 (discussing complaining to Odahl
about Lindsey telling plaintiff to leave the shop).  <u>But see</u> Mayo
Dep. Tr. at 55:2-7 (acknowledging that in complaining to Odahl
about Lindsey telling plaintiff to leave the shop he did not tell
Odahl that Lindsey called him "coon ass"), 58:20-22
(acknowledging that he never told anyone in management that
Lindsey had said "coon ass").  Plaintiff states that Odahl never
took a statement from him and Lindsey's mistreatment continued.
(Mayo Decl. ¶ 7.)

Plaintiff also reported to Odahl on five or six
occasions that Lindsey did not properly service plaintiff's
truck.   (Mayo Decl. ¶ 6; <u>see also</u> Mayo Dep. Tr. at 60:13-62:9
(discussing complaining to Odahl about Lindsey's failure to

---

[3]   Plaintiff and Serpa's declarations incorrectly spell
Odahl's name as "O'Dahl."

1  repair truck for three weeks).)   According to plaintiff, Odahl
2  never took a statement from plaintiff and "would always only say
3  'I will talk to him' or 'I will take care of it.'" (Mayo Decl. ¶
4  6.)   Plaintiff claims that Lindsey continued to refuse to
5  properly repair his truck despite his complaints to Odahl.  (Id.)

6          Not only did Odahl fail to take a statement from
7  plaintiff when he complained about Lindsey's failure to repair
8  his truck, plaintiff also perceived that Odahl was "getting
9  annoyed": "It's just the way he was acting when I would come in
10 and complain about this.  I'll take care of it.  It's nothing to
11 it."  (Mayo Dep. Tr. at 60:11-15; see also id. at 61:14-21
12 (describing Odahl's responses to multiple complaints about
13 Lindsey's failure to repair truck for three weeks).)

14         With respect to Lindsey's authority and relationship
15 with Odahl, plaintiff states:

16     [Lindsey] always tried to tell everyone what to do.  He
       always tried to tell me what to do.  He acted like my
17     supervisor.    O'Dahl   never   countermanded   any   of
       [Lindsey's] orders.  Thus, to me it was like I had two
18     supervisors: both [Lindsey] and O'Dahl.

19     I got the feeling that [Lindsey] and O'Dahl were close
       friends. . . . They often talked together privately and
20     could be seen socializing at the yard.

21 (Mayo Decl. ¶¶ 9-10.)  Serpa, plaintiff's co-employee, states
22 that Lindsey "acted like he was the boss, like he had authority
23 over Sean O'Dahl. [Lindsey] would often try and give us orders
24 and tell us what to do."  (Serpa Decl. ¶ 3.)

25         In his declaration, Odahl acknowledges that plaintiff
26 complained to him about Lindsey "on several occasions."  (Odahl
27 Decl. ¶ 7.)  Odahl states that plaintiff did not complain that
28 Lindsey's conduct was related to plaintiff's race:

                               6

1     The nature of Mr. Mayo's complaints were that he and Mr.
      Lindsey were having a disagreement of some sort, or that
2     Mr. Lindsey was not fixing his truck as quickly as Mr.
      Mayo would like.   Mr. Mayo never advised me that Mr.
3     Lindsey had made any comments of a racial nature to him,
      nor did Mr. Mayo indicate that he believed Mr. Lindsey's
4     actions toward him were based upon his race.

5     (Id.)  Odahl's declaration does not address how, if at all, he

6     responded to those "several" complaints that Odahl acknowledges

7     he received.

8          In addition to his termination, plaintiff points to

9     other instances in which Odahl discriminated against him based on

10    race during the course of his employment.  Plaintiff claims that

11    Lindsey and Odahl "tried to blame [plaintiff] for allowing the

12    truck to overheat and not bringing it in sooner."  (Mayo Decl. ¶

13    5.)  Plaintiff also claims that Odahl assigned the Caucasian

14    drivers better routes and better trucks.  (Id. ¶¶ 13-15.)

15         In August of 2005, defendant implemented a policy

16    related to accidents:

17        Simply stated, if you are involved in two (2) accidents
          involving property damage or injury while operating
18        company equipment, your employment may be terminated.
          This is in addition to the existing "zero-tolerance" drug
19        policy, which includes the provision that a positive
          result from a single post-accident drug test can result
20        in termination as well.

21    (McMullin Decl. Ex. A.)  While the policy does not appear to

22    expressly contemplate whether an accident was a fault or no-fault

23    accident, the "may" in the policy's language suggests that

24    termination was permissive following two accidents.

25         In June of 2007, plaintiff was involved in an accident

26    in which "the box" fell off of his truck when he turned left at a

27    traffic light.  (Odahl Decl. ¶ 4, Ex. A.)  It appears from the

28    evidence that Robert Standert, not Odahl, was the general manager

                                  7

1  of the Stockton facility at the time of the first accident.
2  While plaintiff testified that he understood that the accident
3  counted as one accident under the accident policy, he testified
4  that he did not think that after the 2007 accident a second
5  accident could result in his termination.  Plaintiff's reasons
6  were that the accident was not his fault because "the box" was
7  not appropriate for the truck and "there were other people that
8  had plenty of accidents that were not terminated."  (See Mayo
9  Dep. Tr. 21:10-23:25 (discussing first accident).)

10          On October 13, 2009, plaintiff was involved in a second
11  accident in which the "tractor jackknifed into the attached
12  trailer."  (Odahl Decl. ¶ 5, Ex. B; see also Mayo Dep. Tr. at
13  27:13-25 (discussing second accident); Mayo Decl. ¶¶ 13-14
14  (same)).  The accident occurred when plaintiff was driving below
15  the speed limit, at twenty-five miles per hour, and breaking as
16  he approached a red light in wet or rainy conditions.
17  Plaintiff's position is the accident was not his fault because
18  the breaks were faulty and locked when he pressed them.

19          Plaintiff refused to drive the truck back to the
20  facility and Lindsey was dispatched to inspect the truck and
21  drive it back.  Plaintiff claims that a week before the accident
22  Lindsey had worked on the truck and had told plaintiff everything
23  was "fine."   (Mayo Decl. ¶ 13.)  As evidence that the accident
24  was not his fault and that the breaks were faulty, plaintiff
25  states that he was told by another driver that the "sub-hauler"
26  who assumed that route and truck following plaintiff's accident
27  refused to drive the truck until the breaks were fixed, and they
28  were then fixed.  Plaintiff and the other drivers had also

1 previously discussed that the truck had problems.

