1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   EDISON MAYO,                    NO. CIV. 2:10-629 WBS EFB

13          Plaintiff,
                                     ORDER RE: MOTION FOR NEW TRIAL
14      v.

15   RECYCLE TO CONSERVE, INC.,

16          Defendant.
     _____/
17

18                         ----oo0oo----

19          After a five-day trial, the jury returned a verdict in

20   favor of defendant Recycle to Conserve, Inc., on plaintiff Edison

21   Mayo's sole claim for employment discrimination under Title VII,

22   42 U.S.C. § 2000e-2.  In its verdict, the jury found that

23   plaintiff had not proven that his race was a motivating factor

24   for defendant's decision to terminate him.  (Docket No. 66.)

25          Pursuant to Federal Rule of Civil Procedure 59,

26   plaintiff now moves for a new trial.  Plaintiff claims that the

27   court "severely prejudiced plaintiff by halting its closing

28   argument on three occasions; and to refuse, in mid-presentation,

                                  1

to allow plaintiff's counsel to use trial transcriptions in his presentation, and to then subsequently and unfairly allow defense counsel to use videotape deposition testimony of plaintiff in her own presentation." (Docket No. 68 at 1:23-2:2.)  Aside from his complaint about the court's decisions and interruptions during his closing statement, plaintiff does not argue that any other grounds merit a new trial.

Rule 59(a)(1)(A) "does not specify the grounds on which a motion for a new trial may be granted, but allows new trials to be granted for historically recognized grounds." Shimko v. Guenther, 505 F.3d 987, 993 (9th Cir. 2007) (internal quotation marks omitted).  "A judge's participation justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." Id.; see also Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) ("The standard for reversing a verdict because of general judicial misconduct during trial is rather stringent" and requires "an extremely high level of interference by the trial judge which creates a pervasive climate of partiality and unfairness." (internal quotation marks and citation omitted)).

    1.    The court did not unfairly interrupt counsel's closing argument

This court recognizes that the closing arguments are an important part of any jury trial.  It is the last opportunity the lawyers have to speak before the case is finally submitted to the jury for deliberation.  Other than the opening statements, and perhaps in the course of jury voir dire, it is the only time the lawyers can directly address the jury; and if the trial is

1  conducted properly, it is the only chance the lawyers have to

2  summarize the evidence and to suggest to the jury how they should

3  interpret that evidence in light of the instructions to be given

4  by the court.

5          The court also recognizes that each lawyer has his or

6  her own style of arguing a case, and for that reason, as long as

7  they keep within the bounds of the law and established

8  procedures, they should be accorded substantial latitude in the

9  manner in which they present their arguments.  For those reasons,

10 this court is always hesitant to restrict, limit, or interrupt

11 counsel in their closing arguments.

12         On the other hand, the court has to recognize its own

13 corresponding obligation to control the proceedings in order to

14 assure a fair trial for both sides.  As the Ninth Circuit has

15 recognized, "a trial judge is more than an umpire, and may

16 participate in the examination of witnesses to clarify evidence,

17 confine counsel to evidentiary rulings, ensure the orderly

18 presentation of evidence, and prevent undue repetition." United

19 States v. Laurins, 857 F.2d 529, 537 (9th Cir. 1988).

20         For the very same reasons that closing arguments are

21 viewed by the attorneys as so important, it is all the more

22 important that the trial judge assure that those arguments are

23 not abused or used improperly to gain unfair advantage.  See

24 United States v. Guess, 745 F.2d 1286, 1288 (9th Cir. 1984) ("It

25 is well-established that the trial judge has broad discretion in

26 controlling closing argument.").

27         Here, the first time plaintiff's attorney complains

28 that the court "interrupted" his argument was after he made the

3

1  following statement:

2      Now, it can be difficult to remember – we've had four
       days off or so since the last time we met, and it can be
3      difficult to remember a lot of the testimony that we
       heard in this case.  And so we have the benefit of the
4      Court Reporter who took down everything that everyone
       said, and we have an opportunity to look at in writing
5      what it is that was said in this case.

6  (Nov. 8, 2011 Tr. at 2:16-22.)

7           That remark took the court entirely by surprise.  To

8  the best of the court's knowledge at that time, there was no

9  transcript of any part of the trial in existence.  The court had

10 not ordered nor received a copy of any transcript.  In fact, the

11 court had expressly informed the jury at the beginning of the

12 trial that their would be no written transcript of the

13 testimony.[1]  The court, quite frankly, did not know what to think

14 of Mr. Bolanos's statement, and believed he was mistaken.  The

15 court accordingly took prompt action to correct Mr. Bolanos's

16 statement lest the jury be misled into believing, contrary to the

17 court's earlier instruction, that there was indeed a written

18 transcript of the testimony for them to consult.  Thus, the court

19 interrupted to point out,

20     We really don't, Mr. Bolanos.  The jury does not have a
       transcript and will not have a transcript.
21

22

       [1]    Specifically, the court stated:
23

24     You'll note that the Court Reporter is taking down
       everything that we say in shorthand.  She can review that
25     on her screen, I also have a screen up here where I can
       view her notes, but they're not in a form that we could
26     just give to you as a transcript.  There will not be a
       written transcript of the testimony for you to consult.
27     That means that you must listen carefully to the
       testimony of the witnesses as it is given.

28 (Id. at 4:5-12.)

                                4

1    (Id. at 2:23-24.)

2         It was only then, after Mr. Bolanos agreed that the

3    jury did not have a transcript, but stated that he wanted to

4    "show them the transcript of some of the testimony"[2] that the

5    court realized that Mr. Bolanos had apparently made arrangements

6    with the Court Reporter, unbeknownst to the court, and apparently

7    unbeknownst to opposing counsel as well, to have some of the

8    trial testimony transcribed, and that was apparently only Mr.

9    Bolanos who had a copy of that transcript.

10        The court considered admonishing counsel then and there

11   not to display his transcript to the jury, but in light of the

12   court's reluctance to interfere with closing arguments and Mr.

13   Bolanos's statement that he was going to show "just partial

14   highlights,"[3] the court refrained from making any further

15   comments at that time.  As Mr. Bolanos's argument progressed,

16   however, the court became increasingly concerned with his

17   repeated showing of excerpts from the transcripts, marked with

18   his own underscoring and highlights.  Had the court known

19   beforehand that he intended to do that, it would have instructed

20   him not to do so.  Nevertheless, hoping that each time would be

21   the last, the court refrained from preventing him from displaying

22   portions of the transcript to the jury.

23        The second time plaintiff's attorney complains that the

24   court "interrupted" his argument was not an interruption at all.

25   When Mr. Bolanos placed an inadmissible document on the screen

26   ─────────────────

27   [2]    (Id. at 2:25-3:2.)

28   [3]    (Id. at 3:1-2.)

1   for the jury to view, defense counsel objected. (<u>Id.</u> at 10:19.)

2   It was in response to that objection that the court asked Mr.

3   Bolanos what he was showing to the jury. (<u>Id.</u> at 10:20.)  After

4   determining that the document was an exhibit which the court had

5   earlier refused to admit into evidence, the court instructed Mr.

6   Bolanos to remove it from the screen.  It was at that time, when

7   Mr. Bolanos's summation had already been interrupted by a valid

8   objection, that the court took the opportunity to more explicitly

9   limit his use of the transcripts.  Specifically, the court

10   instructed Mr. Bolanos to remove the transcripts from the screen

11   and explained, "You can use them to refresh your own recollection

12   for purposes of argument, but I've already explained to the jury

13   there is no transcript for them to read."  (<u>Id.</u> at 11:7-10.)