2       Plaintiff states that when he returned to the facility
3 on the day of the second accident Odahl told plaintiff "that it
4 was likely the case that the truck just malfunctioned, and that
5 the brakes locked up." (Id. ¶ 13.) Nonetheless, Odahl in his
6 Supervisor's Incident Investigation Report places the blame on
7 plaintiff:

8     Excessive braking in rainy conditions was the cause of
    this accident. Of which the driver operating the vehicle
9     has total control. Given the fact that another driver
    operated this very same vehicle after the incident in the
10     same rainy conditions safely, [sic] indicates that
    excessive breaking and possible negligence was the root
11     cause of the accident.

12 (Odahl Decl. Ex. B.) According to Odahl's report, Lindsey did
13 not find any mechanical problems with the truck. (Id.)

14       Plaintiff claims he was not aware during the days
15 following the accident that he could be terminated. (See Mayo
16 Decl. ¶ 16.) Defendant allowed plaintiff to continue driving for
17 over two weeks following the accident and to train a new driver.
18 (Id.) However, Odahl initiated plaintiff's termination following
19 the accident:

20     Following Mr. Mayo's second accident, I determined that
    Mr. Mayo had violated RTC's two-accident policy and
21     recommended that his employment be terminated based upon
    his violation of that policy. I made my recommendation
22     to Robert McMullin, RTC's President.

23 (Odahl Decl. ¶ 6.) Based upon Odahl's recommendation, president
24 of defendant, Robert McMullin, approved the termination of
25 plaintiff. (McMullin Decl. ¶¶ 3-5.) McMullin states that he
26 approved the termination based on plaintiff's violation of the
27 accident policy. (Id.) On October 30, 2009, over two weeks
28 following the accident, Odahl informed plaintiff of his

1  termination.   (See generally Mayo Dep. Tr. 45:1-46:19 (discussing
2  termination meeting.)

3        Plaintiff claims that the accident policy was applied
4  differently to him than to other drivers.  Plaintiff's
5  declaration states that he is "personally aware" of four
6  accidents involving Caucasian driver Ralph Lantz and a failed
7  drug test following one of them, four accidents involving
8  Caucasian driver Kevin Christian,[4] including one in which
9  Christian "ran his truck into [plaintiff's] vehicle," and several
10 accidents involving Caucasian mechanic Lindsey driving
11 defendant's trucks.  (Mayo Decl. ¶ 11.)  On one occasion, Lindsey
12 "backed into [plaintiff] with his truck into [plaintiff's]
13 company truck."  (Id. ¶ 12.)  Plaintiff claims that defendant did
14 not even take a statement from him following the two accidents in
15 which his vehicle was hit.  Odahl disagrees that the policy was
16 applied unevenly and states that only Lantz was involved in one
17 accident following implementation of the policy.  (Odahl Decl. ¶
18 8.)

19       On March 16, 2010, plaintiff filed the instant action.
20 (Docket No. 2.)  Plaintiff alleges claims for race discrimination
21 and retaliation pursuant to Title VII of the Civil Rights Act of
22 1964.  See 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).  Plaintiff
23 also alleges a claim for violation of California Labor Code
24 section 1102.5(c).  See Cal. Labor Code § 1102.5(c).

25 II.  Discussion

26

27      [4]    The record contains multiple spellings of this name:
   Christian, Christiansen, and Christianson.  Plaintiff's
28 declaration uses "Christian."  The court will also use
   "Christian."

10

1        Summary judgment is proper "if the movant shows that
2   there is no genuine dispute as to any material fact and the
3   movant is entitled to judgment as a matter of law." Fed. R. Civ.
4   P. 56(a). A material fact is one that could affect the outcome
5   of the suit, and a genuine issue is one that could permit a
6   reasonable jury to enter a verdict in the non-moving party's
7   favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
8   (1986). The party moving for summary judgment bears the initial
9   burden of establishing the absence of a genuine issue of material
10  fact and can satisfy this burden by presenting evidence that
11  negates an essential element of the non-moving party's case.
12  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
13  Alternatively, the moving party can demonstrate that the
14  non-moving party cannot produce evidence to support an essential
15  element upon which it will bear the burden of proof at trial.
16  Id.

17       Once the moving party meets its initial burden, the
18  burden shifts to the non-moving party to "designate 'specific
19  facts showing that there is a genuine issue for trial.'" Id. at
20  324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden,
21  the non-moving party must "do more than simply show that there is
22  some metaphysical doubt as to the material facts." Matsushita
23  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
24  "The mere existence of a scintilla of evidence . . . will be
25  insufficient; there must be evidence on which the jury could
26  reasonably find for the [non-moving party]." Anderson, 477 U.S.
27  at 252.

28       In deciding a summary judgment motion, the court must

11

1 | view the evidence in the light most favorable to the non-moving
2 | party and draw all justifiable inferences in its favor. Id. at
3 | 255. "Credibility determinations, the weighing of the evidence,
4 | and the drawing of legitimate inferences from the facts are jury
5 | functions, not those of a judge . . . ruling on a motion for
6 | summary judgment . . . ." Id.

7      A.    Evidentiary Objections

8      Federal Rule of Civil Procedure 56, as amended on
9 | December 1, 2010, now states that "[a] party may object that the
10 | material cited to support or dispute a fact cannot be presented
11 | in a form that would be admissible in evidence." Fed. R. Civ. P.
12 | 56(c)(2). The Advisory Committee notes to the amended rule
13 | explain that an objection to evidence on a motion for summary
14 | judgment "functions much as an objection at trial, adjusted for
15 | the pretrial setting. The burden is on the proponent to show
16 | that the material is admissible as presented or to explain the
17 | admissible form that is anticipated." Id. advisory committee's
18 | notes on 2010 amendments. A party may also object to summary
19 | judgment evidence based on the "sham affidavit rule."[5]