14        The third time plaintiff's attorney complains that the

15   court "interrupted" his argument it was actually in his favor.

16   Concerned that Mr. Bolanos might have misinterpreted the court's

17   ruling on defendant's objection and its admonition not to show

18   his transcripts to the jury to have been intended to also

19   preclude him from continuing to show the jury the slides he had

20   prepared to illustrate his argument, as Mr. Bolanos held an

21   exhibit in his hand, the court politely interrupted him to point

22   out:

23      THE COURT: What -- let me clarify what you can show to
       the jury.  That's fine.  You also prepared a couple of
24      slides that you put on there to show the jury to
       illustrate your argument.  That kind of thing is okay.
25      If you have any more of those, you can show that to the
       jury.  It's just that you can't show them exhibits that
26      weren't received in evidence.  Okay?

27      MR. BOLANOS: Got it.

28      THE COURT: All right.

(Id. at 12:23-13:6.)

It is hard to imagine how these legitimate and limited interruptions addressing a specific issue could reflect a bias against plaintiff, let alone constitute an "extremely high level of interference" that created "a pervasive climate of partiality and unfairness." Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995). The Ninth Circuit has found that a new trial was not merited when trial judges' interruptions have been far more frequent and questionable than the three occasions in this case. See, e.g., United States v. Mostella, 802 F.2d 358, 361-62 (9th Cir. 1986) (trial judge's numerous interruptions through a trial, including "extensive questioning" of expert witnesses and sarcastic comments did not merit a new trial); United States v. Poland, 659 F.2d 884, 894 (9th Cir. 1981) (trial judge's impatience with defense, displays of irritation, and use of sarcasm, while inappropriate, were not prejudicial).[4]

2.   The court did not err in not allowing plaintiff's

---

[4]    Even if the court's interruption of Mr. Bolanos's closing argument could somehow be interpreted as indicating the court's view of the case or disagreement with Mr. Bolanos's position, any such suggestion was cured by the court's instructions to the jury at the beginning and close of the trial. Specifically, in its opening instructions to the jury, the court stated, "You should not take anything that I may say or do during the course of the trial as an indication of what I think of the evidence or what your verdict should be.  That will be a matter entirely for you to determine."  (Nov. 1, 2011 Tr. at 3:7-10.) In giving the final instructions to the jury, the court reminded the jury, "You must not read into these instructions or into anything that I may have said or done any suggestion as to what verdict you should return--that is a matter entirely up to you." (Docket No. 63 at 2:17-19.)  This court, like the Ninth Circuit, "assume[s] that juries follow admonitions and curative instructions," United States v. Nolan, 700 F.2d 479, 485 (9th Cir. 1983), and the court has no reason to believe that the jury disregarded the court's instructions in this case.

1     <u>counsel to publish the transcript to the jury during</u>

2     <u>closing argument</u>

3        In jury trials, it is this court's uniform practice not

4 to permit counsel to show, or purport to read from, transcripts

5 of the trial testimony during their closing arguments.  There are

6 several important reasons for this practice.  First, preparation

7 of a trial transcript during trial is expensive.  Court reporters

8 charge the more expensive "daily" rate for those transcripts.

9 Accordingly, the party with less money to spend on a trial may

10 find itself at a disadvantage if the other side has the benefit

11 of a transcript during argument.

12        Second, preparation of a daily transcript poses an

13 undue consumption of court time and resources.  Whenever one is

14 requested, two court reporters, working in shifts, are generally

15 required in order to produce the transcripts while the trial is

16 still in session.  That practice can unnecessarily drain the

17 resources of the court.

18        Third, publishing excerpts of the transcript leads to

19 the risk that the jurors will place undue emphasis on certain

20 portions of the testimony because they saw those portions in

21 writing.  In that regard, the Ninth Circuit has repeatedly

22 recognized that rereading a witness's testimony from a transcript

23 or giving a jury a partial copy of a transcript creates a risk

24 that the jury will give undue weight to that part of the

25 evidence, thus the "rereading of a witness' testimony is

26 disfavored when it unduly emphasizes that testimony."  <u>United

27 States v. Binder</u>, 769 F.2d 595, 600 (9th Cir. 1985).

28        Even when faced with a jury request to review a

transcript, the judge must determine "whether the beneficial effects from allowing the jury to review a part of the transcript outweigh the risk that the jury will give undue weight to that part of the evidence."  United States v. An Article of Drug, 661 F.2d 742, 746 (9th Cir. 1981).  Thus, when the jury has requested to rehear testimony, the "preferred method . . . is in open court, under the supervision of the court, with the defendant and attorneys present," which can be accomplished by the court reporter reading from the transcript.  United States v. Hernandez, 27 F.3d 1403, 1408 (9th Cir. 1994).[5]

In this court's experience, consistent with Ninth Circuit caselaw, most other judges seem to follow the same practice.  The Ninth Circuit has held that counsel's use of transcripts during oral argument "falls within the discretion of the trial judge."  Guess, 745 F.2d at 1288; accord United States v. Bradley, 869 F.2d 121, 123 (2d Cir. 1989) ("It was within the discretion of the district court whether to allow copies of the trial transcript to be distributed to the jury."); United States v. Kuta, 518 F.2d 947, 954 (7th Cir. 1975) ("[W]e think it is also within the discretion of the trial court whether to permit counsel to read from the trial transcript during closing

---

[5]    See also Jury Instructions Committee of the Ninth Circuit, A Manual on Jury Trial Procedures § 5.2.E.1 (2004) ("The trial court should probably never send a transcript of testimony into the jury room.  If it decides to do so, great caution should be exercised.").  This method is recommended because it decreases the chance that the jury may give undue weight to evidence by repeatedly reviewing a limited excerpt in the jury room.  United States v. Sacco, 869 F.2d 499, 502 (9th Cir. 1989).

1   argument.").[6]

2          Here, and consistent with the court's uniform practice,

3   the court restricted Mr. Bolanos from publishing a copy of the

4   transcript for the jury to view during his closing argument.  The

5   limitation initially stemmed from the court's prior instruction

6   to the jury when the jury was first empaneled that a transcript

7   would not be available. (See Nov. 1, 2011 Tr. at 4:5-12.)  That

8   instruction is based on the Ninth Circuit's Model Instruction No.

9   1.13, which states:

> During deliberations, you will have to make your decision
> based on what you recall of the evidence.  You will not
> have a transcript of the trial.  I urge you to pay close
> attention to the testimony as it is given.  If at any
> time you cannot hear or see the testimony, evidence,
> questions or arguments, let me know so that I can correct
> the problem.

14  Although it may be obvious, this instruction serves the important

15  purpose of preventing the jury from relying on the possibility of

16  reviewing transcripts at the close of trial, thus encouraging it

17  to pay close attention throughout the entire trial.