20

21     [5] "The general rule in the Ninth Circuit is that a party
cannot create an issue of fact by an affidavit contradicting his
22 | prior deposition testimony." Kennedy v. Allied Mut. Ins. Co.,
952 F.2d 262, 266 (9th Cir. 1991). "[I]f a party who has been
23 | examined at length on deposition could raise an issue of fact
simply by submitting an affidavit contradicting his own prior
24 | testimony, this would greatly diminish the utility of summary
judgment as a procedure for screening out sham issues of fact."
25 | Id. (quoting Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462
(9th Cir. 1985)) (alteration in original) (internal quotation
26 | marks omitted).
     The sham affidavit rule may be invoked only if a
27 | district court makes "a factual determination that the
contradiction was actually a 'sham'" and "the inconsistency
28 | between a party's deposition testimony [or interrogatory
response] and subsequent affidavit . . . [is] clear and

1    Following the filing of defendant's thirteen objections
2  to plaintiff's original declaration and eight objections to
3  plaintiff's co-employee Serpa's declaration, (Docket No. 15-1),
4  the court continued the hearing and allowed plaintiff to file a
5  response to the objections.  (Docket Nos. 16-18.)  The court
6  allowed defendant to file a reply to plaintiff's response.[6]
7  (Docket No. 19.)

8           1.  Plaintiff's Original Declaration

9           Defendant objects to statements in plaintiff's original
10  declaration pursuant to evidentiary rules governing personal
11  knowledge, relevance, hearsay, legal conclusions, conclusory
12  statements, and sham affidavits.  Based on evidentiary rules
13  governing personal knowledge and hearsay, the court sustains in
14  full objections 3 and 7 and sustains in part objections 4-5, 8,
15  and 9 to plaintiff's original declaration.[7]  The court overrules

16

17  unambiguous."  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998
     (9th Cir. 2009) (quoting Kennedy, 952 F.2d at 267) (internal
18  quotations marks omitted in first quotation).  Accordingly, "the
     non-moving party is not precluded from elaborating upon,
19  explaining or clarifying prior testimony elicited by opposing
     counsel on deposition; minor inconsistencies that result from an
20  honest discrepancy, a mistake, or newly discovered evidence
     afford no basis for excluding an opposition affidavit."  Messick
21  v. Horizon Indus., Inc., 62 F.3d 1227, 1231 (9th Cir. 1995).

22       [6]   Defendant withdrew in part objection 2 to plaintiff's
     original declaration.  Plaintiff withdrew plaintiff's
23  objectionable statement in response to objection 12.
          Defendant withdrew objection 1 to Serpa's declaration.
24  Plaintiff expressly withdrew a statement in response to objection
     2.  The court finds that plaintiff implicitly withdrew Serpa's
25  statements in response to objections 6-8 because plaintiff did
     not respond to the objections despite expressly acknowledging
26  these three objections in his response.

27       [7]   The court sustains the objections to the following
     statements in plaintiff's original declaration: (1) "[a]nother
28  driver also drove the truck, Kevin Christian, and it continued to
     have problems" and "Kevin Christian is Caucasian, and he was not

                              13

1   defendant's objections to plaintiff's original declaration in all
2   other respects.

3        While the court declines to address each objection in
4   detail, two statements, objections to which the court overrules,
5   are particularly important to defendant's motion and warrant
6   analysis.  First, defendant objects to the following statement
7   based on the sham affidavit rule:

8        O'Dahl and I actually talked about how [Lindsey] was
         racist against me.   In fact, O'Dahl told me that
9        [Lindsey] was racist, and had some kind of mental
         problem, and that I should just "stay away" from him.  We
10       discussed this on at least three or four occasions when
         I would complain about [Lindsey].
11

12  (Original Mayo Decl. ¶ 7.)

13       Defendant fails to recognize that, while plaintiff
14  testified that he did not use the "exact words," he told Odahl
15  that "[Lindsey] was coming at [plaintiff] in a negative way, in
16  a, in a _racist way_."  (Id. at 50:6-11 (emphasis added).)
17  Plaintiff also testified that he told Odahl that Lindsey was
18  saying things "he shouldn't be saying" and "talking to
19  [plaintiff] in a, in a bad way," and that Odahl just told him to
20

21  even blamed for causing the problem"; (2) "[i]f a white driver
22  went to O'Dahl and asked for a repair or a different truck, the
    white driver would get the work done"; (3) "O'Dahl never . . .
23  took any action against [Lindsey in response to my complaints
    about repairs]"; (4) "whenever I brought my problems to O'Dahl
24  about [Lindsey's failure to repair my truck], he never did
    anything for me"; (5) "nothing was ever done [in response to my
25  complaints to Odahl that Lindsey was racist against me]: no
    investigation, . . ., nothing"; (6) "O'Dahl never took any action
26  against [Lindsey] for anything he did to me"; (7) "[t]he company
    did nothing [when Kevin Christian ran his truck into my vehicle].
27  . . . Nothing was ever done about it [when Lindsey had several
    accidents driving company trucks]"; and (8) "no report was ever
28  made [when Lindsey ran his truck into plaintiff's company
    truck]."  (Original Mayo Decl. ¶¶ 5-7, 10-12, 16.)

                                14

1 not "worry about him, just play him off, stay away from him the
2 best [plaintiff] [could]." (Id. at 50:1-3.)  When defendant's
3 counsel asked if plaintiff "just" told Odahl that Lindsey was
4 "making negative comments," plaintiff agreed but added: "You
5 know, [Odahl] got my point on how I said it.  I mean, he knew
6 what I was talking about. . . . His response was, you know, just
7 stay away from him, that's kind of how he is." (Id. at 50:15-
8 25.)  In sum, plaintiff declaration statement that he told Odahl
9 that Lindsey "was racist against" plaintiff is not in direct
10 contradiction to his deposition testimony. (See Original Mayo
11 Decl. ¶ 7.)

12       Moreover, the number of times that plaintiff complained
13 about Lindsey's racism, three or four times according to
14 plaintiff's original declaration, is not in direct contradiction
15 to his deposition testimony. "[T]he non-moving party is not
16 precluded from elaborating upon, explaining or clarifying prior
17 testimony elicited by opposing counsel on deposition." Messick
18 v. Horizon Indus., Inc., 62 F.3d 1227, 1231 (9th Cir. 1995).