18          Mr. Bolanos should have been well aware of this court's

19

20          [6]   See also Robert E. Jones, Gerald E. Rosen, William E.
    Wegner, & Jeffrey S. Jones, Rutter Group Practice Guide: Federal
21  Civil Trials and Evidence Ch. 14-B(2)(g)(1) (2011) ("It is within
    the trial judge's discretion to permit counsel to read from the
22  trial transcript during closing argument. . . . Likewise,
    counsel's use of transparencies (blowups) of portions of the
23  trial transcript during closing argument is within the court's
    discretion."); Jacob Stein, Closing Arguments § 1:75 (2011-2012
24  ed.) ("[T]he recognized rule is that it is within the trial
    court's discretion whether to permit counsel to read from the
25  trial transcript during final argument to the jury."); Federal
    Trial Handbook Civil § 76:3 (4th ed.) ("The trial judge has
26  discretion to deny permission to counsel to distribute copies of
    portions of the trial transcript to the jury during summation.");
27  Federal Procedure, Lawyers Edition § 77:263 (Dec. 2011) ("The
    trial judge has discretion to deny permission to the counsel to
28  distribute copies of portions of the trial transcript to the jury
    during summation.").

practice of instructing the jury that there would be no

transcript, because not only had he heard it in this case but he

had recently heard the instruction when he tried an unrelated

case before the undersigned judge only five months prior to

trying plaintiff's case.[7]   Despite the court's clear instruction

to the jury that a transcript would not be available for its

review, Mr. Bolanos had a transcript prepared and, without

talking to the court about it,[8] sought to show it to the jury

throughout his closing argument.   The fact that he was even able

to show several portions of the transcript to the jury before the

court finally put a stop to the practice, if anything, gave Mr.

Bolanos an unfair advantage.

---

[7]   (See June 1, 2011 Tr. at 5:13-21 ("The Court Reporter
is taking down what we say in shorthand, and she has a screen on
which she can view her notes.   I have another screen up here
which I can view them as well.   That does not mean there is going
to be a written transcript for you to read at the end of the
trial or during the trial.   There will not.   She can read those
notes, and I can see them, but they're not in a form that we
could give to you so that you can read them.   And so it is
important that you listen to the testimony of the witnesses as it
is given.").)

[8]   According to one practice guide, Mr. Bolanos's failure
to inform the court about his desire to use the transcript during
his closing argument is fatal to plaintiff's request for a new
trial:

In determining whether an abuse of discretion has
resulted by the denial of an attorney's request to read
from the trial transcript during closing argument, it is
first necessary that counsel offer to indicate to the
court that which is to be read, the purpose for the
request, and the need as seen by the party making the
request.   The underlying rationale is that just as
discretion should not be arbitrarily withheld, it cannot
be unexplainedly demanded.

Jacob Stein, Closing Arguments § 1:75.

1    Although it was within its discretion, and would have
2 been consistent with this court's general practice, after
3 instructing Mr. Bolanos not to continue showing portions of the
4 transcript to the jury, the court did not restrict him from
5 utilizing the transcript during the remainder of his summation.
6 In fact, Mr. Bolanos read verbatim from his copy of the
7 transcript after the court restricted him from publishing it.[9]
8 Because Mr. Bolanos was still able to utilize the transcript to
9 refresh his recollection and read extensively from it, his
10 inability to publish the written copy of it did not even affect
11 the substance of his closing argument.  The court did not
12 perceive, nor did Mr. Bolanos articulate, any need to show the
13 jury portions of the transcript, as opposed to using it to
14 refresh his recollection or, as Mr. Bolanos did, reading portions
15 of it.  In his motion for a new trial, Mr. Bolanos still does not
16 explain why the jury needed to see the transcript.

17    In an effort to preserve the credibility of the court's
18 prior instruction about the unavailability of a transcript and to
19 prevent the jury from placing undue weight on limited testimony
20 because it saw only that testimony in writing, the court was well
21 within its discretion to restrict Mr. Bolanos from publishing
22 excerpts of the transcript during his closing argument.

23
24    [9]    (See, e.g., id. at 19:16-20:10 ("MR. BOLANOS: But then
on direct -- on cross-examination, he [Sean Odahl] admitted,
25 well, I thought he was making a misrepresentation about the
speed.   Question: So you believe that Mr. Mayo was making a
26 misrepresentation -- first, at the time of this report, did you
believe that Edison was making a misrepresentation about the
27 speed he was traveling?  Answer: No.  Two questions later: Okay.
After whether or not you could slip a truck at 20 miles an hour,
28 I asked him, So you believe that he was making a
misrepresentation about his speed?  Answer: Correct.").)

1    Accordingly, because the limitation neither affected the

2    substance of Mr. Bolanos's closing argument nor was influenced by

3    or suggested the existence of the court's bias against plaintiff

4    or his counsel, the limitation does not entitle plaintiff to a

5    new trial.

6          3.   <u>Defendant's use of the videotaped deposition</u>

7               Lastly, plaintiff argues that the court should grant a

8    new trial because, after preventing plaintiff from publishing the

9    transcripts for the jury, the court did not prevent defendant

10   from playing portions of plaintiff's videotaped deposition during

11   its closing argument.  Unlike the transcripts, however, the

12   portions plaintiff's videotaped deposition which were shown

13   during defendant's argument had been played to the jury during

14   the cross-examination of plaintiff.

15              Moreover, plaintiff did not object to defendant's use

16   of the videotaped deposition during defendant's closing argument.

17   "There is an even 'high[er] threshold' for granting a new trial

18   where [the party seeking a new trial] failed to object to the

19   alleged misconduct during trial."  <u>Settlegoode v. Portland Pub.</u>

20   <u>Schs.</u>, 371 F.3d 503, 517 (9th Cir. 1991) (alternation in

21   original).  When a counsel fails to raise a contemporaneous

22   objection, a new trial is merited only if the conduct by opposing

23   counsel amounts to plain error.  <u>Id.</u>  "Plain error review

24   requires: (1) an error; (2) that the error be plain or obvious;

25   (3) that the error have been prejudicial or affect substantial

26   rights; and (4) that review be necessary to prevent a miscarriage

27   of justice."  <u>Id.</u>  The use of the videotaped deposition, which

28   had already been showed to the jury without objection during the

13

1 trial, by defendant did not result in error, let alone plain

2 error.

3          IT IS THEREFORE ORDERED that plaintiff's motion for a

4 new trial be, and the same hereby is, DENIED.

5          Defendant has ten days from the date of this Order to

6 file an Amended Bill of Costs seeking any costs incurred in

7 opposing plaintiff's motion for a new trial.  If Defendant files

8 an Amended Bill of Costs, plaintiff shall file any opposition

9 within five days of the date the Amended Bill of Costs is filed.

10 DATED: January 27, 2012

11

12 _____

13 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---o0o---

EDISON MAYO,

        Plaintiff,

vs.                                          No. Civ.S-10-629

RECYCLE TO CONSERVE, INC.,

        Defendant.

_____/

---o0o---

<u>REPORTER'S PARTIAL TRANSCRIPT</u>

JURY TRIAL

PLAINTIFF'S CLOSING STATEMENT

TUESDAY, NOVEMBER 8, 2011

---o0o---

Reported by:   KATHY L. SWINHART, CSR #10150

1                              APPEARANCES

2

   For the Plaintiff:
3
            LAW OFFICE OF ALDON BOLANOS
4           925 G Street
            Sacramento, California  95814
5           BY:    ALDON BOLANOS

6           Also Present:

7                  EDISON MAYO

8

   For the Defendant:
9
            WILKE, FLEURY, HOFFELT, GOULD & BIRNEY
10          400 Capitol Mall, 22nd Floor
            Sacramento, California  95814
11          BY:    KELLI M. KENNADAY

12          Also Present:

13                 SEAN ODAHL

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2       TUESDAY, NOVEMBER 8, 2011, 9:01 A.M.

3                 ---o0o---

4       (The following proceedings were had in the

5       presence of the jury:)

6                 * * * * *

7       THE COURT:  All right.  This is the time for the

8  arguments of counsel.  As I explained at the beginning of the

9  trial, Ladies and Gentlemen, the arguments of counsel are not

10 evidence.  They're intended to help you interpret the evidence

11 as the lawyers remember it.