19       Second, defendant objects to plaintiff's statement
20 relating to Lantz's and Christian's accidents based on the sham
21 affidavit rule, personal knowledge, and hearsay:

22       I personally know of two other drivers who had two
        accidents and were not terminated under the two accident
23       rule.  They were white drivers.  The two other drivers
        are Ralph and Kevin Christian.  Ralph had at least four
24       accidents that I am personally aware of, and had failed
        a drug test after one of the accidents.  But he was not
25       terminated.  Kevin Christian had four accidents as well.

26 (Original Mayo Decl. ¶ 11.)

27       Defendant's sham affidavit rule objection is based on
28 plaintiff providing a different number of accidents involving

15

1  Lantz and Christian at the deposition.  However, "the non-moving
2  party is not precluded from elaborating upon, explaining or
3  clarifying prior testimony elicited by opposing counsel on
4  deposition."  <u>Messick</u>, 62 F.3d at 1231.

5        The court declines to find that plaintiff lacks
6  personal knowledge when plaintiff testified at the deposition
7  that Lantz and Christian told him about their accidents.  (<u>See</u>
8  Mayo Dep. Tr. at 68:13-15, 69:8-10.)  In his supplemental
9  declaration following defendant's objections, plaintiff also
10  states: "I talked with these other drivers about their accidents.
11  We talked when we were at the yard, or on break."  (Supplemental
12  Mayo Decl. ¶ 5.)  While plaintiff may not have personal knowledge
13  that the accidents in fact occurred, plaintiff has personal
14  knowledge that Lantz and Christian told him about their
15  accidents.

16        Lastly, with respect to whether plaintiff's statement
17  contains inadmissible hearsay, there appears to be a number of
18  ways in which the evidence could be presented in an admissible
19  form at trial.  First, plaintiff states in his supplemental
20  declaration: "I also know that these individuals do not want to
21  jeopardize their place in the company, but that if they are
22  forced to testify, that they would testify truthfully about their
23  accidents."  (Supplemental Mayo Decl. ¶ 5.)  Second, plaintiff's
24  original declaration states that he observed first-hand one of
25  Christian's accidents because Christian "ran his truck into
26  [plaintiff's] vehicle."  (Original Mayo Decl. ¶ 7.)

27        Third, Lantz's and Christian's out of court statements
28  about their accidents could be admissible as an admission by a

1  party-opponent.   Federal Rule of Evidence 801(d)(2)(d) provides
2  that a statement is not hearsay if it is offered against a party
3  and is "a statement by the party's agent or servant concerning a
4  matter within the scope of the agency or employment, made during
5  the existence of the relationship."   Fed. R. Evid. 801(d)(2)(d).

6         Fourth, even if the statements were not admissions by a
7  party-opponent, plaintiff could offer them for the limited
8  purpose of showing that defendant was <u>on notice</u> of the accidents,
9  not for the truth of the matter asserted, i.e., whether the
10  accidents in fact occurred:  <u>See</u> <u>id.</u> 801(c).

11         2.   <u>Serpa's Declaration</u>

12         Defendant objects to statements in the declaration of
13  plaintiff's co-employee Serpa based on evidentiary rules
14  governing hearsay, personal knowledge, and conclusory statements.
15  The court sustains the contested objections, objections 3-5, for
16  lack of personal knowledge.

17         3.   <u>Supplemental Objections</u>

18         In connection with its new reply, defendant filed
19  "supplemental" objections to plaintiff's new declaration, Serpa's
20  declaration, and plaintiff's counsel's new declaration, although
21  defendant acknowledges that the objections only "reiterate its
22  evidentiary objections in relation to the 'new,' but
23  substantially unchanged, submissions by Plaintiff."   (Def. RTC's
24  Supplemental Evidentiary Objections at 1:21-22 (Docket No. 26-
25  2).)

26         Defendant's objections to plaintiff's new declaration
27  merely repeat the same objections it made to plaintiff's original
28  declaration, which is understandable because the two declarations

1 are nearly identical.  The only truly supplemental objection to
2 plaintiff's new declaration is based on the assumption that
3 plaintiff's original declaration has been superseded.  (See Def.
4 RTC's Supplemental Evidentiary Objections at 4:14-5:1 (objecting
5 to plaintiff's statement that Lindsey called him "coon ass"
6 because plaintiff's original declaration states that plaintiff
7 called him "coon-ass" and "coon-ass nigger").)  However, because
8 plaintiff's counsel cites the original declaration in his new
9 opposition memorandum, (see Pl.'s Mem. in Opp'n at 3:22-23
10 (Docket No. 22)), the court treats both plaintiff's original and
11 new declaration as operative.

12      Defendant's objections to Serpa's declaration are
13 identical to objections upon which the court has previously
14 ruled.

15      The only other truly supplemental objection is to
16 plaintiff's counsel's new declaration statement[8] describing an
17 attached exhibit.  Based on the original document rule, the court
18 sustains this objection.

19      B.   Merits

20      Plaintiff's claims for race discrimination and
21 retaliation under Title VII are subject to the McDonnell Douglas
22 burden-shifting analysis used at summary judgment to determine
23 whether there are triable issues of fact for resolution by a
24 jury.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

25 _____

26      [8]   Plaintiff's counsel states: "plaintiff discovered a
court-filed document from San Joaquin County Superior Court in
27 which one of the company's Caucasian drivers, Kevin Christian,
was involved in an accident while on company time, and using a
28 company truck, causing property damage . . . ."  (Bolanos Decl. ¶
6 (Docket No. 25).)

Under <u>McDonnell Douglas</u>,

> a plaintiff must first establish a prima facie case of discrimination [or other illegal conduct]. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination [or other illegal conduct] disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

<u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 50 n.3 (2003) (citations omitted). "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."[9] <u>Chuang v. Univ. of Cal. Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998)).

      1.   <u>Race Discrimination</u>

Plaintiff has the burden of establishing a prima facie

---

[9] Earlier case law suggests that circumstantial evidence to show pretext must be "specific" and "substantial." <u>See e.g.</u>, <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1222 (9th Cir. 1998). The "specific" and "substantial" evidence requirement has been questioned in light of <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003), in which the Supreme Court recognized that circumstantial evidence may be "more certain, satisfying and persuasive than direct evidence." <u>Id.</u> at 100; <u>see</u> <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1030-31 (9th Cir. 2006) (questioning the continued viability of <u>Godwin</u> and "conclud[ing] that in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence"); <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1124 (9th Cir. 2004) (holding that a disparate treatment plaintiff can defeat summary judgment motion relying on circumstantial evidence).