12      We'll begin with the argument on behalf of the

13 plaintiff by Mr. Bolanos, then you'll hear the argument on

14 behalf of the defendant by Ms. Kennaday, and Mr. Bolanos will

15 have a rebuttal argument.

16      You may proceed.

17      MR. BOLANOS:  Thank you, Your Honor.

18      And keeping with our trouble with technology, I'm just

19 trying to turn the -- lectern laptop.  All right.

20      Okay.  Everyone can hear me all right, I hope.

21      All right.  Ladies and Gentlemen, I want to thank you

22 again for serving on the jury.  We've tried to make this a

23 relatively fast case, keep it straightforward and simple.

24 It's been about a week long.  So I want to thank you on behalf

25 of Mr. Mayo and myself for doing your duty as jurors and

1   serving on this jury.

2         This is now the time when you've had a chance to hear

3   all of the evidence in the case, and then soon you're going to

4   be asked to decide a couple of questions of fact.  You're

5   going to be given I believe three questions to answer.  It's

6   going to be a yes or no format.  You're going to be given

7   instruction on the law of the case as well from the judge, and

8   then it will be your time to deliberate.

9         Essentially what you're going to be asked is did race

10  play a role in the termination of Mr. Edison Mayo?  The

11  question is going to be was race a factor?  Was race a role?

12  It doesn't necessarily mean that race was the only reason for

13  Mr. Mayo being terminated or even the prevailing reason.  But,

14  if it played a role, if it was a factor, that's going to be

15  the first question that you're going to be asked.

16        Now, it can be difficult to remember -- we've had four

17  days off or so since the last time we met, and it can be

18  difficult to remember a lot of the testimony that we heard in

19  this case.  And so we have the benefit of the Court Reporter

20  who took down everything that everyone said, and we have an

21  opportunity to look at in writing what it is that was said in

22  this case.

23        THE COURT:  We really don't, Mr. Bolanos.  The jury

24  does not have a transcript and will not have a transcript.

25        MR. BOLANOS:  Right, but I want to show them some of

1    the transcript from some of the testimony, just partial

2    highlights.

3          It's true that you won't have this transcript with you

4    when you deliberate.  You're going to have to go from what you

5    heard, the witnesses, what they said; whether you believe they

6    were truthful or not; whether you believe they were testifying

7    about events that they recalled; and, generally speaking,

8    weigh the evidence in that regard.  So you will not have this

9    transcript with you when you're in there, but I think that

10   there are some important points to show you here.

11         The first is that we know that Mr. Mayo started

12   working for these guys before they were called Recycle to

13   Conserve, they were called Dext, and he started with them in

14   1997.  So he's been with them well over ten years, closer to

15   twelve.

16         And we know that he had some problems with Mr.

17   Lindsay, Elwood Lindsay at work.  He testified that he would

18   call him -- call him names, calling him out of my name was the

19   testimony that he gave; that there was some trouble with

20   fixing the trucks that he was driving, there was trouble with

21   getting parts for the trucks; and essentially that he would go

22   to his supervisor, Sean Odahl, and talk about these problems,

23   and that not a lot was done.

24         There was also an issue about drivers going into the

25   shop.  Other drivers were permitted into the shop.  We heard

1    something from the defense that there was some agreement not

2    to allow drivers into the shop.  But, for the most part, the

3    testimony was drivers were going into the shop, if you recall,

4    but Mr. Mayo himself, Edison Mayo was forbidden from going

5    into the shop.

6          So we talked about the times that Mr. Mayo went and

7    spoke with Sean Odahl about some of the issues that he was

8    having with Elwood Lindsay.  And he talked about meeting with

9    him formally in his office, and he talked about meeting with

10   him three, four, five times in the office.  And then we talked

11   about Mr. Mayo meeting informally with Mr. Odahl, and that

12   that occurred also three, four, five times.  About -- it's

13   towards the end of this document, but here we see that he

14   talks about the formal meetings in the office, closed doors,

15   just the supervisor, the general manager and Mr. Mayo.

16         Now, one of the things that was discussed was that

17   there was problems with the trailer.  We've talked so much

18   about this trailer and the issues with the trailer, where it

19   came from, what kind of work that was done on it and what kind

20   of problems that Mr. Mayo had with the trailer.

21         And Mr. Mayo testified at length that he had numerous

22   problems with the trailer.  It was the Cottage Bakery trailer.

23   They found it in a wrecking yard.  It needed a lot of repairs.

24   He would report problems to Elwood, but Elwood more or less

25   wasn't listening to him or hearing anything he had to say.

1    And he would run him out of the shop was the testimony,

2    cussing me, calling me names.

3         So I think it's important to keep in mind the issues

4    that we had with this trailer because it's going to be a key

5    issue in this case.

6         And Mr. Mayo talked about some of the names that he

7    was being called.  And we had some testimony at length from

8    Mr. Mayo, we had some testimony at length from Joe Serpa, and

9    we had some testimony from Sean Odahl on this subject as well.

10        Again, more trouble with the trailer.  I want to keep

11   this clean for you.

12        The controls weren't in working order.  The box would

13   fall off the truck because the cables weren't stretched tight.

14   The trailer plays a central role in this case.

15        The cable was coming loose, clamped together.  It

16   wouldn't pull the box all the way up.  It would slip.  And

17   they had to call out on a number of occasions a tow truck

18   company to come and pick it up because the trailer and the

19   truck couldn't do it.

20        And that's undisputed.  Because a lot of times in this

21   case we heard one side say one thing and another side say

22   another.  And so I'm not going to ask you to take any one

23   particular side's word for anything.  I'm just going to ask

24   you to look at what their testimony said and see if we can't

25   funnel down what we heard to come to a few basic truths about

1    what took place in the workplace.

2          Next I asked Mr. Mayo what he would do about getting

3    the trailer fixed, and that Sean Odahl would go and talk to

4    Elwood about getting this trailer fixed; and that even on a

5    couple of occasions the president of the company went to

6    Elwood talking about the trailer, get it fixed.  We're having

7    trouble with the air lines, we're having trouble with the

8    brakes, we're having trouble with the cables.

9          All of these things undisputed because we heard both

10   Mr. Mayo testify about them and, as we get further into this,

11   we heard Mr. Lindsay testify about them.  And we also heard

12   Mr. Odahl testify about some of the problems with the trailer.

13         So then we come to October, October 13th, which is

14   when we had this accident.  He's driving in wet conditions 20

15   miles an hour, 25 miles an hour.  He comes to a red light,

16   starts braking.  The rear tires on the trailer lock up.  And

17   even when he takes his foot off the brakes, the tires remain

18   locked, and the trailer slides causing damage to the cab of

19   the truck.

20         Again, as you see here, the president comes down,

21   talks about getting the trailer fixed.  It was fixed, but it

22   was not fixed.  He would fix it.  It would break back down.

23         Now, I want to get into one of the important things

24   that we heard in this case which related to Sean Odahl.  We

25   heard that there were a number of occasions, several occasions

1    when Mr. Mayo would complain about Sean Odahl, and then we

2    heard Sean Odahl say, well, I didn't do any investigation or I

3    didn't do any follow-up or take any statements.  And I want to

4    point something out to you, which is that Mr. Odahl has

5    essentially admitted that he failed to follow the company's

6    policy about reporting.

7          Now, we have the benefit of looking at that company

8    policy.  And the defense gave you an exhibit, which you're

9    going to have with you in the room -- you're going to take all

10   the exhibits that have been admitted into evidence.  They're

11   going to go back in with you when you deliberate.