1  case by showing that "(1) he is a member of a protected class;
2  (2) he was qualified for his position; (3) he experienced an
3  adverse employment action; and (4) similarly situated individuals
4  outside his protected class were treated more favorably, or other
5  circumstances surrounding the adverse employment action give rise
6  to an inference of discrimination." Peterson v. Hewlett-Packard
7  Co., 358 F.3d 599, 603 (9th Cir. 2004).  The Ninth Circuit has
8  held that a plaintiff's burden in establishing a prima facie case
9  of discrimination is "minimal." Coghlan v. Am. Seafoods Co., 413
10  F.3d 1090, 1094 (9th Cir. 2005).

11          Plaintiff is an African-American who was terminated,
12  thus satisfying the first and third elements for prima facie race
13  discrimination.  Defendant argues that plaintiff does not satisfy
14  the second element, which requires that he was qualified for his
15  position, because "Plaintiff was not performing competently at
16  the time of his termination.  Specifically, Plaintiff had two
17  accidents which damaged Company property and which violated RTC's
18  two-accident policy."[10]  (Mem. of P. & A. in Supp. of Def.'s Mot.
19  at 5:12-14 (Docket No. 9-1).)  However, plaintiff has pointed to
20
21          [10]    On its face, defendant's argument that plaintiff is not
22  qualified is the same argument that it had a legitimate,
    nondiscriminatory reason for terminating plaintiff: violation of
23  defendant's accident policy.  See, e.g., Gosho v. U.S. Bancorp
    Piper Jaffray Inc., No. 00-1611, 2002 WL 34209804, at *3 (N.D.
24  Cal. Oct. 1, 2002) (defendant argued that plaintiff was not
    qualified because plaintiff violated defendant's policies).
25  However, defendant's argument that plaintiff is not qualified is
    slightly different because defendant seems to argue that even if
26  it did not have an accident policy, plaintiff would be
    unqualified because he was performing incompetently, i.e., he was
27  at fault for his accidents.
            Even if defendant's qualification argument were
28  identical to its legitimate, nondiscriminatory reason, the court
    would find that plaintiff has met his burden.

                                    20

1  evidence suggesting that the accidents were not his fault.  (See
2  Mayo Dep. Tr. 21:10-23:25, 27:13-25; Mayo Decl. ¶¶ 13-14.)
3  Moreover, with regards to his qualifications, plaintiff states:

4      I am a truck driver with a Class A license in good
       standing and all endorsements.  I have been a certified
5      and licensed truck driver for approximately thirteen
       years.  During my entire career, I was never disciplined
6      or written-up [sic] and every year I always received a
       raise.  I also have received a bonus for good driving in
7      2006.

8  (Mayo Decl. ¶ 2.)  Thus, plaintiff has presented sufficient
9  evidence to satisfy the second element of prima facie race
10  discrimination.

11        Plaintiff has satisfied the final element of prima
12  facie race discrimination that "similarly situated individuals
13  outside his protected class were treated more favorably."
14  Peterson, 358 F.3d at 603.  Plaintiff states in his declaration:

15      I personally know of two other drivers who had two
       accidents and were not terminated under the two accident
16     rule.  They were white drivers.  The two other drivers
       are Ralph and Kevin Christian.  Ralph had at least four
17     accidents that I am personally aware of, and had failed
       a drug test after one of the accidents.  But he was not
18     terminated.  Kevin Christian had four accidents as well.
       In fact, on one occasion he ran his truck into my
19     vehicle.  I had to take him to court for that. . . . No
       statements were taken [by defendant].  Kevin Christian is
20     white.[11]

21  (Mayo Decl. ¶ 11.)  Plaintiff's supplemental declaration adds
22  that plaintiff was told about these accidents by Lantz and
23  Christian "when [they] were at the yard, or on break."
24  (Supplemental Mayo Decl. ¶ 5.)  Plaintiff claims that he "know[s]

25  _____

26      [11]  Plaintiff also states that Lindsey was involved in
    accidents.  However, Lindsey was a mechanic and thus not
27  similarly situated to plaintiff.  See Vasquez v. Cnty. of Los
    Angeles, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are
28  similarly situated when they have similar jobs and display
    similar conduct.").

1  that these individuals do not want to jeopardize their place in
2  the company, but that if they were forced to testify, that they
3  would testify truthfully about their accidents."   (Id.)

4        To satisfy this final element of a prima facie race
5  discrimination claim, the evidence need only be "minimal."
6  Coghlan, 413 F.3d at 1094.  Plaintiff has provided more than
7  adequate evidence to establish at the prima facie stage that
8  similarly situated employees were treated differently.  See
9  Singson v. Farber, No. C 09-5023, 2010 WL 5399217, at *10 (N.D.
10 Cal. Dec. 23, 2010) (holding that race discrimination plaintiff
11 who was disciplined for violating internal policy did not have to
12 provide "specific evidence of other individuals" who violated
13 policy and "who were treated differently" to establish a prima
14 facie case).  Accordingly, the court finds that plaintiff has
15 established a prima facie case of race discrimination.

16        Defendant has offered a legitimate, nondiscriminatory
17 reason for plaintiff's termination.  Defendant presents evidence
18 that plaintiff was involved in two accidents in violation of
19 defendant's accident policy.  Subsequent to the second accident,
20 Odahl, general manager of the Stockton facility, recommended
21 plaintiff's termination and McMullin, president of defendant,
22 approved the termination.  (See Odahl Decl. ¶¶ 4-5, Exs. A-B;
23 McMullin Decl. Ex. A.)  Thus, the McDonnell Douglas presumption
24 that defendant terminated plaintiff because of his race "drops
25 out of the picture."  Cornwell v. Electra Cent. Credit Union, 439
26 F.3d 1018, 1032 (9th Cir. 2006) (quoting Reeves v. Sanderson
27 Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)) (internal
28 quotation marks omitted).