12         You're going to take a look at Exhibit L.  Exhibit L

13   is the employee handbook, and the employee handbook talks

14   about what a manager is supposed to do when he gets a

15   complaint.  There's a few relevant pages to it here.

16         Complaint procedure, this is page 7 of Exhibit L,

17   bring the issues to your supervisor.  If you experience a

18   problem, report the incident to your supervisor, who will

19   investigate the matter and take the appropriate action.

20         Page 8, if you're unsatisfied with the immediate

21   supervisor or you think he's involved, report directly to the

22   head of your department.  That's Sean Odahl again.

23         If the company determines the employee is guilty, it

24   would take appropriate disciplinary action.  Then we have talk

25   about what is a bonafide complaint.  If, after an

1    investigation of a complaint, the determination is that it's

2    not a legitimate complaint, there will be other action.

3           Over and over again we hear there needs to be an

4    investigation.  The supervisor needs to do something.

5    Promptly report the incident to your supervisor, who will

6    investigate the matter and take appropriate action.  Again,

7    head of the department.

8           This is page 51 of the employee handbook.  Step one,

9    dispute resolution, problem resolution.  Discuss the problem

10   with your supervisor as a first step.  It doesn't say you have

11   to make a complaint in writing as a first step in order for

12   the supervisor to take it seriously.  It doesn't say that you

13   have to go to human resources.  It says talk to your

14   supervisor.

15          Step two, encouraged to request a meeting with your

16   supervisor's supervisor.  Again, it does not say submit a

17   formal written complaint detailing exactly all of the

18   allegations that you have to your supervisor or your

19   supervisor's supervisor.

20          All right.  Sean Odahl was required, when he gets a

21   complaint verbally, to conduct an investigation and to

22   generate a report.  It's what the company policy says, and

23   it's what undisputedly Mr. Mayo went to him on a couple of

24   occasions undisputedly and did.

25          Now, you remember what Sean Odahl told us about what

1   he did.  He said, When I get a complaint in writing, when

2   someone verbally complains to me, I give them a verbal

3   response.  If they give me something in writing when they're

4   looking for an answer, they're going to get a written

5   response.  That's how I work.

6        But that's not how the company is supposed to work.

7   That's not what the company policy is.  The company policy is

8   you need to conduct an investigation.  You need to do

9   something when an employee comes to you.  You don't just have

10  this -- this attitude where if it's a written complaint, it's

11  more serious than a verbal complaint.  He said this over and

12  over again.

13       I asked him, Have you ever documented a verbal

14  complaint in your time as a supervisor for Recycle to Conserve

15  for anything?  No.

16       If you make a complaint orally, you get something back

17  orally, right?  Right.

18       If they give me a verbal complaint, I'll look into it,

19  and I'll give them a verbal response.

20       So it's important to point out here that the company

21  policy said one thing about when you receive a verbal

22  complaint.  In fact, the company policy says go to your

23  supervisor verbally.  It says talk to your supervisor verbally

24  as a step one.  It says, if that doesn't work, talk to your

25  supervisor's supervisor verbally as a step two.

1          In this instance, Sean Odahl was the general manager.

2     There was no supervisor's supervisor.  He was the only

3     supervisor at the plant.  But we have no investigation and no

4     report.

5          So the question then becomes -- we heard Sean Odahl

6     say, well, Edison Mayo didn't come to me, he didn't report

7     anything to me.  But we have Edison saying he went to him on a

8     number of occasions.  So where do you go with that?  Well,

9     here's where you go.

10         We have at least two instances where Sean Odahl has

11    agreed that he spoke with Edison Mayo about problems he was

12    having with Elwood Lindsay, the mechanic.  I'm not going to

13    ask you to take one person's word over the other.  I'm only

14    going to ask you to look at the evidence, where we can agree

15    on the evidence.

16         First I asked him about how many times did he come?

17    Had you ever said that Mr. Mayo came to you on several

18    occasions and made complaints about Elwood Lindsay?

19         MS. KENNADAY:  Your Honor, this isn't in evidence.

20         THE COURT:  What are you showing them now?

21         MR. BOLANOS:  This is page 2 of a declaration filed

22    with the court by --

23         THE COURT:  Is it evidence?

24         MR. BOLANOS:  It is not in evidence, no.

25         THE COURT:  Oh, it's not in evidence.  You can't show

1    them something that's not in evidence.

2            MR. BOLANOS:  This is closing argument.

3            THE COURT:  Take that off the screen.

4            MR. BOLANOS:  It's off the screen.

5            We had this incident in the testimony --

6            THE COURT:  And while we're at it, take those

7    transcripts off the screen, they're not evidence either.  You

8    can use them to refresh your own recollection for purposes of

9    argument, but I've already explained to the jury there is no

10   transcript for them to read.

11           MR. BOLANOS:  Okay.  So, for clarification, should I

12   be limited to just exhibits that have been admitted into

13   evidence?

14           THE COURT:  Yes.

15           MR. BOLANOS:  The first incident that Mr. Odahl agreed

16   that he talked to Edison Mayo about related to the throwing of

17   parts at his feet.  You recall that Edison Mayo testified that

18   he would go into the shop, and Elwood Lindsay would throw

19   things; and he would go to bring him a part, and then he would

20   drop it at his feet and say there, you get that, boy.

21           And he went to Sean Odahl.  Undisputedly Sean Odahl

22   received that complaint at least once.  No investigation, no

23   written statements, no discipline undisputedly.  He just said,

24   you know, I talked to him, I talked to him about it, I talked

25   to Edison about it.

1          Sean Odahl also admitted that there were a number of

2     problems with the trailer, and that Edison Mayo came to him on

3     a number of occasions and reported the problems.  He reported

4     that he was having trouble with Elwood Lindsay; that he was

5     bringing these repair issues to Elwood, that Elwood was

6     chasing him out of the shop, calling him names, throwing

7     things at him, and the trailer was still having problems.  No

8     dispute about that either.

9          No written statement from the employee [verbatim].

10          Now, then you remember that Sean Odahl told us that he

11     knew there was nothing wrong with that trailer because it had

12     been used by another driver, Kevin Christian, on a number of

13     occasions, and there were no complaints about the trailer.

14          The defense introduced something called Exhibit P,

15     like Peter, and that's going to be with you back in the

16     deliberation room.  And you'll recall during the course of the

17     trial that I objected to this exhibit, and I said this is --

18     there's no foundation for this.  There's -- there's nothing to

19     this exhibit.  It looks like they made it up just for the

20     purposes of the trial.  And because I had not lodged a formal

21     objection prior to the trial, I had waived that objection.  So

22     this is -- this is evidence now.

23          THE COURT:  What -- let me clarify what you can show

24     to the jury.  That's fine.

25          You also prepared a couple of slides that you put on

1    there to show the jury to illustrate your argument.  That kind

2    of thing is okay.  If you have any more of those, you can show

3    that to the jury.  It's just that you can't show them exhibits

4    that weren't received in evidence.  Okay?

5          MR. BOLANOS:  Got it.

6          THE COURT:  All right.

7          MR. BOLANOS:  So Exhibit P was received in evidence,

8    and the defense represented to you that this shows who drove

9    the truck in the time before Mr. Mayo's accident.  They

10   represented to you that this showed who drove the same truck

11   and trailer that Mr. Mayo wrecked.  That's Ms. Kennaday's

12   words, not mine.  She asked that question to Sean Odahl.  Does

13   this Exhibit P show the same truck and trailer?  And Mr. Odahl

14   answered that is correct, yes, like I said.