1           Plaintiff has presented sufficient evidence that
2   defendant's proffered legitimate, nondiscriminatory reason is
3   pretextual.  Plaintiff presents evidence that the accident policy
4   was applied differently to two similarly situated Caucasians,
5   Lantz and Christian, as discussed above.  See Vasquez v. Cnty. of
6   Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) ("A showing that
7   the County treated similarly situated employees outside Vasquez's
8   protected class more favorably would be probative of pretext.");
9   id. ("[I]ndividuals are similarly situated when they have similar
10  jobs and display similar conduct.").

11          In response to plaintiff's claims, Odahl's declaration
12  only offers qualified, conclusory statements about whether Lantz
13  and Christian were involved in accidents as defined under the
14  policy:

15          To my knowledge, no other driver at the Stockton facility
            has been involved in two accidents involving property
16          damage or injury while operating Company equipment
            following implementation of the two-accident policy,
17          other than Mr. Mayo.  I understand that Mr. Mayo claims
            that Mr. Lindsey, Mr. Christian, and Mr. Lantz were
18          involved in two accidents at some point in time.  Mr.
            Lindsey is not a driver and RTC's two-accident policy
19          applies only to drivers.  Moreover, to my knowledge, Mr.
            Lindsey has not been involved in any accidents involving
20          injury or property damage since the two-accident policy
            was implemented.  Mr. Christiansen has not been involved
21          in any accidents following implementation of the
            two-accident policy, and Mr. Lantz was involved in only
22          one accident following implementation of the two-accident
            policy.
23

24  (Odahl Decl. ¶ 8.)

25          It does not appear that Odahl even has personal
26  knowledge on this issue.  It appears that Odahl was not the
27  facility's general manager the entire period that the accident
28  policy had been in effect.  The policy was implemented in August

                                23

1   of 2005.  When plaintiff was terminated in October of 2009, Odahl

2   had been his supervisor for only two or three years.  (Mayo Dep.

3   Tr. at 18:6-8.)  As noted earlier, when plaintiff was involved in

4   his first accident in June of 2007 the general manager was

5   Standert, not Odahl.  Defendant has not submitted declarations

6   from Standert, other former general managers, or declarations

7   from Lantz and Christian themselves.  No documentary evidence has

8   been presented to the court.

9         A jury could reasonably infer that, if defendant's

10   reason for terminating plaintiff was a violation of the accident

11   policy, defendant would not have permitted plaintiff to continue

12   driving for over two weeks and to train a new driver.  Not only

13   did defendant permit plaintiff to continue working as usual,

14   defendant did not even suggest to plaintiff that he could be

15   terminated under the accident policy.

16         Further, the notion that defendant had no choice but to

17   terminate plaintiff "may reasonably appear to be an overstatement

18   sounding in pretext."  Rosales v. Career Sys. Develop. Corp., No.

19   Civ. 08-1383 WBS KJM, 2009 WL 3644867, at *12 (E.D. Cal. Nov. 2,

20   2009).  The accident policy appears to be discretionary,

21   providing that two accidents "may" result in termination.

22   (McMullin Decl. Ex. A.)  Odahl does not even acknowledge the

23   discretionary nature of the accident policy.  Odahl's declaration

24   implies that he was required to recommend plaintiff's termination

25   following plaintiff's second accident.  (See Odahl ¶ 6.)

26   Defendant's president makes a similar implication.  (See McMullin

27   ¶ 4.)

28

1     Even if Odahl[12] and McMullin had stated that they
2  decided to exercise their discretion under the accident policy
3  because plaintiff was at fault for his two accidents,[13] the court
4  would still find sufficient evidence of pretext.  Odahl placed
5  the blame on plaintiff in his Supervisor's Incident Investigation
6  Report.  However, Odahl told plaintiff immediately after the
7  accident "that it was likely the case that the truck just
8  malfunctioned, and that the brakes locked up."  (Mayo Decl. ¶
9  13.)  Thus, a reasonable jury could find that defendant was not
10  actually motivated by plaintiff's fault in light of these
11  inconsistent statements.

12     A reasonable jury could also find that Odahl did not
13  believe Lindsey when Lindsey essentially told Odahl that
14  plaintiff was at fault for the second accident.  Odahl's basis
15  for blaming plaintiff is what Lindsey had told Odahl following
16  the accident: Lindsey had been able to drive the truck back
17  safely to the facility and had not found mechanical problems.

18

19     [12]    Defendant has not argued that Odahl's motivation is not
20  imputed to McMullin, who approved Odahl's recommendation to
   terminate plaintiff.  See Galdamez v. Potter, 415 F.3d 1015, 1026
21  n.9 (9th Cir. 2005) ("Title VII may still be violated where the
   ultimate decision-maker, lacking individual discriminatory
22  intent, takes an adverse employment action in reliance on factors
   affected by another decision-maker's discriminatory animus.").
23  Cf. Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007) ("We
   hold that if a subordinate, in response to a plaintiff's
24  protected activity, sets in motion a proceeding by an independent
   decisionmaker that leads to an adverse employment action, the
25  subordinate's bias is imputed to the employer if the plaintiff
   can prove that the allegedly independent adverse employment
26  decision was not actually independent because the biased
   subordinate influenced or was involved in the decision or
27  decisionmaking process.").

28     [13]    In their declarations, Odahl and McMullin do not
   mention fault.

25

1  However, Odahl knew that plaintiff had complained on three or
2  four occasions that Lindsey "was racist against" plaintiff and
3  had complained on five or six occasions that Lindsey failed to
4  properly service plaintiff's truck. (Mayo Decl. ¶ 7.) According
5  to plaintiff and his co-employee Serpa, Odahl and Lindsey
6  appeared to be "close friends" and Odahl did not "countermand[]"
7  orders from Lindsey, who acted as if he had authority to make
8  orders.[14] (Id. ¶¶ 9-10.)

9  　　　　Other evidence suggesting pretext includes Odahl's
10 failure to respond to plaintiff's complaints about the quality of
11 Lindsey's truck repairs. See Cornwell, 439 F.3d at 1032
12 (explaining that a reasonable jury could conclude that
13 defendant's CEO's treatment of plaintiff, specifically a lack of
14 interaction with plaintiff, in the months preceding plaintiff's
15 demotion, resulted from racial animus). Odahl did not take a
16 statement from plaintiff and even appeared to be annoyed by some
17 of plaintiff's complaints. Plaintiff states that his inability
18 to receive repairs for his truck continued following his
19 complaints to Odahl. On the other hand, the Caucasian drivers
20 received repairs. (See Supplemental Mayo Decl. ¶ 3.)