15         Well, if this is the same truck and trailer, if this

16   is the same truck and trailer, how is it that there's no

17   record of this trailer being used on October 13th, 2009?

18   That's the date that Mr. Mayo used it.  There's no dispute

19   that that's the date that Mr. Mayo used it.

20         How is it that this same truck and trailer was driven

21   twice by Edison Mayo on October 14th?  We thought it was

22   wrecked and damaged on the 13th.  How was it that he drove it

23   again twice on the 15th, and that Edison and Kevin both drove

24   it on the 16th?  That doesn't make any sense.

25         And I want you to question the accuracy and the

1   truthfulness of this exhibit because this is not some report

2   that was kept in the normal course of business of the

3   bakery -- of the company.  This is something that they

4   prepared for this case to show to you to try and prove that

5   there was no problem with the brakes.

6         Now we get into the issue of mechanical problems with

7   the trailer.  We've talked about it and talked about it and

8   talked about it.  And the question became for Sean Odahl,

9   according to his testimony, there was no mechanical problem

10  with this trailer, it couldn't have been a mechanical problem.

11        But the sole basis for him concluding that it could

12  not have been a mechanical problem was because that's what

13  Elwood Lindsay told him.  Elwood Lindsay went out there and

14  said -- looked at the brakes and said this trailer is fine,

15  don't worry about this trailer.

16        So Sean Odahl writes in his report, his supervisor's

17  incident/accident report, Mr. Lindsay did not find any

18  mechanical problems with the trailer.

19        He was asked where did you get this information in the

20  second paragraph about there being no problem with the

21  mechanics of the trailer?  And he said from Elwood Lindsay.

22        So then it's up to us to look at what Elwood Lindsay

23  told him.  If the basis for his decision that there was no

24  mechanical problem with the trailer is what Elwood told him,

25  what is it that Elwood told him?  And we have that, too.

1   Because this is another exhibit that's going to be back in the

2   jury room.  This is Elwood's report dated October 15th, 2009,

3   two days after the incident.

4         Now, you would expect this report to talk about the

5   brakes, the trailer, the wet conditions, the wheels, the road,

6   the cables, something about the incident of October 13th.  But

7   it doesn't open up with that.  It opens up with a history of

8   Edison Mayo and all the problems Edison Mayo has had.

9         The driver complained.  The driver got mad and told

10  Sean something.  Other drivers have told me that this driver

11  is a problem and that he's done other things wrong at the

12  shop.  This is the same driver who won't do something else

13  that I asked him to do because he couldn't learn to do his

14  job.

15        Does this sound like someone who's talking about an

16  incident that occurred two days before, or does this sound

17  like a hatchet job to you, like someone who is deliberately

18  going out of his way to try and get someone fired?

19        He concludes, I know, I refuse to talk about the truck

20  and trailer incident.  That's the whole purpose of this

21  report.  It's two days after this truck and trailer incident.

22  He says I refuse to talk about it except that, you know, the

23  brakes, we adjusted those as part of this BIT inspection.

24  Another key point.  When were the brakes adjusted?  When were

25  the brakes repaired?  That's going to be something that we're

1    going to move on to next.

2         But this is just -- this is just Elwood Lindsay

3    spouting about all the things that he thinks are wrong with

4    Edison Mayo.  On that basis, Sean Odahl concludes there was no

5    mechanical problem.  Mr. Mayo is fired.

6         You remember I asked Sean Odahl about what kind of

7    brakes -- what kind of work had been done on this trailer.

8    And his response was there was nothing done on the preceding

9    month.  We have to do a 90-day inspection as part of this BIT

10   inspection for regulations, and everything was fine.  And

11   nobody else complained about it, specifically Kevin Christian.

12        And then I asked Elwood Lindsay about what he did with

13   the brakes.  You'll recall that testimony.  We established

14   that if there was a problem with the brakes, it would have

15   been Elwood Lindsay's responsibility to fix them.  We

16   established -- I asked him, How often did you inspect this

17   trailer?  He said about every three months.  I said, Do you

18   recall any recurring issues with the trailer?  He said no.

19        I asked him about the history of the trailer.  He

20   said, you know, I got it from this -- from this recycling

21   yard, and it was out of service for a few months, but then it

22   was fine.

23        You know, we got this trailer for one purpose and one

24   purpose only, one customer and one customer only -- that's the

25   Cottage Bakery route that we have been talking about -- and it

1    was the only one we had.

2           I asked him if Edison ever came directly to him and

3    said, look, I'm having problems with this trailer, can you

4    please help me fix it?  He said, no, Edison never came to me

5    for anything.

6           I said -- I asked him did Mr. Odahl ever come to you

7    and say, look, I spoke with Edison, there's trouble with the

8    trailer, can you please get the trailer fixed?  He said no,

9    nothing like that.  Nothing at all wrong with this trailer

10   according to Elwood Lindsay.

11          And then you remember I put some receipts in front of

12   him.  And the receipts had his signature on them, they had his

13   handwriting on them, and they said this is for the new

14   trailer.  And I asked him, well, is it a new trailer?  He

15   says, well, this is the used trailer that we were talking

16   about.

17          And I said, so, you know, were you still buying parts

18   for this thing leading right up to the accident?  His

19   response, I was buying parts the whole time.

20          And so I asked him, So you were still doing work on

21   the trailer, right?  He said, Yes, I did work on the trailer

22   all the time.  He directly contradicted his own testimony that

23   no work was done on the trailer for approximately 90 days.

24          How often did you work on this trailer?  Was it all

25   the time?  Because it was the only trailer for this job, I

1    looked at that trailer every -- I'd say every week at least.

2          So just to recap where we are right now, we have Sean

3    Odahl admitting that he was aware of issues between Elwood

4    Lindsay and Edison Mayo.  He admitted that he didn't document

5    or investigate anything or take any statements because that

6    was how he operated.  That was the way he did business.

7    That's how I work.  And he admitted that his conclusion that

8    there was nothing wrong with that trailer was based on what

9    Elwood Lindsay told him.

10          So then you're left with why did you fire Edison Mayo?

11   Well, because there was nothing mechanically wrong with that

12   trailer.  And how did you arrive at that conclusion?  Well,

13   because Elwood Lindsay told me there was nothing mechanically

14   wrong with that trailer.

15          Then consider that you've got this document that looks

16   very official, but is really not.  No one told you, yes, I

17   generated these documents.  No one told you, yes, I prepare

18   these in the course of my business.  No one told you any of

19   that.  They just said, look, it's the same truck and trailer,

20   and this other driver uses it just as much as Edison and

21   doesn't complain.  Well, we've talked about this document.  It

22   has some serious factual problems with this document and the

23   way it's set up.

24          You know, you throw also in that Sean Odahl said he

25   didn't know that there was any work being done on the trailer.

1   He said as far as he was concerned, 90 days, no work on the

2   trailer.  So what should that tell you?  That should tell you

3   that Sean Odahl didn't know what Elwood Lindsay was doing on

4   that trailer.  Elwood Lindsay was working on it every week.

5   He was ordering parts for it all the time.  The trailer was a

6   broken down piece of junk is the only way to characterize it.

7        We heard Edison Mayo talk about the controls didn't

8   work, the brakes didn't work, the box couldn't be lifted onto

9   the back of the trailer, it was rusted out, it had bad tires.

10  All these things were wrong with this trailer.  Sean Odahl

11  found there was no mechanical problem with the trailer, and

12  yet Sean Odahl didn't know that Elwood Lindsay was tinkering

13  on this trailer every week on a weekly basis.