21 　　　　Plaintiff also claims that Odahl gave the other drivers
22 better routes and trucks. According to plaintiff, the other

23

24 　　　　[14] Additionally, if defendant based its termination of
25 plaintiff on plaintiff's fault for the accident, a reasonable
   jury could find that Lindsey made the determination that
26 plaintiff was at fault, and that Odahl did not make an
   independent determination. Cf. Willis v. Marion Cnty. Auditor's
27 Office, 118 F.3d 542, 548 (7th Cir. 1997) (indicating that, when
   the decision-maker conducts an independent evaluation of the
28 employee's alleged policy violations, the subordinate's
   discriminatory motive is not attributed to the employer).

1  drivers told him that they did not want the Cottage Bakery route
2  or the "very old trailer" assigned to that route.  (See Mayo
3  Decl. ¶¶ 13-14.)  Plaintiff claims that Odahl "forced" plaintiff
4  to take the route and trailer.  (Id. ¶ 14.)  When another driver
5  quit, plaintiff "had to assume" both that driver's route and the
6  Cottage Bakery route.  (Id. ¶ 15.)  However, when that driver
7  decided to return, he was allowed to resume his old route and
8  plaintiff "was forced to again take the route none of the other
9  white drivers wanted," the Cottage Bakery route.  (Id.)
10 Plaintiff was told by another driver after his second accident
11 that the "route was [later] assigned to a sub-hauler because none
12 of the other drivers wanted the route or to use the trailer."
13 (Id. ¶ 14.)

14         In sum, plaintiff has presented evidence sufficient to
15 create a genuine issue of material fact regarding the motivation
16 behind his termination.  Accordingly, the court will deny
17 defendant's motion for summary judgment as it relates to the race
18 discrimination claim.

19             2.  Retaliation

20         Defendant argues that plaintiff failed to exhaust his
21 retaliation claim.  "A person seeking relief under Title VII must
22 first file a charge with the [Equal Employment Opportunity
23 Commission [("EEOC")] within 180 days of the alleged unlawful
24 employment practice . . . ."  Surrell v. Cal. Water Serv. Co.,
25 518 F.3d 1097, 1104 (9th Cir. 2008).  "Under [a] workshare
26 agreement, a charge filed with the [Department of Fair Employment
27 and Housing] is deemed constructively filed with the EEOC,
28 because the EEOC and DFEH cross-designate the other as its agent

27

1 for the purpose of receiving charges." EEOC v. Dinuba Med.
2 Clinic, 222 F.3d 580, 585 (9th Cir. 2000).

3            "Even when an employee seeks judicial relief for claims
4 not listed in the original EEOC charge, the complaint
5 'nevertheless may encompass any discrimination like or reasonably
6 related to the allegations of the EEOC charge.'" Freeman v.
7 Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002)
8 (quoting Oubichon v. N. Am. Rockwell Corp., 482 F.2d 569, 571
9 (9th Cir. 1973)). Allegations are "reasonably related" if they
10 either "fell within the scope of the EEOC's actual investigation
11 or an EEOC investigation which can reasonably be expected to grow
12 out of the charge of discrimination." Id. (quoting B.K.B. v.
13 Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir. 2002)) (internal
14 quotation marks omitted). "[I]t is appropriate to consider such
15 factors as the alleged basis of the discrimination, dates of
16 discriminatory acts specified within the charge, perpetrators of
17 discrimination named in the charge, and any locations at which
18 discrimination is alleged to have occurred." Id. (quoting
19 B.K.B., 276 F.3d at 1100).

20            Here, defendant has provided a copy of the
21 administrative complaint filed with the DFEH. (Kennaday Decl.
22 Ex. C.)   The complaint filed with the DFEH alleged that plaintiff
23 was terminated because of his race and age.  The complaint did
24 not allege termination in retaliation for engaging in protected
25 activity.

26            The court finds that an investigation into whether
27 plaintiff was terminated to retaliate against plaintiff for
28 engaging in protected activity could not "reasonably be expected

                                28

1    grow out of the charge" that defendant terminated plaintiff

2    because of his race.  Freeman, 291 F.3d at 636 (quoting B.K.B.,

3    276 F.3d at 1100).  Thus, plaintiff has not exhausted his Title

4    II retaliation claim.  See Latu v. Am. Airlines, No. C

5    01-3301SI, 2001 WL 1658289, at *6 (N.D. Cal. Dec. 6, 2001) ("The

6    claim of retaliation is not like or reasonably related to the

7    allegations in his EEOC charge, which focused solely on his claim

8    that he was harassed and discharged based on his race."); Barron

9    v. United Air Lines, Inc., No. C 92 1364, 1993 WL 140630, at *6

10   (N.D. Cal. Apr. 20, 1993); see also Miles v. Dell, Inc., 429 F.3d

11   380, 492 (4th Cir. 2005); Wallin v. Minn. Dep't of Corr., 153

12   F.3d 681, 688 (8th Cir. 1998); Beane v. Agape Mgmt. Servs., Inc.,

13   C/A No. 3:08-3445, 2009 WL 2476629, at *3 (D.S.C. Aug. 11, 2009);

14   Donald v. BWX Techs., Inc., Civil No. 6:09CV00028, 2009 WL

15   2170170, at *3 (W.D. Va. July 21, 2009); Figueroa v. Riverbay

16   Corp., No. 06 CIV 5364, 2006 WL 3804581, at *5 (S.D.N.Y. Dec.

17   22, 2006); Dowlatpanah v. Wellstar Douglas Hosp., Civil Action

18   No. 1:05-CV-2752, 2006 WL 4093123, at *13 (N.D. Ga. Dec. 5, 2006)

19   (magistrate judge's findings and recommendations), adopted by No.