14       Incidentally, Sean Odahl also included in his report

15  that Mr. Mayo was traveling approximately 20 to 25 miles an

16  hour.  But then on direct -- on cross-examination, he

17  admitted, well, I thought he was making a misrepresentation

18  about the speed.

19       Question:  So you believe that Mr. Mayo was making a

20  misrepresentation -- first, at the time of this report, did

21  you believe that Edison was making a misrepresentation about

22  the speed he was traveling?  Answer:  No.

23       Two questions later:  Okay.  After whether or not you

24  could slip a truck at 20 miles an hour, I asked him, So you

25  believe that he was making a misrepresentation about his

1   speed?  Answer:  Correct.

2           Then there was some testimony about the white drivers

3   and whether they had any injuries or accidents.  And one of

4   the white drivers was Ralph Lantz.  We heard from him.  And

5   the other white driver was Kevin Christian, and we heard from

6   him.  And when we talked to Sean Odahl he was asked

7   specifically by his attorney, Did Kevin Christian have any

8   accidents while you were the supervisor?  The answer, no, he

9   has not, no accidents involving damage to company property or

10  injury.

11          Well, this is Plaintiff's Exhibit 5.  You heard Edison

12  Mayo talk about this exhibit.  This is a document from San

13  Joaquin County small claims division.  Kevin Christian is the

14  defendant.  Payment made of eleven hundred dollars and 41

15  cents, $1,166.41.  Full and final settlement of damages to Mr.

16  Mayo's vehicle on July 28th, 2006, at Recycle to Conserve.

17          What was this lawsuit about?  Why does the defendant

18  owe plaintiff money?  The defendant damaged my car while it

19  was parked in the parking lot.  You remember that?  He dropped

20  a bin, a bin that they hold the dough, he dropped it, hit the

21  car, damaged the car.  This was after the accident policy, and

22  it caused property damage, so why didn't it count against

23  Kevin Christian under the accident policy?

24          I asked Sean Odahl about that.  His answer was

25  property damage was property damage.  It could be ours or it

1   could be a third party's.  Why didn't it count against Kevin

2   Christian?

3         Now, at the beginning of this trial, I told you that

4   it is always difficult to show that there is race

5   discrimination.  The law that we're dealing with is over 40

6   years old at this point, and we as a society have become very

7   good at masking or hiding our prejudices.  No one sends an

8   e-mail or writes a memo about the prejudice that they have

9   against other people.  Things are done verbally.  And so that

10  can be hard to prove when you're in a court of law because, as

11  you've seen the last week or so, we look at a lot of

12  documents.  We look at a lot of exhibits.

13        But I think you were able to discern from the

14  testimony that you heard that there was some bad blood between

15  Elwood Lindsay and Edison Mayo.  We had Elwood tell us that,

16  you know, he come out telling me my job.  You don't do that.

17  And you don't tell me what to change on the truck.

18        I asked him, Did you ever call Edison any names?

19  Answer:  Not that I remember.

20        These names that we have been talking about, you know,

21  coon, I don't even -- I don't even want to say them, you know,

22  lazy nigger.

23        Have you ever called him any ethnic or racial names at

24  all?  Not that I remember.  Don't you think he would have said

25  no if he didn't do it?

1          We all know that we can only be held to testify about

2     what we remember.  Well, not that I recall is an easy way of

3     saying I'm not going to say no to that because I don't want to

4     commit perjury, but I don't want to admit it either.  Not that

5     I remember.

6          So on this issue of bad blood, then, we had --

7     obviously we had Edison Mayo talk, and then we had Elwood

8     Lindsay talk, and then we had Joe Serpa talk.  Joe Serpa,

9     disinterested witness presumably.  He had a little bit of a

10    run-in with Elwood, that's not disputed.  He was let go in

11    November of 2009.  The reason given was that his salary was

12    too high.  He made 12.50 an hour.  We remember Joe Serpa.  No

13    interest in this case at all.  Just thought that things were

14    being done to Edison or that he was not getting a fair shake.

15         Joe Serpa testified about the words.  What kind of

16    comments would you hear Elwood say about Edison?  He was a

17    lazy "N" word.  Ah, coon.  Just he's no good, he's worthless,

18    he doesn't need to be here, so forth.

19         These are the things that Elwood Lindsay was saying

20    about and to Edison Mayo.  This is evidence of the bad blood

21    between those two.  Keep in mind, Elwood Lindsay is the reason

22    why it was decided there was no mechanical failure with that

23    trailer.

24         Joe Serpa testified about the frustration that Edison

25    Mayo was feeling, that he was going to his supervisor, he was

1    trying to correct these issues, and nothing was getting done.

2          He testified that he saw that other drivers were going

3    into the shop to get minor repairs done for little nicks or

4    bumpers going bad or little things like that that occurred in

5    the course of driving.  They would get their repairs done

6    quickly and be out the door.

7          And we, again, established there's only one

8    supervisor, there's only one general manager at this plant,

9    and it's Sean Odahl.  There was some talk about, well, if Sean

10   Odahl is not being responsive to your complaints, go higher.

11   But there was no one higher.  There was no one else there.

12         We talked a little bit about human resources.  They're

13   down in L.A.  The way that Edison Mayo contacted human

14   resources previously was he went to the secretary and said, I

15   need to talk with someone about a payroll issue I'm having.

16   The secretary connected him to human resources.  That was

17   years prior and had nothing to do with complaints of

18   discrimination or inappropriate conduct by a co-worker in the

19   workplace.

20         My point here is that you've got Edison telling you,

21   Edison Mayo telling you that there was this problem, this

22   inappropriate conduct in the workplace.  You've got Elwood

23   Lindsay admitting it to a degree.  You've got Sean Odahl

24   admitting that he came to -- that Edison came to him on

25   several occasions with problems related to Elwood Lindsay.

1              And then you've got Joe Serpa, who was just an

2      employee there at the time and really is as close to an

3      impartial witness as we're going to get in this case because

4      all the other witnesses were either on the plaintiff's side or

5      the defense side, employed by the defendant.  And he told us,

6      yeah, there was problems.  There was bad blood between those

7      guys.  There was racial stuff going on in the workplace.

8              Joe also talked about the trailer and the problems

9      with the trailer.

10             So you're going to be asked a couple of questions, and

11     the first is going to be whether race played a role in the

12     firing, and that's what we have been talking about this entire

13     time.  The second question you're going to be asked is

14     whether -- even if race didn't play a role in the termination,

15     whether Recycle to Conserve, Incorporated, still would have

16     terminated Mr. Mayo anyway.  That's question two essentially.

17             And what I want to point out to you is that the basis

18     for the termination, as we have been talking about this entire

19     morning, is that there was no mechanical problem with the

20     trailer.  The trailer was never checked out, the trailer was

21     never investigated, there was never any look at the brakes,

22     but they determined there was no mechanical problem with the

23     trailer.  How did they determine that?  Because of what Elwood

24     told them.  But that was the basis for the termination.

25             So my question would be, if there was a mechanical

1    problem with the trailer, clearly you wouldn't have terminated

2    Edison Mayo, right?  Because that was the whole basis for

3    their termination.  So even if you try to take race out of the

4    equation, you're still left with the only reason they fired

5    him is because of what the racist guy told him about Edison

6    Mayo and all the things that he said in that two-page report

7    going back to August of that year.