20   1:05-cv-2752, 2007 WL 639875 (Feb. 26, 2007); Hudgens v. Wexler &

21   Wexler, 391 F. Supp. 2d 634, 649 (N.D. Ill. 2005).

22           Under some facts, retaliation can be reasonably related

23   to discrimination based on race.  Cf. Russell v. TG Mo. Corp.,

24   340 F.3d 735, 748 (8th Cir. 2008) (noting in dicta that an

25   allegation in an administrative complaint that defendant wanted

26   to terminate plaintiff because she could only work 40 hours per

27   week because of her "condition" arguably provides notice that

28   retaliatory discharge is alleged); Amin v. Akzo Nobel Chems.,

29

1  Inc., 282 Fed. App'x 958, 961 (2d Cir. 2008) (holding that
2  because relevant evidence of defendant's stated reason for
3  discharging plaintiff would include performance reviews, which
4  included documents in which plaintiff complained that defendant
5  engaged in discriminatory practices, the EEOC investigation into
6  discharge based on national origin would "reasonably be expected
7  to assess whether his complaints to Akzo of discrimination on
8  that basis played a role in Akzo's decision to discharge him");
9  Hudson v. Chertoff, No. C05-01735RSL, 2007 WL 2288062, at *7
10  (W.D. Wash. Aug. 3, 2007) ("Plaintiff's unsworn declaration and
11  formal complaint contain a multitude of references to concerns
12  that he was terminated in response to his efforts to obtain
13  accommodations for his disability."), aff'd on other grounds, 304
14  Fed. App'x 540 (9th Cir. 2008).

15          There are no such facts here, however.  Plaintiff makes
16  no meaningful attempt to argue that the administrative complaint
17  for termination based on race is reasonably related to a claim
18  for termination based on retaliation.  Instead, plaintiff
19  incorrectly describes the content of the administrative complaint
20  and argues that the incorrect version of the administrative
21  complaint "clearly relates" to his retaliation claim: "Here,
22  Mayo's complaint about persistent race discrimination even in the
23  face of repeated complaints clearly relates to a claim for
24  retaliation for opposing race discrimination."  (Pl.'s Mem. in
25  Opp'n at 12:26-13:1.)  However, plaintiff's administrative
26  complaint only alleged that he had been terminated because of his
27  race; plaintiff's administrative complaint did not allege
28  "persistent race discrimination."  The administrative complaint

1  also makes no mention of plaintiff complaining to defendant about
2  race discrimination.  Because the retaliation claim is not
3  reasonably related to plaintiff's administrative complaint and
4  thus plaintiff did not exhaust his administrative remedies, the
5  court will grant summary judgment in favor of defendant on this
6  claim.

7              3.    Violation of California Labor Code Section 1102.5

8              Section 1102.5(c) provides that "[a]n employer may not
9  retaliate against an employee for refusing to participate in an
10 activity that would result in a violation of state or federal
11 statute, or a violation or noncompliance with a state or federal
12 rule or regulation."  Cal. Labor Code § 1102.5(c).  Plaintiff has
13 not presented evidence that he refused "to participate in an
14 activity that would result in a violation of state or federal
15 statute, or a violation or noncompliance with a state or federal
16 rule or regulation."  Id.  Accordingly, the court will grant
17 defendant's motion for summary judgment as to this claim.

18             IT IS THEREFORE ORDERED that defendant's motion for
19 summary judgment be, and the same hereby is, GRANTED with respect
20 to plaintiff's claims for Title VII retaliation and violation of
21 California Labor Code section 1102.5(c) and DENIED with respect
22 to plaintiff's claim for Title VII race discrimination.
23 DATED:   June 10, 2011
24
25                            WILLIAM E. SHUBB
26                            UNITED STATES DISTRICT JUDGE
27
28

                                  31

# EXHIBIT B

# * * * EMPLOYMENT * * *

COMPLAINT OF DISCRIMINATION UNDER
THE PROVISIONS OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT

DFEH #    E200910E5250-00

DFEH USE ONLY

<u>CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING</u>

| YOUR NAME (indicate Mr. or Ms.) | TELEPHONE NUMBER (INCLUDE AREA CODE) |
|---|---|
| MAYO, EDISON | (209)465-7714 |

ADDRESS

2153 STEWART STREET

| CITY/STATE/ZIP | COUNTY | COUNTY CODE |
|---|---|---|
| STOCKTON, CA 95205 | SAN JOAQUIN | 077 |

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| RECYCLE TO CONSERVE | (209)982-5085 |

| ADDRESS | DFEH USE ONLY |
|---|---|
| 704 ZEPHYR STREET | |

| CITY/STATE/ZIP | COUNTY | COUNTY CODE |
|---|---|---|
| STOCKTON, CA 95206 | SAN JOAQUIN | 077 |

| NO. OF EMPLOYEES/MEMBERS (if known) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month,day, and year) | RESPONDENT CODE |
|---|---|---|
| | 10/30/2009 | 00 |

THE PARTICULARS ARE:

I allege that on about or before <u>10/30/2009</u> , the following conduct occurred:

- X termination
- ___ laid off
- ___ demotion
- ___ harassment
- ___ genetic characteristics testing
- ___ constructive discharge (forced to quit)
- ___ impermissible non-job-related inquiry

- ___ denial of employment
- ___ denial of promotion
- ___ denial of transfer
- ___ denial of accommodation
- ___ failure to prevent discrimination or retaliation
- ___ retaliation
- ___ other (specify) _____

- ___ denial of family or medical leave
- ___ denial of pregnancy leave
- ___ denial of equal pay
- ___ denial of right to wear pants
- ___ denial of pregnancy accommodation

by    RECYCLE TO CONSERVE

Name of Person        Job Title (supervisor/manager/personnel director/etc.)

because of :

- ___ sex
- X age
- ___ religion
- X race/color

- ___ national origin/ancestry
- ___ marital status
- ___ sexual orientation
- ___ association

- ___ disability (physical or mental)
- ___ medical condition (cancer or genetic chracteristic)
- ___ other (specify) _____

- ___ retaliation for engaging in protected activity or requesting a protected leave or accommodation

State of what you believe to be the reason(s) for discrimination

MY RACE, AFRICAN-AMERICAN.

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue. I understand that if I want a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure," or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

By submitting this complaint I am declaring under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated   12/16/2009 1:42:00 PM

At   Stockton

**6**

DFEH-300-03o (02/08)
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

DATE FILED:   12/16/2009 1:42:00 PM

STATE OF CALIFORNIA



EXHIBIT NO. ___
D. SADLER #5365