8         You know, I don't think that Sean Odahl is a racist

9    guy.  I don't think that he deliberately set Edison Mayo up to

10   get fired.  And I don't think he had anything against Edison

11   Mayo or anybody at his job.  To me Sean Odahl seemed like a

12   pretty straightforward guy.

13        But the thing that we heard repeatedly from the

14   witnesses in this case was that he was an office guy.  He

15   didn't much try to get involved with some of the problems that

16   the employees were having.  We heard Elwood Lindsay say, you

17   know, he's an office guy.  He doesn't know what's going on in

18   my shop.  The shop is my area.  He stays up front, deals with

19   the numbers.

20        We heard Sean Odahl tell us himself that he was

21   brought in to make the company more profitable from the Los

22   Angeles office.  We heard Joe Serpa say, well, you know, my

23   feeling was he wasn't going to do anything about any

24   complaints, you might as well just shred them, nothing gets

25   sent to corporate.  And he's a numbers guy, he's there for

1    that reason.

2            So I think what you had happen is you had this culture

3    of truck drivers, and there was inappropriate conduct in the

4    workplace, but Sean Odahl, for whatever reason, just didn't

5    want to address it.  He was notified of it, several employees

6    came to him and said there was an issue, but for whatever

7    reason he was focused on the profitability of the company.

8    And there's nothing wrong with focusing on the profitability

9    of a company, but you also need to -- as the general manager,

10   as the only supervisor, you also need to turn your attention

11   to your people when there is an allegation or there's evidence

12   of improper conduct in the workplace.

13           Now, at the conclusion of the jury verdict form,

14   you're going to be asked a question that if you found that

15   there was race as a factor, and if you found that there was no

16   way they could have terminated him absent this racial factor,

17   those two first questions, the third question says, okay, what

18   kind of damages are going to be involved here?

19           In a criminal case, if the defendant is found guilty,

20   he's sentenced to jail time.  But in a civil case, if you

21   found the defendant liable, then the penalty is damages, it's

22   not jail time.

23           And so you're going to be asked for two categories of

24   damages.  The first is called compensatory damages.  Now these

25   are, generally speaking, damages to make the plaintiff whole

1    again, to compensate him for having to deal with this case,

2    for having to be out of work, for having to bring a lawsuit in

3    federal court, for having to do all of the things that go with

4    the problems of being involved in a lawsuit.  It's stressful.

5    And this lawsuit has been going on for two years now.

6         So I talked to Mr. Mayo, and we would submit to you

7    that, if you are inclined to award compensatory damages to Mr.

8    Mayo, you consider these factors.

9         THE COURT:  No, you don't.  You can't consider wages.

10   We've talked about that.

11        MR. BOLANOS:  I'm asking them to calculate

12   compensatory damages using his wages as a baseline.

13        THE COURT:  I suppose you can get away with that.  Go

14   ahead.

15        MR. BOLANOS:  Mr. Mayo does not want to or seek a

16   windfall from this case.  He doesn't want to say that the

17   mental stress was so burdensome for him that he should be

18   entitled to what would essentially be like winning the

19   lottery.  Sometimes we see some of these outrageous civil

20   judgments that are in the millions of dollars.  That's not

21   what we're looking for here.

22        What Mr. Mayo is saying is that he did have a

23   substantial problem after this incident took place, and he

24   would just like to be compensated for the trouble that he went

25   through.  The trouble that he went through was essentially

1    this.

2              He made nineteen an hour at Recycle to Conserve.  He

3    was out of work for six months.  Nineteen an hour times 40

4    hours a week is seven sixty.  Seven sixty times four, that's

5    3,000 bucks a month.  $3,000 a month times six months he was

6    out of work, $18,000.

7              Then he got another job at Cherokee Truck Lines, but

8    he made substantially less at Cherokee, he made fourteen an

9    hour, and he still works there now.  So same analysis.

10   Fourteen an hour times 40 hours a week is approximately $500.

11   $500 times four weeks is approximately $2,200 a month, which

12   comes out to, per year, $26,880.

13             Now you'll see I also did the analysis at the Recycle

14   to Conserve wage times a year.  He made 36,000 a year.  So he

15   essentially made 36,000 at Recycle to Conserve and twenty-six

16   at Cherokee.  So it's about a $10,000 difference.

17             So our request to you would be the loss of $18,000

18   over six months --

19             THE COURT:  I just can't let you -- I'm sorry.  I

20   cannot let you make this argument.

21             MR. BOLANOS:  All right.

22             THE COURT:  The law is, Ladies and Gentlemen, that you

23   may not award any damages for lost wages.  If you decide

24   liability, it will be for the Court to determine how much, if

25   any, to award the plaintiff for his lost wages.  You may only

1    award compensatory damages for the emotional distress.  You

2    may not award damages for lost wages.

3         I just can't let you make that argument, Mr. Bolanos.

4    I'm sorry.

5         MR. BOLANOS:  All right.  Then let me phrase it a

6    different way.

7         The compensatory damages Mr. Mayo requests for his

8    pain and suffering, for his emotional distress, for the mental

9    anguish of going through this process is $34,000.

10        Now, on the issue of punitive damages, punitive

11   damages are a second category of damages that deal with

12   punishing a defendant.  You're going to be asked if the

13   defendant acted in willful disregard for a federally protected

14   right or deliberately turned a blind eye or was indifferent to

15   a federally protected right.  And I would submit to you that

16   some of Mr. Odahl's conduct in failing to take any action at

17   all and just really not taking any action to correct what was

18   inappropriate conduct in the workplace could constitute a

19   deliberate indifference to the occurrence of that conduct.

20        And so you're going to be asked to determine what, if

21   any, punitive damages, which are to -- essentially to punish

22   or deter an employer from doing this kind of thing again.  You

23   know, you want the employer to say or the defendant to say,

24   look, we need to do something differently so that this kind of

25   stuff doesn't happen again.  And unfortunately, you know, in

1   our world, in a profit-driven world, in a corporate-driven

2   world, that sort of incentive only comes with having to write

3   a check.  Companies don't listen to anything besides that.

4          Now, the way I've seen punitive damages computed is as

5   follows, and here's what I would submit to you.

6          If you want to consider punitive damages, I would put

7   it at three tiers.  I would say, if the level of culpability

8   is low, we don't want to punish them too much, just consider

9   half of the compensatory damages, whatever you award.  If you

10  want to say it's sort of in the middle range of culpability,

11  consider an amount equal to the compensatory damages award.

12  And then if you believe that there is an egregious need for

13  punitive damages, you would want to double the compensatory

14  damages award.  Those are your three -- low, medium and

15  high -- if you're inclined to award punitive damages.  And

16  that's completely up to you.

17         I will tell you that any award of ten times or greater

18  compensatory damages is not going to work.  It's going to get

19  thrown out by the Court.  They're going to say it's too much.

20  So limit your -- if you do award punitive damages, keep that

21  limit in mind.

22         Otherwise, I would thank you again for your jury

23  service, and we appreciate your time.

24         THE COURT:  All right.  Ms. Kennaday, would you rather

25  have a break or would you rather start right now and then we

1    can break when you decide that you would like to ask me to do

2    that?

3            MS. KENNADAY:  Well, Your Honor, if we could take a

4    break right now, then I can finish up probably in about 35

5    minutes.

6            THE COURT:  All right.  We'll take a 10-minute recess.

7    Ladies and Gentlemen, remember the admonition.

8            (Recess taken.)

9                (End of requested proceedings.)

10                      ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2           I certify that the foregoing is a correct partial

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6
                              /s/ Kathy L. Swinhart
7                             KATHY L. SWINHART, CSR #10150

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25